# In The
# United States District Court
## for the
## District of Maryland

CHARLES G. MENK III

███████████████

Civil Action #

DAVID AMARAL

████████████████████

TAMRAT ASFAW

██████████████
████████████

HUGO BADILLO

███████████████

SCOTT BAGER

████████████████

MICHAEL BATE

████████████████

SALLY C. BERG

████████████████

JEFFREY BLAKE

███████████████

1

██████████████

PAUL BOIN

████████████████████

JASON BROOKS

███████████████

ALBERT CASTILLO

████████████████

JOSEPH CONNERY

██████████████████

AUSTIN COOK

███████████████

RUSSELL SCOTT CRABTREE

█████████████████

CLARICE CROSS-DAWKINS

████████████████

CHRISTOPHER DALTON

███████████████

JOHN DAVIS

███████████████

███████████████

DALE DELISLE

████████████████████

VINCENT DIGIOIA

███████████████████

DAN ELLIS

████████████████████

JORDAN ESTRADA

██████████████████

JEANNE FANDOZZI

████████████████████

BRIAN FREEMAN

██████████████████

GARY FRICK

████████████████████

GLORIA GEORGE

██████████████████

CHRISTOPHER GRIECO

██████████████

3

████████████████

PAMELA GUENSCH,
In Her Capacity as Personal Representative
Of the ESTATE OF CRAIG GUENSCH,

████████████████████

W. GORDON HADYK

██████████████████████

HEATHER HARRIS-AGUIRRE

████████████████

JAMES BRIAN HOBBS

██████████████████

JONATHAN JACOBY

██████████████████

KIMBERLY JARVI

████████████████

ERIK JOHNSON

██████████████

EDWIN KEMON

████████████████

TIMOTHY KENDALL

JOSHUA KIIHNE

JERRY KIM

JASON KOLLIGS

AARON KUHN

ANDREA A. KUNZ

MARIE MERRICK

KEVIN MILLER

LYNNE MILLER

BARBARA MONTELLA

MICHELLE NEFF

NICOLE PARRISH

CASSAUNDRA J. PELLERIN

CONNIE K. PENG

MARK PIZZOLATTO

ELIZABETH RAHM

MICHELLE ROGERS

BARBARA SACHER

SHARHONDA SCARBROUGH

JENNIFER SCHWARTZ

MICHAEL SILVER

JOSHUA SINGH

CAROL SPOONER

SUSANNE STIEBER

CECILIA TACKETT

FRANCIS B. TAVENNER, JR.

CALEB WAN

ELLEN WARD

BRANDON WERNER

ERIN WHEELER

GREGORY M. WHITTAKER

DALE WICKIZER

NORMAN WORRELL

JOSEF ZAPLETAL

and

AMANDA ZHENG

  *Plaintiffs,*

vs.

THE MITRE CORPORATION
**300 Sentinel Drive**
**Suite 500 & 600**
**Annapolis, MD 20710**

     Resident Agent:
     THE CORPORATION TRUST, INC.
     2405 York Road, Suite 201
     Lutherville-Timonium, MD 21093-2264,

     *Defendant.*

-o0o-
**COMPLAINT**
(Jury Trial Requested)

     Plaintiffs, CHARLES MENK, DAVID AMARAL, TAMRAT ASFAW, HUGO BADILLO, SCOTT BAGER, MICHAEL BATE, SALLY C. BERG, JEFFREY BLAKE, PAUL BOIN, JASON BROOKS, ALBERT CASTILLO, JOSEPH CONNERY, AUSTIN COOK, RUSSELL SCOTT CRABTREE, CLARICE CROSS-DAWKINS, CHRISTOPHER DALTON, JOHN DAVIS, DALE DELISLE, VINCE DIGIOIA, DAN ELLIS, JORDAN ESTRADA, JEANNE FANDOZZI, BRIAN FREEMAN, GARY FRICK, GLORIA GEORGE, CHRISTOPHER GRIECO, PAMELA GUENSCH, , in her capacity as Personal Representative of the ESTATE OF CRAIG GUENSCH,   W. GORDON HADYK, HEATHER HARRIS-AGUIRRE, JAMES BRIAN HOBBS, JONATHAN

JACOBY, KIMBERLY JARVIS, ERIK JOHNSON, EDWIN KEMON, TIMOTHY KENDALL, JOSHUA KIIHNE, JERRY KIM, JASON KOLLIGS, AARON KUHN, ANDREA A. KUNZ, MARIE MERRICK, KEVIN MILLER, LYNNE MILLER, BARBARA MONTELLA, MICHELLE NEFF, NICOLE PARRISH, CASSAUNDRA J. PELLERIN, CONNIE K. PENG, MARK PIZZOLATTO, ELIZABETH RAHM, MICHELLE ROGERS, BARBARA SACHER, SHARHONDA SCARBROUGH, JENNIFER SCHWARTZ, MICHAEL SILVER, JOSHUA SINGH, CAROL SPOONER, SUSANNE STIEBER, CECILIA TACKETT, FRANCIS B. TAVENNER, JR., CALEB WAN, ELLEN WARD, BRANDON WERNER, ERIN WHEELER, GREGORY M. WHITTAKER, DALE WICKIZER, NORMAN WORRELL, JOSEF ZAPLETAL, and AMANDA ZHENG, by and through their attorneys, Francis J. Collins and Kahn, Smith and Collins, P.A., here by sue Defendant THE MITRE CORPORATION (hereinafter "MITRE"), and, in support thereof, state as follows:

## I. INTRODUCTION

1.      This is a case related to the termination of a large group of employees of MITRE because the employees refused to comply with a COVID-19 vaccine mandate.

2.      Plaintiffs were employees of MITRE.  Most of the Plaintiffs were long-term employees with excellent credentials and job performance.  In October 2021,

MITRE instituted a company-wide vaccine mandate, requiring Plaintiffs to submit proof of vaccination against COVID-19 as a condition of their employment or an approved medical or religious exemption.  MITRE purported to implement its mandate in response to Exec. Order No. 14042, 86 Fed. Reg. 50985 (Sept. 9, 2021) (EO 14042).  EO 14042 purported to compel certain federal contractor employees to be vaccinated against COVID-19 by January 18, 2022. Under the terms of its mandate, MITRE required Plaintiffs to submit proof of vaccination, or of an exemption granted by MITRE as a reasonable accommodation of religion or disability, on or before November 22, 2021.  MITRE was one of the first employers to impose a vaccine mandate and one of the few that carried out the mandate by terminating a large group of employees.  Most employers at the time opted for using a carrot, rather than a stick.  Before the deadline contained in EO 14042 the Courts had imposed injunctions against enforcement of vaccine mandates for employees who held jobs similar to the Plaintiffs.

3.     During the fall of 2021, many Plaintiffs applied for exemptions to the MITRE mandate, seeking reasonable accommodations of their religious practices or observances or their medical conditions. MITRE refused to grant exemptions to any of the Plaintiffs. In implementing and enforcing its mandate, MITRE subjected all Plaintiffs to unlawful medical inquiries and examinations under the ADA. MITRE also violated Plaintiffs' rights under the Procurement Act, the Free Exercise Clause

of the First Amendment, and the Due Process Clause of the Fifth Amendment and Fourteenth Amendment and otherwise violated Plaintiffs' statutory and constitutional rights.

## II. JURISDICTION

4.     Plaintiffs have fulfilled the jurisdictional requirements of Title VII and the ADA, by filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and receiving Right to Sue letters from EEOC, in compliance with 42 U.S.C. § 2000e-5(f)(1) and §12117(a).

5.     MITRE is subject to the provisions of Title VII and the ADA, as it employs more than fifteen employees under 42 U.S.C. § 2000e(b) and 42 U.S.C. § 12111(5)(A).

6.     This Court has original subject matter jurisdiction over this action, as the claims therein arise under the Constitution and the laws of the United States, pursuant to 28 U.S.C. § 1331.  This Court has personal jurisdiction over MITRE, as MITRE transacts business and contracts to supply services in the District of Maryland, in keeping with Fed. Rule Civ. Pro. 4(k)(1)(A) and Md. Code § 6-103(b)(1) and (2), and as the exercise of this Court's jurisdiction in this case would comport with the due process requirement of the Fourteenth Amendment of the United States Constitution. *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).

7.     MITRE has at least seven separate business locations in the State of Maryland, not including the various locations of employees who continue to work remotely for MITRE within the State of Maryland.  Although some of the Plaintiffs worked outside the State of Maryland, all of the EEOC cases for the Plaintiffs were consolidated into the Baltimore office of the EEOC, which issued right to sue letters (attached).  Venue is proper in the District of Maryland under 28 U.S.C. § 1391(b)(2) and (3), because a substantial part of the events or omissions giving rise to this claim occurred in Maryland, and because MITRE is subject to this Court's personal jurisdiction with respect to this action.

### III. PARTIES

8.     Plaintiffs, whose names and addresses are listed in the caption and incorporated herein by reference, were at all relevant times employees of MITRE until they were fired, *en masse*, on or about November 22, 2021 (with minor exceptions noted below).

9.     MITRE is a large nonprofit organization, employing thousands of individuals across the country. MITRE operates federally funded research and development centers (FFRDCs) to assist the federal government with scientific research and analysis, development and acquisition, and systems engineering and integration.  It was established for the express purpose of advancing national security and to serve the public interest.

13

10.    Along with other FFRDCs, MITRE operates the federal government's Health FFRDC on behalf of sponsors across the Department of Health and Human Services. Through multi-disciplinary teams, this federally funded research and development center serves all federal agencies with health and human services missions: the Centers for Medicare & Medicaid Services, Centers for Disease Control and Prevention (CDC), Food and Drug Administration, National Institutes of Health (NIH), Health Resources and Services Administration, Administration for Children and Families.  As the Health FFRDC operator, MITRE maintains a close working relationship with and guides decision-making at the CDC.

11.    MITRE operates six FFRDCs.  The federal government pays MITRE billions of dollars each year to support its operation.  MITRE sees itself as a leader in public health and seeks federally funded research and development opportunities. As such, it stands in a direct conflict of interest when it recommends public health programs to the federal government and then benefits from those programs.  In the context of this case, that conflict of interest colored its decision-making.  MITRE was more interested in gaining recognition and currying favor with the current Executive Branch of the Federal Government than it was in protecting the interests of its employees.

## IV. FACTUAL ALLEGATIONS

### A. The Jobs of the Plaintiffs

14

12.     MITRE is a large nonprofit organization, employing thousands of individuals across the country. MITRE operates FFRDCs to assist the federal government with scientific research and analysis, development and acquisition, and systems engineering and integration. The federal government pays MITRE billions of dollars each year to support its operation.

13.     MITRE has been in business since at least the 1950s. During that time, it has had many worksites across the United States. When the COVID-19 pandemic was declared in and around March 2020, MITRE instituted a work-at-home policy for most of its employees. It was able to continue doing business in much the same way it had been doing prior to the pandemic. Many of its employees already worked full- or part-time from home even before the pandemic. Other employees worked at client sites, such as Department of Defense buildings, and continued to appear at those sites, employing the required masking, testing, and social distancing protocols. In short, MITRE was able to continue billing and performing its services for the federal government with little or no interruption.

14.     The physical requirements of the jobs of the Plaintiffs are largely limited to computer work. Most of the Plaintiffs are highly educated individuals with advanced degrees, earning well over $100,000 per year. Many have Ph.Ds. and/or master's degrees and many have rare and specialized knowledge, education, experience, and skill sets. Generally, their work can be accomplished while sitting

in front of a computer screen where they can be socially distanced from others and wear facial masks.  Plaintiffs were willing and able to engage in measures understood to ameliorate the risk of spreading COVID-19 such as working from home, wearing masks, social distancing, and undergoing frequent COVID-19 testing.  Their jobs generally could be performed away from other people.  Plaintiffs rarely, if ever, engaged in meetings with the general public and all of their meetings with co-workers and the client's workers could be done either remotely or while utilizing the above-described disease prevention techniques.

15.    Many of the Plaintiffs contracted the COVID-19 disease and therefore acquired  "natural immunity."  Nonetheless, MITRE treated all employees the same – regardless of their status as naturally immune or not.  In October 2021 and into November 2021, MITRE required all employees to become "fully vaccinated" regardless of the employee's status as having disease acquired immunity or not. MITRE failed to consider the individual impact of vaccination on individual employees such as the employee's risk profile and/or the employee's likelihood of transmission based on the employee having natural immunity.

## B. MITRE'S Vaccine Mandate

16.    On September 9, 2021, President Joseph R. Biden, Jr., issued Exec. Order No. 14042 (EO 14042), purporting to require all federal government contractor employees and direct work subcontractors to be fully vaccinated against

the COVID-19 virus, except in the limited circumstances in which an employee was entitled to a religious or medical exemption.

17.     On October 11, 2021, MITRE CEO Jason Providakes announced, on his weekly video call with all staff, that MITRE would adopt a mandatory vaccination policy for all its employees as a condition of employment, effective on or about November 22, 2021.   Mr. Providakes contended at that time that the company mandate was in response to the executive order.   When discussing religious and medical exemptions, Mr. Providakes called them "two very limited circumstances" and required employees who had already submitted exemption requests to resubmit so that they may be put through a "rigorous process."

18.     Later that day, Mr. Providakes and Kathleen Federico, Senior Vice President, emailed MITRE's staff further outlining the new vaccination policy. Under that policy, vaccinated employees were required to upload proof of their vaccination into MITRE's Workday platform between October 25, 2021, and November 15, 2021. The policy was updated to require unvaccinated employees to upload proof of vaccination no later than November 22, 2021. The updated policy further required that employees seeking an exemption from the mandate because of a documented medical condition, disability, or sincerely held religious belief submit a request for reasonable accommodation no later than October 22, 2021. If MITRE granted an employee reasonable accommodation, the employee could submit proof

thereof to Workday to fulfill the requirements of the new policy.

19.      At the time MITRE announced its vaccine mandate, EO 14042 had a deadline of Dec. 8, 2021.  On Nov. 8, 2021, the EO 14042 deadline was extended to Jan. 4, 2022.  Despite this, MITRE did not update its deadline for vaccination and still terminated its unvaccinated employees who were not granted an exemption in November 2021, roughly six weeks before the updated deadline.  As noted above, prior to that deadline, several courts had issued injunctions halting vaccine mandates for employees who held jobs similar to Plaintiffs.

### C. CEO Jason Providakes' Public Statements

20.      Mr. Providakes made statements disparaging employees who objected to the vaccine mandate. In the October 11, 2021, video call, Mr. Providakes stated that he could "live with" the outcome, if MITRE lost 10 percent of its employees due to noncompliance with its vaccine requirement.

21.      On October 18, 2021, in another weekly call with staff, Mr. Providakes made statements discouraging employees from seeking exemptions to the vaccine mandate. With respect to medical exemptions, Mr. Providakes stated, "cautionary note … there is a very narrow window for that." With respect to religious exemptions, Mr. Providakes stated, "If your religion does not have a vaccination [sic], that says don't do vaccinations, it can be very hard to put together a case. You can't just wake up in the morning and decide the religious conviction that you

automatically get an exemption, so there's a high bar to process that goes through [sic] regarding a firm belief on that." Referring to MITRE's duty to accommodate, Mr. Providakes stated, "…And once those two things are done, and you do get an exemption, it's something called reasonable accommodation. Be clear on what a reasonable accommodation means. It means you're not coming into the MITRE space. It means you'll be assigned work appropriate with what you can do remotely, at home, which is really important for that one. Your role may change as well. That's what reasonable accommodation, quote, means for a private company and a private employer."

22.     In these October 18, 2021, statements, Mr. Providakes mischaracterized employees' protections under Title VII and the ADA and MITRE's obligation to provide reasonable accommodations. Mr. Providakes also indicated to employees that any requests for reasonable accommodation would be futile. Mr. Providakes further suggested that MITRE would retaliate against any employees who sought and obtained a reasonable accommodation.

23.     In all of Mr. Providakes' video addresses to staff, he displayed contempt for employees who objected to receiving the vaccine, speaking about them in a condescending tone.

24.     At no time did MITRE provide any significant level of transparency regarding its internal policies and procedures for employees to apply for exemptions

or about its internal policies and procedures for granting exemptions.  When it denied the exemptions to the Plaintiffs, MITRE failed to explain its reasoning and provided an unsigned denial letter that did not provide a right to appeal.

### D. Plaintiffs' Requests for Exemptions

**Religious Accommodations**

25.    Plaintiffs MENK, AMARAL, ASFAW, BADILLO, BAGER, BATE, BERG, BLAKE, BOIN, BROOKS, CASTILLO, CONNERY, COOK, CRABTREE, CROSS-DAWKINS, DALTON, DAVIS, DELISLE, DIGIOIA, ELLIS, ESTRADA, FANDOZZI, FREEMAN, FRICK, GEORGE, FRIECO, GUENSCH, HADYK, HARRIS-AGUIRRE, HOBBS, JACOBY JARVI, JOHNSON, KEMON, KENDALL, KIIHNE, KIM, KOLLIGS, KUHN, KUNZ, MERRICK, MILLER. KEVIN, MILLER. LYNNE, MONTELLA, NEFF, PARRISH, PELLERIN, PENG, PIZZOLATTO, RAHM, ROGERS, SACHER, SCARBROUGH, SCHWARTZ, SILVER, SINGH, SPOONER, STEIBER, TACKETT, TAVENNER, WAN, WARD, WERNER, WHEELER, WHITTAKER, WICKIZER, WORRELL, ZAPLETAL, and  ZHENG requested to be exempt from the vaccine mandate, as a reasonable accommodation of their sincerely held religious beliefs.

26.    Plaintiffs submitted their requests on forms provided by MITRE. Plaintiffs were willing to engage in disease mitigation measures such as masking,

social distancing, remote working, or such other measures requested by MITRE. They were not willing to submit to a COVID-19 vaccine but were willing to consider any other reasonable requests by MITRE.

27.     MITRE interviewed Plaintiffs over the phone after they submitted their written exemption requests. During those interviews, MITRE showed no inclination to provide Plaintiffs their requested accommodations and did not discuss alternative accommodations. MITRE did not accept that employees could have a sincere conscientious and religious objection to the vaccine.  In fact, however, at about that same time, MITRE was aware through media reports and its own investigations that around 20 percent of Catholics and other Christians were against the COVID-19 vaccination (*see* Yahoo! News, Nov. 8, 2021, https://www.yahoo.com/news/faith-covid-vaccine-religions-doctrinal-191640493.html).  Around the same time, it was reported that approximately 10% of Americans were of the view that the COVID-19 vaccines conflicted with their religious beliefs (*see* NPR, Dec.9, 2021, https://www.npr.org/2021/12/09/1062655300/survey-religion-vaccine-hesitancy-exemptions).

28.     Many religious objections to the COVID-19 vaccines centered on the role of human embryonic stem cell products used in the development and/or production of the vaccines.  The pharmaceutical industry's use of embryonic stem cells derived from aborted fetuses is a longstanding and widespread concern voiced

by religious adherents that predates the COVID-19 vaccines.  *See* e.g., Alvin Wong, *The Ethics of HEK 293*, Nat'l Catholic Bioethics Quarterly 473 (Autumn 2006).

29.    The cell lines sold under the trade names HEK 293 and PER.C6 are derived from the cells of human fetuses.  The vaccines available in October and November 2021 were developed and/or produced using those cell lines.  Many of the Plaintiffs objected specifically because, in their view, utilizing a product that was developed and/or produced using cell lines derived from aborted fetal tissue, even years after the tissue was obtained, is participation in, and encouragement of, evil.  Similar objections have been raised in the field of religious morality and bioethics to the use of information derived from Nazi medical experiments on Jewish prisoners during the Second World War and U.S. governmental research performed on African Americans at Tuskegee.  At the bottom of the debate is the extent to which the ends justify the means and the extent to which people are willing to use the evil acts of others to achieve a perceived positive outcome.  Regardless of the Court's view on these topics, one fact remains.  This is a debatable issue that involves differing views founded in ethics, religion, morality, and theology.

30.    When Plaintiffs filed for a religious exemption, MITRE did not start from the proposition that the employee's religious views were sincerely held unless there was objective evidence to prove otherwise, as required under Title VII.  *See*

*Dockery v. Maryville Acad.*, 379 F. Supp. 3d 704, 718 (N.D. Ill. 2019) (quoting EEOC Compliance Manual § 12–I.A.3).

31.     Instead, MITRE set out with a plan to undermine, question, dispute, and reject the stated objections articulated by its employees.  In nearly all cases, MITRE rejected the requested religious exemptions contending that the objections were not sincerely held.

32.     MITRE also engaged in adversarial interviews with the Plaintiffs.  It did not allow Plaintiffs to bring attorneys, religious leaders, or others to the interviews.  In the absence of objective evidence suggesting that the Plaintiffs were not sincere in their religious objections, such interviews should have been limited to an interactive process with Plaintiffs with the goal of finding possible accommodations.  MITRE used those interviews to interrogate Plaintiffs on the sincerity of their religious beliefs despite the fact that MITRE had no objective evidence the Plaintiffs' stated religious opposition to the vaccine mandate was not sincerely held.  As the Fifth Circuit explained, such inquiries by an employer are "bizarre" because under clear precedent an employer is required to take an employee "at their word regarding their own religious convictions." *Sambrano v. United Airlines*, 2022 WL 486610, fn 2, 21-11159 (5th Cir., 2/17/2022) (citations omitted). The mere fact that MITRE interviewed Plaintiffs without prior evidence of a lack of sincerity constitutes a violation of Title VII.

23

33.     On or around November 5, 2021, Plaintiffs received a letter from MITRE informing them that their requests to be exempt were denied. The letter provided no explanation as to why the requests were denied. At no other time, did MITRE explain the denial to Plaintiffs. MITRE did not allow Plaintiffs to appeal the decision.  It is believed, and therefore averred, that to the extent MITRE granted any religious exemption requests, it did so arbitrarily and, often, because the religion relied upon was not a mainstream religion with which MITRE was acquainted.

34.     Other Plaintiffs objected to the vaccine mandate for religious reasons but did not submit a request for reasonable accommodation. Plaintiffs JOHNSON, RAHM and KEMON did not submit a request because they correctly believed that MITRE would deny it no matter what. After the vaccine mandate was announced, Plaintiff BADILLO submitted questions about the reasonable accommodation process to MITRE via email, as he was considering asking for an exemption from the vaccine mandate. Because MITRE did not respond, further frustrating the required interactive process, Plaintiff Badillo never formally submitted the forms required by MITRE.

35.     Among other violations, the mere fact that MITRE interviewed Plaintiffs about their religious beliefs, without prior evidence of a lack of sincerity, constitutes a violation of Title VII.

**Medical Accommodations**

36.    Plaintiffs KENDALL, FANDOZZI, BAGER, GRIECO, and HARRIS-AGUIRRE requested to be exempt from the vaccine mandate, as a reasonable accommodation under the ADA.

37.    Plaintiffs submitted their requests on forms provided by MITRE. On the forms, Plaintiffs stated their requested reasonable accommodations. Plaintiffs also authorized their medical provider to release their information to MITRE in support of their requests.

38.    MITRE interviewed Plaintiffs over the phone after they submitted their requests. During those interviews, MITRE showed no inclination to provide Plaintiffs their requested accommodation and did not discuss alternative accommodations. Rather than engage in an interactive process with Plaintiffs, MITRE used those interviews to engage in a fishing expedition regarding the veracity of their medical conditions and the necessity of their requested accommodations.  The mere fact that MITRE interviewed Plaintiffs without prior evidence of a lack of sincerity constitutes a violation of the ADA.

39.    On or around November 5, 2021, Plaintiffs received a letter from MITRE informing them that their requests to be exempt were denied. The letter provided no explanation as to why the requests were denied. At no other time did

MITRE provide Plaintiffs with its reasoning. MITRE did not allow Plaintiffs to appeal the decision.

**Objections to the Vaccine Mandate on Personal Grounds**

40.     Plaintiffs MERRICK, CRABTREE, and CONNERY objected to the vaccine mandate for personal reasons, including protesting MITRE's violation of employee rights and condoning a hostile work environment toward unvaccinated employees.  The anti-retaliation provisions of 42 U.S.C. § 2000e-3(a) and 29 CFR § 1630.12(a) prohibit discrimination against any employee who has opposed unlawful practices.  Plaintiffs did not submit requests to be exempt from the vaccine due to their personal objections.

**E. Plaintiffs' Ability to Work Remotely as a Reasonable Accommodation**

41.     The fact that many of the Plaintiffs worked remotely demonstrates that MITRE could have accommodated them with ease.

42.     Since the advent of the COVID-19 crisis in March 2020, Plaintiffs, MENK, AMARAL, ASFAW, BADILLO, BAGER, BATE, BERG, BLAKE, BOIN, BROOKS, CASTILLO, CONNERY, COOK, CRABTREE, CROSS-DAWKINS, DALTON, DAVIS, DELISLE, DIGIOIA, ELLIS, ESTRADA, FANDOZZI, FREEMAN, FRICK, GEORGE, FRIECO, GUENSCH, HADYK, HARRIS-AGUIRRE, HOBBS, JACOBY JARVI, JOHNSON, KEMON, KENDALL, KIIHNE, KIM, KOLLIGS, KUHN, KUNZ, MERRICK, MILLER. KEVIN,

MILLER. LYNNE, MONTELLA, NEFF, PARRISH, PELLERIN, PENG,  RAHM, ROGERS, SACHER, SCARBROUGH, SILVER, SINGH, SPOONER, STEIBER, TAVENNER,  WAN,  WARD,  WERNER,  WHEELER,  WHITTAKER, WICKIZER, WORRELL, ZAPLETAL, and  ZHENG worked remotely, generally from their homes or off-site, on a full- or part-time basis.   PIZZOLATTO, SCHWARTZ and TACKETT were hired after March 2020 and worked remotely until their terminations.

43.    Many Plaintiffs also worked remotely or off-site before COVID-19, underscoring how a return to MITRE could easily be accomplished, even if the company returned to pre-COVID policies regarding in-person work. Prior to March 2020, Plaintiffs MENK, AMARAL, ASFAW. BADILLO, BAGER, BATE, BERGMERRICK, BOIN, BROOKS, CONNERY, CRABTREE, CROSS-DAWKINS, DALTON, DAVIS, DELISLE, DIGIOIA, ESTRADA, FANDOZZI, HARRIS-AGUIRRE, HOBBS, JACOBY, JARVI, JOHNSON, KEMON, KENDALL, K. MILLER, L. MILLER, MONTELLA, PELLERIN, PENG, SACHER, SCARBROUGH, SILVER, TAVENNER, WAN, WARD, WERNER, WHEELER, WHITTAKER, WICKIZER,  WORRELL, ZAPLETAL, and ZHENG worked remotely or off-site on a full- or part-time basis.

44.    MITRE could have easily accommodated the requests of Plaintiffs who already worked remotely by simply allowing them to continue to do so. As to in-

person Plaintiffs, MITRE could have accommodated them by allowing them to wear face masks, maintain social distancing, and submit to regular COVID-19 tests. These mitigation procedures had been in place for 20 months and MITRE was able to accomplish its goals.

### F. Plaintiffs' Involuntary Termination of Employment

45.     On or about November 22, 2021, MITRE terminated Plaintiffs MENK, AMARAL, BADILLO, BAGER, BATE, BERG, BLAKE, BOIN, BROOKS, CASTILLO, CONNERY, CRABTREE, CROSS-DAWKINS, DALTON, DAVIS, DELISLE, ELLIS, ESTRADA, FANDOZZI, FREEMAN, FRICK, GEORGE, FRIECO, GUENSCH, HADYK, HOBBS, JACOBY JARVI, JOHNSON, KEMON, KENDALL, KIIHNE, KIM, KOLLIGS, KUHN, KUNZ, MERRICK,  MILLER. LYNNE, MONTELLA, NEFF, PELLERIN, PENG, PIZZOLATTO, ROGERS, SACHER, SCARBROUGH, SCHWARTZ, SILVER, SINGH, SPOONER, STEIBER, TACKETT, TAVENNER, WAN, WARD, WERNER, WHEELER, WHITTAKER, WICKIZER, ZAPLETAL, and  ZHENG.  Plaintiffs GRIECO, HARRIS-AGUIRRE, ASFAW, and COOK resigned under duress in lieu of termination. Plaintiffs DIGIOIA, KEVIN MILLER, PARRISH, RAHM, and WORRELL retired under duress to avoid termination.  None of these Plaintiffs would have left their employment with MITRE at that time, but for the vaccine mandate.  These Plaintiffs should be considered constructively terminated.

28

46.    After their terminations, forced resignations or forced retirements, Plaintiffs unjustly suffered economic losses including, but not limited to loss of salary, employment benefits, pension benefits and other perquisites of employment. Many Plaintiffs were denied unemployment insurance benefits after being forced out of MITRE, despite Mr. Providakes saying that anyone terminated for refusing vaccination would **not** be terminated for cause.  Plaintiffs also suffered non-economic injuries such as mental pain and anguish, embarrassment, and humiliation.

47.    MITRE did not offer Plaintiffs leaves of absence, whether paid or unpaid.  At no time since terminating Plaintiffs has MITRE offered to reinstate Plaintiffs.

48.    Well before terminating Plaintiffs, MITRE was aware of the various legal challenges to vaccine mandates generally.  After the issuance of EO 14042, various suits were filed around the country.  Before the implementation date set in the EO, numerous Courts had found the order unenforceable for various reasons. Nonetheless, MITRE stayed committed to enforcing the mandate while most employers capitulated in the face of the legal challenges.  *See Louisiana v. Becerra*, 571 F. Supp. 3d 516 (W.D. La. 2021), *vacated and remanded*, No. 21-30734, 2022 WL 2116002 (5th Cir. June 13, 2022) (nationwide injunction ordered 11/30/2021); *Kentucky v. Biden*, 571 F. Supp. 3d 715 (E.D. Ky. 2021) (multistate injunction ordered 11/30/2021); *BST Holdings, L.L.C. v. Occupational Safety & Health Admin.,*

*United States Dep't of Labor*, 17 F.4th 604 (5th Cir. 2021) (Occupational Safety and Health Administration Emergency Temporary Standard stayed 11/12/2021); *Georgia v. Biden*, 574 F. Supp. 3d 1337 (S.D. Ga. 2021), *aff'd in part, vacated in part sub nom. Georgia v. President of the United States*, 46 F.4th 1283 (11th Cir. 2022) (nationwide injunction ordered 12/7/2021).

49.    On January 13, 2022, before the effective date of EO 14042, the Supreme Court issued its decision in *Nat'l Fed'n of Indep. Bus. V. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661  (2022).  In that case, the Supreme Court held that the President and the Executive Branch could not issue a vaccine mandate to private employers pursuant to its authority under the Occupational Safety and Health Act.

50.    Since before November 2021, MITRE was aware that vaccination was not the only means by which to mitigate and control the spread of COVID-19. Indeed, by that time, the effectiveness of the vaccines to limit the spread of the disease was largely debunked.  Although the science seemed to indicate, at that time, that vaccination may reduce a patient's symptoms from COVID-19, it was well known that the vaccines did not prevent the spread of the disease.  Thus, as of November 2021, MITRE was attempting to coerce employees into making a medical decision that was not intended to prevent the spread to others, but rather, was intended to reduce that employee's symptoms if he or she was to contract the disease.

This sort of cost-benefit analysis regarding a proposed medical procedure is not within the purview of an employer to make.  It is a medical decision that should, and legally, must, be left to the individual patient, after giving informed consent.  At no time did MITRE attempt to engage in informed consent and instead, it engaged in coercive threats.

### G.  MITRE's Malicious Intent

51.    It is a well-known fact at MITRE that the corporate leadership of the company has liberal-leaning tendencies and is anti-religious in its outlook.  As part of this outlook, the MITRE leadership began a process of pivoting away from defense projects and focusing on health and human service projects.  It also made public pronouncements regarding political events, encouraging employees to vote for the democrat candidate for president.  For example, in 2016, after the election of Donald Trump, the leadership of MITRE made public statements to its employees disparaging that outcome.   Similarly, shortly before the election of 2020, the leadership of MITRE made public comments to its employees intended to encourage them to vote for the democrat candidate for president.

52.    Prior to the summer of 2021, Plaintiffs carefully avoided bringing religious and political discussions into the workplace.  They performed their duties without regard for their own religious and political leanings.  As a result, MITRE was unaware of Plaintiffs' belief systems until that time.

31

53.     In the fall of 2021, MITRE demanded that all employees expose their religious and political leanings by either being vaccinated or by filing for a religious and/or medical exemption.  The mere act of filing for a religious exemption exposed Plaintiffs' religious views and, by implication, political views, to the scrutiny of MITRE management.  Before that time, MITRE had no way of learning the religious and/or political views of its employees.

54.     By forcing employees who opposed the vaccine to divulge that opposition, MITRE essentially "unmasked" its conservative religious employees in a way that left Plaintiffs vulnerable to judgment, ridicule, and isolation from their vaccinated coworkers.

55.     MITRE was aware that persons who opposed the vaccination mandate tended to hold conservative religious views.  MITRE knew that, if it issued a vaccination mandate and did not honor religious exemption requests, terminating employees for refusing the vaccination would have a disparate impact on employees holding conservative religious views.

56.     Armed with that knowledge, MITRE intentionally planned the mandatory vaccination policy with the conscious intention of eliminating employees with conservative religious views.  It undertook this plan with malice and/or reckless indifference to the federally protected rights of the employees holding those views.

**COUNT I**

32

## RELIGIOUS DISCRIMINATION
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
## (42 U.S.C. § 2000e *et seq.*)

57.    Plaintiffs incorporate by reference the allegations set forth in the Paragraphs above, and Count VI below, as if fully set forth herein.

58.    This Count is brought by Plaintiffs MENK, AMARAL, ASFAW, BADILLO, BAGER, BATE, BERG, BLAKE, BOIN, BROOKS, CASTILLO, COOK, CROSS-DAWKINS, DALTON, DAVIS, DELISLE, DIGIOIA, ELLIS, ESTRADA, FANDOZZI, FREEMAN, FRICK, GEORGE, GUENSCH, HADYK, HARRIS-AGUIRRE, HOBBS, JACOBY, JARVI, JOHNSON, KEMON, KENDALL, KIIHNE, KIM, KOLLIGS, KUHN, KEVIN MILLER, LYNNE MILLER, MONTELLA, NEFF, PARRISH, PELLERIN, PENG, PIZZOLATTO, RAHM, ROGERS, SACHER, SCARBROUGH, SCHWARTZ, SILVER, SINGH, SPOONER, STIEBER, TACKETT, TAVENNER, WAN, WARD, WERNER, WICKIZER, WHEELER, WHITTAKER, WORRELL, ZAPLETAL, and ZHENG.

59.    Each of the Plaintiffs were "employees" within the meaning of 42 U.S.C. § 2000e(f).

60.    MITRE is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

61.    Title VII of the Civil Rights Act provides that "[i]t shall be an unlawful employment practice for an employer … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because

of such individual's … religion." 42 U.S.C. § 2000e-2. Accordingly, an employer must "reasonably accommodate to an employee's or prospective employee's religious observance or practice," absent "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

62.     To establish a prima facie case of an employer's violation of the duty to reasonably accommodate an employee's religious observance or practice, an employee must prove "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *U.S. Equal Emp. Opportunity Comm'n v. Consol Energy, Inc.*, 860 F.3d 131, 141 (4th Cir. 2017) (quoting *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008)); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "If the employee establishes a prima facie case, the burden then shifts to the employer to show that it could not [reasonably] accommodate the plaintiff's religious needs without undue hardship." *Firestone Fibers & Textiles Co.*, 515 F.3d 307 at 312 (quoting *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1019 (4th Cir.1996)); *McDonnell Douglas*, 411 U.S. 792.

63.     Here, Plaintiffs had bona fide religious beliefs that conflicted with MITRE's COVID-19 vaccine mandate.

34

64.    Plaintiffs MENK, AMARAL, ASFAW, BAGER, BATE, BERG, BLAKE, BOIN, BROOKS, CASTILLO, COOK,CROSS-DAWKINS, DALTON, DAVIS, DELISLE,  DIGIOIA, GEORGE, GUENSCH, ELLIS, ESTRADA, FANDOZZI, FREEMAN, FRICK, HADYK, HARRIS-AGUIRRE, HOBBS, JACOBY, JARVI, KENDALL, KIIHNE, KIM,  KOLLIGS, KUHN,  KUNZ, KEVIN  MILLER, LYNNE  MILLER, MONTELLA, NEFF, PARRISH, PELLERIN, PENG, PIZZOLATTO, ROGERS, SACHER, SCARBROUGH, SCHWARTZ,  SILVER,  SINGH,  SPOONER,  STIEBER,  TACKETT, TAVENNER, WAN, WARD, WERNER, WHEELER, WHITTAKER, WICKIZER, WORRELL, ZAPLETAL, and ZHENG informed the employer of this belief in their requests for religious accommodations, which MITRE then denied.

65.    Plaintiffs JOHNSON, KEMON, and RAHM did not inform MITRE of their bona fide religious beliefs because they believed requesting religious accommodations to be futile, based on MITRE's open hostility toward those requesting religious accommodations. Title VII does not require plaintiffs "to engage in a futile gesture" to sustain their claims for discrimination.  *Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 366 (1977).  Plaintiff BADILLO submitted questions to MITRE about reasonable accommodations, intending to request one, but MITRE did not respond, in dereliction of its responsibility to engage in an interactive process.

35

66.     MITRE terminated Plaintiffs MENK, AMARAL, BADILLO, BAGER, BATE, BERG, BLAKE, BOIN, BROOKS, CASTILLO, CROSS-DAWKINS, DALTON, DAVIS, ELLIS, ESTRADA, FANDOZZI, FREEMAN, FRICK, GEORGE, GUENSCH, HADYK, HOBBS, JACOBY, JARVI, JOHNSON, KEMON, KENDALL, KIIHNE, KIM, KOLLIGS, KUHN, KUNZ,LYNNE MILLER, MONTELLA, NEFF, PELLERIN, PENG, PIZZOLATTO, SACHER, SCARBROUGH, SCHWARTZ, SILVER, SINGH, SPOONER, WAN, WARD, WICKIZER, WHEELER, ZAPLETAL, ZHENG, WHITTAKER, TAVENNER, STIEBER,  TACKETT, ROGERS, WERNER, and DELISLE for not complying with the vaccine mandate. Plaintiffs HARRIS-AGUIRRE, ASFAW, and COOK resigned under duress in lieu of discharge.  DIGIOIA, KEVIN MILLER, RAHM, PARRISH, and WORRELL retired under duress to avoid termination.   These Plaintiffs would not have left their employment with MITRE at that time, but for the vaccine mandate.

67.     As explained above, MITRE was prohibited from questioning the sincerity of an employee's religious beliefs unless it was in possession of objective evidence that called that sincerity into question.  At no time did MITRE have any objective evidence that Plaintiffs' stated objections were not sincerely held.  Despite that fact, MITRE insisted that employees be interviewed, without legal counsel, regarding the nature of their religious beliefs.  During those interviews, MITRE did

not engage in a good faith discussion about morality, theology, ethics, and/or conscience.  Instead, MITRE attempted to use those interviews to engage in a fishing expedition in search of contradictions, inconsistencies, illogical beliefs, and other reasons to contend that the Plaintiffs were not sincere.  Those interviews were unsuccessful in that regard because Plaintiffs' sincerity was true, but MITRE, nonetheless, imposed its view of morality, theology, ethics, and conscience, and rejected Plaintiffs' requested exemptions.

68.    Even if MITRE doubted the sincerity of Plaintiffs' religious beliefs, MITRE could have accommodated Plaintiffs without undue hardship by allowing them to work remotely, wear face masks, engage in social distancing, and/or undergo testing during any in-person duties. Most Plaintiffs worked remotely, at least part of the time, at the time of their separation, underscoring the ease with which MITRE could have accommodated them. As the EEOC explains, an employer must consider whether the employee "works in a solitary or group setting or has close contact with other employees or members of the public."   EEOC Compliance Manual on Religious Discrimination.  In this case, MITRE failed to consider those factors and, if it had, those factors would have dictated against a vaccine mandate for each of these Plaintiffs.

69.    In processing requests for religious accommodation, an employer should engage in an interactive process: "bilateral cooperation is appropriate in the

search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986) (internal citations and quotations omitted); *see also* U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2021-3, Section 12: Religious Discrimination (2021), https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination ("This typically involves the employer and employee mutually sharing information necessary to process the accommodation request. Employer-employee cooperation and flexibility are key to the search for a reasonable accommodation. If the accommodation solution is not immediately apparent, the employer should discuss the request with the employee to determine what accommodations might be effective"). During those interviews with Plaintiffs, MITRE failed to discuss the accommodations Plaintiffs were requesting nor any potential for undue hardship in granting those accommodations, and instead only focused on the sincerity of the Plaintiffs' exemption requests. Therefore, MITRE did not engage in an interactive process with Plaintiffs. Rather, it imposed its vaccine mandate as a *per se* rule.

## COUNT II
## DISABILITY DISCRIMINATION
## UNDER THE AMERICANS WITH DISABILITIES ACT
## (FAILURE TO ACCOMMODATE)
## (42 U.S.C. § 12101 *et seq.*)

70.     Plaintiffs incorporate by reference the allegations set forth in the Paragraphs above, as if fully set forth herein.

71.     This Count is brought by Plaintiffs KENDALL, FANDOZZI, GRIECO, and HARRIS-AGUIRRE. Each of the Plaintiffs was an "employee" of the MITRE within the meaning of 42 U.S.C. § 12111(4).

72.     MITRE is an "employer" within the meaning of 42 U.S.C. § 12111(5)(A).

73.     The Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") prohibits employers from discriminating "against a qualified individual on the basis of a disability." 42 U.S.C. § 12112(a).

74.     One form of discrimination prohibited by the ADA is failing to make "reasonable accommodations" for a disabled employee's "known physical or mental limitations," unless the employer "can demonstrate that the accommodation would impose an undue hardship" on its business. 42 U.S.C. § 12112(b)(5)(A).

75.     To show that an employer has failed to accommodate a plaintiff's disability, "the plaintiff must prove: (1) that she had a disability within the statutory meaning; (2) that the employer knew of her disability; (3) that a reasonable accommodation would permit her to perform the essential functions of the position; and (4) that the employer refused to make the accommodation." *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 959 (4th Cir. 2021), *cert. denied,* 142 S. Ct. 767

(2022) (citing *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013)). Nevertheless, "even if the plaintiff makes this showing, the employer can still defeat the failure-to-accommodate claim by demonstrating that the reasonable accommodations would impose an undue hardship." *Id.* (citing *US Airways, Inc. v. Barnett*, 535 U.S. 391, 395 (2002)).

76.    Plaintiffs claimed that they have a medical condition that prevented them from being vaccinated against COVID-19, as MITRE required. Plaintiffs requested, as reasonable accommodations, that MITRE exempt them from the vaccine mandate. Plaintiffs could have performed the essential function of their jobs with such an accommodation. Still, MITRE refused to grant them the accommodation.

77.    MITRE terminated Plaintiffs KENDALL and FANDOZZI for not complying with the vaccine mandate. Plaintiffs GRIECO and HARRIS-AGUIRRE were constructively discharged in that they resigned under duress in lieu of discharge.

78.    MITRE could have reasonably accommodated Plaintiffs by allowing them to work remotely, wear face masks, and/or undergo testing during any in-person duties. That MITRE cannot claim undue hardship is further underscored by the fact that most Plaintiffs worked remotely, at least part of the time, at the time of their separation.

79.     Under the ADA, "[an] employer must engage with the employee "in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Haschmann v. Time Warner Ent. Co.*, 151 F.3d 591, 601 (7th Cir. 1998); *see* also 29 C.F.R. § 1630.2(o)(3); 29 C.F.R. Pt. 1630, App. § 1630.9; U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2003-1, Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA (2002), https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada ("A request for reasonable accommodation is the first step in an informal, interactive process between the individual and the employer."). MITRE did not engage Plaintiffs in an interactive process.

### COUNT III
### DISABILITY DISCRIMINATION
### UNDER THE AMERICANS WITH DISABILITIES ACT
### (UNLAWFUL MEDICAL EXAMINATION OR INQUIRY)
### (42 U.S.C. § 12101 *et seq.*)

80.     Plaintiffs incorporate by reference the allegations set forth in the Paragraphs above, as if fully set forth herein.

81.     This count is common to all Plaintiffs.

82.     The ADA's prohibition on discrimination "include[s] medical examinations and inquiries." 42 U.S.C.A. § 12112(d)(1). MITRE's demand that employees disclose their medical and COVID-19 vaccination status constitutes a

medical examination or inquiry.  The ADA provides that employers "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability…, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A); 29 C.F.R. § 1630.13(b), 14(c).

83.    "Whether a medical inquiry is job-related and consistent with business necessity 'is an objective inquiry.'" *Coffey v. Norfolk S. Ry. Co.,* 23 F.4th 332, 339 (4th Cir. 2022) (quoting *Hannah P. v. Coats,* 916 F.3d 327, 339 (4th Cir. 2019)).  An employer must have an objectively reasonable basis to believe that the employee cannot carry out the employee's duties.  *Id.* at 336 (citation omitted).  "An employer's request for a medical examination is job-related and consistent with business necessity when: "(1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others." *Hannah P.*, 916 F.3d at 339 (quoting *Kroll v. White Lake Ambulance Auth.,* 763 F.3d 619, 623 (6th Cir. 2014)).  An employer must prove: (i) "that the asserted 'business necessity' is vital to the business," (ii) "that the examination ... genuinely serves the asserted business necessity," and (iii) "that the request is no broader or more intrusive than necessary."  *Blake v. Baltimore Cty., Md.,* 662 F. Supp. 2d 417, 422 (D. Md. 2009) (quoting *Conroy v. N.Y. State*

42

*Dep't of Corr. Serv.,* 333 F.3d 88, 97-98 (2d Cir. 2003); 42 U.S.C. §12112(d)(4); 29

C.F.R. §1630.14(b), 14(c).

84.   Here, MITRE made medical inquiries and required Plaintiffs to

undergo a medical examination when it mandated that they receive the COVID-19

vaccination as a condition of their employment. MITRE further made a medical

examination or inquiry when, in connection with its vaccine mandate, it inquired

into employees' vaccination status and required them to upload proof that they had

been vaccinated.

85.   Plaintiffs' ability to perform the essential functions of their jobs was

not impaired by their status as unvaccinated.  There was no objectively reasonable

basis for MITRE to believe that Plaintiffs were unable to carry out the essential

functions of their jobs.  Nearly all Plaintiffs worked at least partially remotely at the

time of their separation. Plaintiffs were willing to continue remote work, wear face

masks, socially distance, and/or submit to regular testing when in contact with others

as part of their job duties. With these precautions in place, they could safely perform

their job functions as they had been doing for the prior 20 months.

86.   COVID-19 is not an occupational hazard that has any particular

relationship to the job duties of the Plaintiffs.  Rather, it is a disease or medical

condition that arises as a result of living in the 21st century, not unlike other

communicable diseases such as the flu, the common cold, HIV, and leprosy.  As the

U.S. Supreme Court explains:

> That is not to say OSHA lacks authority to regulate occupation-specific
> risks related to COVID–19. Where the virus poses a special danger
> because of the particular features of an employee's job or workplace,
> targeted regulations are plainly permissible. We do not doubt, for
> example, that OSHA could regulate researchers who work with the
> COVID–19 virus. So too could OSHA regulate risks associated with
> working in particularly crowded or cramped environments. But the
> danger present in such workplaces differs in both degree and kind from
> the everyday risk of contracting COVID–19 that all face. OSHA's
> indiscriminate approach fails to account for this crucial distinction—
> between occupational risk and risk more generally—and accordingly
> the mandate takes on the character of a general public health measure,
> rather than an "*occupational* safety or health standard." 29 U.S.C. §
> 655(b) (emphasis added).

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.,*

142 S. Ct. 661, 665–66 (2022).  Due to the nature of Plaintiffs' jobs, they had no

greater chance of spreading COVID-19 than the general public.  Their job duties did

not bring them into contact with immune compromised medical patients, as might

be the case with nurses and doctors, or otherwise involve a higher risk of spreading

the disease than might exist in the general public.

87.    Plaintiffs did not pose a direct threat to the public or their co-workers.

In the context of reasonable accommodation, "[d]irect [t]hreat means a significant

risk of substantial harm to the health or safety of the individual or others that cannot

be eliminated or reduced by reasonable accommodation."  29 C.F.R. § 1630.2(r).

The determination … shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job" and "a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." *Id.* "In determining whether an individual would pose a direct threat, the factors to be considered include: (1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm." *Id.*

88.    MITRE allowed Plaintiffs to continue working from March 2020 until the date of termination.  At no point did MITRE inform Plaintiffs that they posed a direct threat to the public or their co-workers.  MITRE continued to bill the U.S. government for Plaintiffs' services during that time and found ways to mitigate against the threat posed by COVID-19, such as mask policies, social distancing, testing, and remote work.  Plaintiffs did not present a direct threat in failing to comply with MITRE's vaccine policies and MITRE certainly could have continued the mitigation measures it and many other employers had previously employed. MITRE bears the burden of proving that Plaintiffs posed a "direct threat" and cannot meet that burden, especially in light of the fact that it utilized Plaintiffs' services for at least 20 months when they were not vaccinated.  Nothing changed in November 2021 to indicate that Plaintiffs were posing a greater threat to others than during the

45

prior 20 months.  Indeed, by this time, MITRE was aware that vaccination did not prevent the spread of the disease and that natural immunity was at least as effective as vaccination.

**COUNT IV**
**DISABILITY DISCRIMINATION**
**UNDER THE AMERICANS WITH DISABILITIES ACT**
**(REGARDED AS DISABLED)**
**(42 U.S.C. § 12101 *et seq.*)**

89.    Plaintiffs incorporate by reference the allegations set forth in the Paragraphs above, as if fully set forth herein.

90.    Under the 2008 amendments to the ADA, an individual is "regarded as" disabled when she is perceived as having a physical or mental impairment, regardless of whether the impairment actually exists or is perceived to limit a major life activity. 42 U.S.C. § 12102(3)(A). An individual cannot be "regarded as having such an impairment," however, if the impairment is "transitory and minor." 42 U.S.C. § 12102(3)(B). "A transitory impairment is an impairment with an actual or expected duration of 6 months or less." *Id.* Thus, "an employee has a 'disability' under the ADA when that employee actually has, or is perceived as having, an impairment that is not transitory and minor." *EEOC v. STME, LLC*, 938 F.3d 1305, 1314 (11th Cir. 2019). "Importantly, what matters for the 'regarded as' theory is whether the [employer] perceived [the plaintiff] as impaired, not whether he was actually impaired." *Forsyth v. Univ. of Alabama, Bd. of Trustees*, No. 20-12513,

2021 WL 4075728, at *4 (11th Cir. Sept. 8, 2021). This "more liberal standard" makes "it significantly easier for a plaintiff to show disability." *Coker v. Enhanced Senior Living, Inc.*, 897 F.Supp.2d 1366, 1374 (N.D. Ga. 2012) (quoting *Barlow v. Walgreen Co.*, No. 8:11–cv–71–T–30EAJ, 2012 WL 868807, at *4 (M.D.Fla. Mar. 14, 2012)).

91.     At the time that Plaintiffs were terminated, MITRE regarded Plaintiffs as disabled because they had the medical status of being unvaccinated. This condition was neither transitory nor minor. At that time, limitations had been placed on unvaccinated individuals that limited one or more of life's major activities. Unvaccinated individuals were:

    a.  prohibited from going into many private and public buildings,

    b.  barred from restaurants and bars,

    c.  prohibited from working in medical facilities such as hospitals, fire departments, doctor's offices, etc.,

    d.  prohibited from entering MITRE's facilities because of their medical status,

    e.  required for periods of time to "shelter in place,"

    f.  required to remain distanced from other people,

    g.  required to refrain from attending any sort of gathering of people,

    h.  required to avoid going to parties, meetings, church services, etc.,

i.   prohibited from worshiping God in their usual manner, such as attending church, synagogue, mosques, and temples,

j.   prohibited from playing sports, even sports such as tennis, that implicitly required social distancing,

k.   attending in person governmental meetings such as school board meetings, legislative sessions, court proceedings, etc.

l.   required by many business establishments to prove that they were vaccinated before obtaining services from such establishments,

m. prohibited from flying on commercial airlines.

92.   MITRE considered unvaccinated individuals such as Plaintiffs to be at a higher risk of transmitting COVID-19 and prohibited them from attending in-person seminars, training, meetings, and other events at MITRE's facilities.  Some of these limitations continue to be imposed on MITRE employees to this day.

93.   MITRE terminated Plaintiffs' employment because it regarded Plaintiffs as disabled.  All of the Plaintiffs were "regarded as" disabled by MITRE due to their status as unvaccinated.  42 U.S.C. § 12102(3).  MITRE considered vaccinated employees "clean" and unvaccinated employees "unclean."  MITRE also regarded unvaccinated employees as "disabled."

94.   The assumptions made by MITRE regarding Plaintiffs' unvaccinated status was not based on any reasonable understanding of the facts regarding

Plaintiffs' ability to perform the essential functions of their positions.  MITRE regarded Plaintiffs as unable to perform the essential functions of their positions solely because they were unvaccinated.  However, Plaintiffs had demonstrated their ability to perform the essential functions of their positions, with or without accommodations.  Assuming for the sake of argument that Plaintiffs required accommodations, those accommodations were the same accommodations that had been granted them for the prior 20 months and Plaintiffs were able to perform the essential functions of their positions during that time.

95.     Despite their ability to do their jobs, with or without reasonable accommodations, MITRE terminated Plaintiffs because MITRE regarded Plaintiffs as disabled.

## COUNT V
## RELIGIOUS DISCRIMINATION
## UNDER THE FIRST AMENDMENT
## (FREE EXERCISE CLAUSE)
## (U.S. Const. Amend. I; 42 U.S.C. § 1983)

96.     Plaintiffs incorporate by reference the factual allegations set forth above, as if fully set forth herein.

97.     This Count is brought by Plaintiffs MENK, BATE, CASTILLO, DALTON, DIGIOIA, ELLIS, FRICK, GEORGE, HOBBS, JACOBY, JOHNSON, KENDALL, KIIHNE, KOLLIGS, KUHN, LYNNE MILLER, NEFF, PELLERIN, PENG, SACHER, SILVER, SPOONER, WAN, WARD, WICKIZER, WHEELER,

ZAPLETAL, ZHENG, KEVIN MILLER, SCARBROUGH, AMARAL, KIM, FREEMAN, KUNZ, WHITTAKER, MONTELLA, BERG, TAVENNER, CROSS-DAWKINS, FANDOZZI, SCHWARTZ, ESTRADA, STIEBER, BLAKE, BROOKS, DAVIS, PIZZOLATTO, BAGER,  RAHM, KEMON, TACKETT, ROGERS, HADYK, BADILLO, WORRELL, HARRIS-AGUIRRE, JARVI, WERNER, PARRISH, BOIN, ASFAW, SINGH, GUENSCH, COOK, and DELISLE.

98.     Many of the Plaintiffs objected to the vaccines that were being utilized in the United States because, as described above, it became well known that all of the available vaccines were developed utilizing cell lines derived from aborted fetal tissue.  The Court can take judicial notice of the fact that abortion is one of the most divisive issues in America and that many religions oppose abortion based on a religious belief about the sanctity of human life.  Many of the Plaintiffs believe that human life begins at conception and that participating in any way with encouraging the medical community to continue with abortions or to use the fruits of abortions is immoral.  *See also*, fn.3 in the Fifth Circuit's decision: "This is a common basis for religious objections to the COVID-19 vaccine."  *Sambrano v. United Airlines*, 2022 WL 486610, fn 3, 21-11159 (5th Cir., 2/17/2022) (citations omitted).

99.     Under the regulations pertaining to Title VII, an employer may not question an employee about the sincerity of the employee's religious beliefs unless

there is an "objective basis" that the employee lacks sincerity in those beliefs. *See* U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2021-3, Section 12: Religious Discrimination (2021), https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination.

100.   The EEOC guidance explains that the definition of religion is broad and protects beliefs, practices, and observances with which the employer may be unfamiliar and an employee's request for religious accommodation is based on a sincerely held religious belief, practice, or observance. *Id.* The guidance also explains that whether the employee's beliefs aligns directly with the religion's teachings or religious leaders' beliefs has no bearing when determining the employee's sincerity in those beliefs. *Id.*

101.   It is clearly established that an employer is not permitted to make such inquiries unless and until it has objective evidence that the employee is lying or committing fraud. The EEOC explains: "Because the definition of religion is broad and protects beliefs, observances, and practices with which the employer may be unfamiliar, the employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief. If, however, an employee requests religious accommodation, and an employer has an objective basis for questioning either the religious nature or the sincerity of a particular belief, observance, or practice, the employer would be justified in seeking additional

51

supporting information." *Id.* In the case of the Plaintiffs, there was no objective evidence that the Plaintiffs lacked sincerity in their religious opposition to the vaccine mandate.

102.  Religious beliefs should not be dissected "because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Thomas v. Review Bd. Of Indiana Emp't Sec. Div.*, 450 U.S. 707, 715 (1981).  In addition, "An employee's belief, observance, or practice can be 'religious' under Title VII even if the employee is affiliated with a religious group that does not espouse or recognize that individual's belief, observance, or practice, of if few – or no – other people adhere to it." *See* U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2021-3, Section 12: Religious Discrimination (2021) (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination).

MITRE's failure to understand, agree with or otherwise appreciate Plaintiffs' religious beliefs has no bearing on whether those beliefs are sincerely held. *See U.S. Equal Emp. Opportunity Comm'n v. Consol Energy, Inc.,* 860 F. 3d 131, 142 (4th Cir. 2017) (whether the plaintiff's belief was not aligned with his religion's belief system and was thereby incorrect did not negate that his belief was sincerely held). In fact, it is only necessary that a Plaintiff's beliefs are religious "in [his] own scheme of things." *See Davis v. Ft. Bend County*, 765 F.3d 480, 485 (5th Cir. 2014).

103.  Under the doctrine of state action, courts may, under certain circumstances, treat "the deed of an ostensibly private organization or individual" as if it were performed by the Federal government or a state government.  *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). "State action may be found if, … there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Id.* (citing *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351 (1974)).  State action may also be found under the public function test or the state compulsion test.  *Harvey v. Harvey,* 949 F.2d 1127, 1130 (11th Cir. 1992).  Under any and all of these tests, MITRE was a state actor for purposes of constitutional torts.  "[T]he public function test shows state action only when private actors are given powers (or perform functions) that are traditionally the exclusive prerogative of the State."  *Id.* at 1131 (quotation marks omitted).

104.  State action may exist when the government "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."  *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Private entities and individuals may be state actors when they act as "a willful participant in joint activity with the State or its agents," *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982) (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)) (internal quotation marks omitted). Private entities and

individuals may also be state actors when they "[have] been delegated a public function by the state." *Brentwood Acad.*, 531 U.S. at 296 (citations omitted). Additionally, "[c]onduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." *Evans v. Newton*, 382 U.S. 296, 299 (1966).

105.    Under the tests articulated by the Supreme Court, MITRE, for purposes of the vaccine mandate, was a state actor.  MITRE was deeply invested in the government's fight against COVID-19.  There is a close nexus between the U.S. government and the challenged action.  MITRE's actions may be fairly treated as that of the U.S. government itself.  The U.S. government has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that jointly of the U.S. government and MITRE.  MITRE was a willful participant in joint activity with the U.S. government and its agents.  MITRE was delegated a public function by the U.S. government. MITRE's conduct was so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon governmental action.

106.    The U.S. Congress did not pass a statute requiring citizens to receive COVID-19 vaccines for the simple reasons that it lacked both the political will and

the constitutional authority.   Nonetheless, the executive branch of the federal government coerced MITRE into implementing its vaccine mandate. Exec. Order No. 14042 expressed the desire of the President and the executive branch to require citizens to be vaccinated while, at the same time, acknowledging that neither they, nor Congress, had the authority to mandate this medical procedure on citizens.

107.   The federal government attempted to implement a broad-reaching vaccine mandate under its authority to regulate occupational health and safety. However, the Fifth Circuit Court of Appeals issued a decision that declared that the Federal Government lacked authority under the Occupational Safety and Health Act. *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Labor,* 17 F.4th 604, 617 (5th Cir. 2021); 29 U.S.C. § 651 *et seq.*

108.   At the time of Plaintiffs' terminations, MITRE was aware of the Fifth Circuit's decision that the executive branch lacked authority to issue a vaccine mandate under the authority of that Act.

109.   MITRE was also aware that the Fifth Circuit declared that the Mandate likely exceeds the federal government's authority under the Commerce Clause because it regulates noneconomic inactivity that falls squarely within the States' police power. A person's choice to remain unvaccinated and forgo regular testing is noneconomic inactivity. *BST Holdings, L.L.C.*, 17 F.4th at 617.

55

110.   Instead of complying with the limitations imposed by the U.S. Constitution, the President and the executive branch of the U.S. government attempted a work-around – it created a "sword of Damocles" for a large sector of the citizenry:  Either get vaccinated or suffer the extreme financial consequences of losing your job.  MITRE was one of the authors of this work-around.  As a result, it voluntarily and intentionally decided to lead the way and impose a vaccine mandate in an attempt to garner the support and favor of the executive branch of the U.S. government, from whom it derives nearly all its funding.

111.   MITRE receives so much of its funding from the federal government, it is completely beholden to the federal government. MITRE was a willful participant in joint activity with the federal government, in that it deliberately aided the federal government in its efforts to influence Americans to receive COVID-19 vaccination by threatening their employment. *See* Exec. Order No. 14043, 86 Fed. Reg. 50989 (executive order mandating vaccination for federal employees, issued simultaneously to Exec. Order No. 14042). MITRE performed a public function delegated by the federal government in implementing the vaccine mandate, because the federal government made it fulfill a role normally left to governmental public health agencies. Additionally, MITRE served a public function in that its primary business activities are supporting the federal government. MITRE was engaging in public action because its actions were entwined with governmental policies and

56

impregnated with a governmental character, as it was essentially acting as the federal government's agent in implementing its vaccine mandate.  Because of these facts, the First, Fifth and Fourteenth Amendments to the Constitution apply to actions undertaken by MITRE in relation to enforcing vaccine mandates.

112.   The Free Exercise Clause of the First Amendment of the United States Constitution applies when government action "discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 532 (1993) (citations omitted). Under the Free Exercise Clause, "if the object of a law is to infringe upon or restrict practices because of their religious motivation, … it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest."  *Id.* at 533 (citations omitted). "Official action that targets religious conduct for distinctive treatment cannot be shielded by … facial neutrality," as "[t]he Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Id.* at 534.

113.   Here, MITRE's vaccine mandate and the medical examinations and inquiries associated therewith violated the Free Exercise Clause.  Serving as an actor for the federal government, MITRE purposefully enacted its vaccine mandate to infringe upon or restrict the practices of its employees who objected to receiving the vaccine because of their religious beliefs. The repeated statements of MITRE CEO

Jason Providakes discouraging employees from seeking exemptions and the sham process by which employees could request those exemptions shows discriminatory intent.   MITRE also exhibited discriminatory intent in that it was adopting the posture of the federal government, which is to promote vaccination, no matter the expense to individual rights.

114.   MITRE's company-wide vaccine mandate was not justified by a compelling interest. COVID-19 vaccines have proven ineffective in combatting the virus for longer than short periods of time. The vaccine mandate did not effectively promote public health among the public in general or among MITRE's staff.   MITRE could not show that its vaccine mandate was narrowly tailored as it was applied as a *per se* rule, allowing for very few exemptions, including for valid religious or medical reasons.   It was further not narrowly tailored to the specific job duties of each Plaintiff because Plaintiffs could have easily achieved the same goals through remote work, masking, social distancing, and/or regular testing. This is further underscored by the fact that, before their terminations, most Plaintiffs worked fully remotely, with rare instances of in-person duties.

115.   MITRE also failed to narrowly tailor its implementation of a vaccine mandate by ignoring the natural immunity of many of the Plaintiffs.   Clearly, those Plaintiffs were at least as unlikely to spread COVID-19 as individuals who consented to being vaccinated.   At the time it terminated Plaintiffs, and thereafter, MITRE had

no scientific evidence that employees with natural immunity were more likely to spread COVID-19 than employees who had been vaccinated. MITRE was aware that many scientists and the European Union acknowledged the obvious impact of natural immunity.

116. MITRE was aware, at the time it terminated Plaintiffs, that definitive scientific evidence was lacking that the vaccines prevent the spread of COVID-19. Rather, the scientific evidence establishes, at best, that the vaccines lessen the symptoms of COVID-19 and reduce the number of hospitalizations. To the extent that MITRE may have considered the "public health risk" posed by unvaccinated individuals, MITRE was not entitled, in the face of religious opposition to the vaccines, to override an individual's choice to risk the possibility of worse symptoms, death, and hospitalization for themselves, especially since there was no scientific evidence that the vaccine prevented the spread of the disease or the severity of the disease in others. MITRE's insistence on vaccination as a means of preventing the spread of the disease also made no sense because, for the 20 months before the mandate, it allowed its employees to continue working, full-time and full-duty. There was no change in Plaintiffs' ability to perform the essential functions of their positions that occurred at the time of the mandate other than the decision to issue a corporate fiat – be vaccinated or be fired.

## COUNT VI

## VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT
### (42 U.S.C. § 2000bb *et seq.*)

117.   Plaintiffs incorporate by reference the factual allegations set forth in the Paragraphs above, as if fully set forth herein.

118.   Pursuant to 42 U.S.C. § 2000bb-1(a), "[i]n general Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b)."

119.   The Religious Freedom Restoration Act ("RFRA") applies to MITRE as an actor for the federal government.  42 U.S.C. § 2000bb-2(1).

120.   Pursuant to 42 U.S.C. § 2000bb-1(b), "Exception.  Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person— (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."

121.   MITRE, serving as an actor for the federal government, has substantially burdened Plaintiffs' exercise of religion by failing to grant religious accommodations.

122.   MITRE's burden on Plaintiffs' exercise of religion is not in furtherance of a compelling governmental interest, particularly given that many Plaintiffs have

acquired natural immunity, as well as recent findings that vaccination does not stop the spread or transmission of the disease.

123.    MITRE's enforcement of its vaccine mandate pressures Plaintiffs to significantly modify their religious behavior by engaging in the immoral act of injecting their body with a morally compromised substance (COVID-19 vaccine) in violation of their sincerely held religious beliefs.

124.    Pursuant to 42 U.S.C. § 2000bb-1(c), "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."

125.    Plaintiffs have suffered and continue to suffer undue hardship and economic and noneconomic damages as a direct result of MITRE's policy and actions in direct violation of RFRA.

**COUNT VII**
**VIOLATION OF THE EQUAL PROTECTION CLAUSE**
**OF THE U.S. CONSTITUTION**
**(FIFTH AND FOURTEENTH AMENDMENTS; 42 U.S.C. § 1983)**

126.    Plaintiffs incorporate by reference the factual allegations set forth in the Paragraphs above, as if fully set forth herein.

127.    This Count is common to all Plaintiffs.

61

128.   Many of the Plaintiffs are naturally immune to COVID-19, having previously been infected with the disease.   Therefore, those Plaintiffs who had natural immunity were at least as equally situated as those who are fully vaccinated with a COVID-19 vaccine.   MITRE denied Plaintiffs equal treatment and conditioned Plaintiffs' continued employment with an unnecessary infringement of bodily integrity.

129.  MITRE's Chief Medical Officer, Dr. Jay Schnitzer, when asked whether those previously infected with COVID-19 needed to be vaccinated, said numerous times that natural immunity was not adequate.  He further stated that mass vaccination would be the only way out of the pandemic.

130.   MITRE's mandate fails to treat the naturally immune Plaintiffs as if they had been vaccinated.  That failure is irrational, arbitrary, and capricious.  As such, it violates the Equal Protection Clause of the U.S. Constitution.

131.  The Fourteenth Amendment, Section 1, to the U.S. Constitution provides that no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

132.   Pursuant to the mandate, all of MITRE's employees were required to receive a COVID-19 vaccination.  No provision was made for those with natural

immunity who had at least the same level of immunity to COVID-19 as those who have been vaccinated.

133.   MITREs' mandate violates the Fourteenth Amendment to the U.S. Constitution, which includes clearly established fundamental rights and liberty interests of personal autonomy and bodily integrity.   *See*, e.g., *Griswold v. Connecticut*, 381 U.S. 479 (1965); *Roe v. Wade*, 410 U.S. 113 (1973)(reversed on other grounds); *Planned Parenthood v. Casey*, 505 U.S. 833 (1992); *Rochin v. California*, 342 U.S. 165 (1952); *Obergefell v. Hodges*, 576 U.S. 644 (2015); and the right to reject medical treatment, *Cruzan v. Director, Missouri Dep't Health*, 497 U.S. 261 (1990) and *Riggins v. Nevada*, 504 U.S. 127 (1992).

134.   In modern jurisprudence, burdens upon fundamental rights require strict scrutiny.   *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) ("narrowly tailored to serve a compelling state interest").   As mandated vaccinations are a substantial burden, MITRE must prove narrow tailoring to a compelling interest that justifies mandatory vaccinations.  While the government may have a general interest in mitigating COVID-19, the following problems reveal no narrow tailoring to any compelling interest exists.   Naturally-acquired immunity from COVID-19 is as robust as vaccine-acquired immunity, so there is no compelling interest (nor any rational basis) in vaccinating or requiring the vaccination of those who have already had COVID-19.

135.   Furthermore, even absent the fundamental rights at issue, the MITRE mandate also violates the Fourteenth Amendment under modern rational basis scrutiny, since the mandate is unreasonable and has no real or substantial relationship towards protecting the public health, particularly as applied to those with robust natural immunity. Arms of the government may not irrationally single out one class of individuals for discriminatory treatment.  The mandate irrationally singles out the convalescent and discriminates against them.

136.   The Equal Protection Clause requires that persons who are similarly situated receive like treatment under the law.   The fully vaccinated and the convalescent are similarly situated, yet the mandate affects them in an unequal manner, continuing employment of the fully vaccinated and terminating the employment of the convalescent. The mandate treats Plaintiffs differently, and negatively, compared with similarly-situated persons based on the way Plaintiffs acquired immunity to COVID-19.

### COUNT VIII
### COMMON LAW WRONGFUL DISCHARGE BASED ON VIOLATION OF THE PUBLIC POLICY ARTICULATED IN THE PROCUREMENT ACT

137.   Plaintiffs incorporate by reference the factual allegations set forth in the Paragraphs above, as if fully set forth herein.

138.   This Count is common to all Plaintiffs.

64

139.   Exec. Order No. 14042 purports to require most federal contractors to be vaccinated against COVID-19.  Exec. Order No. 14042 exceeded the scope of the President's authority under the Procurement Act.  40 U.S.C. §§ 101 *et seq.*

140.   In the Procurement Act, "the statutory scheme establishes a framework through which agencies can articulate specific, output-related standards to ensure that acquisitions have the features they want."  *Georgia v. President of the United States*, 46 F.4th 1283, 1295 (11th Cir. 2022). It is clear that "[n]othing in the Act contemplates that every executive agency can base every procurement decision on the health of the contracting workforce." *Id.* at 1295. It is "a well-established principle of statutory interpretation" that "we 'expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance.'" *Id.* (quoting *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.,* 141 S. Ct. 2485, 2489 (2021)). Thus, "the 'highly consequential power' asserted here lies 'beyond what Congress could reasonably be understood to have granted.'" *Id.* at 1296. (quoting *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2609 (2022)).

141.   MITRE, a state actor, violated the Procurement Act by carrying out Exec. Order No. 14042 through the implementation of its vaccine mandate. MITRE's actions were improper as they could be attributed to the unlawful exercise

of executive power by the President, in excess of the authority conferred by Congress.

142.   Termination of employees pursuant to an illegal executive order, and in violation of the Procurement Act, constitutes wrongful discharge under the common law.

**COUNT IX**
**VIOLATION OF DUE PROCESS CLAUSE**
**OF THE FIFTH AMENDMENT**
**(SUBSTANTIVE DUE PROCESS)**
**(U.S. Const. Amend. V; 42 U.S.C. § 1983)**

143.   Plaintiffs incorporate by reference the factual allegations set forth in the Paragraphs above, as if fully set forth herein.

144.   This Count is common to all Plaintiffs.

145.   MITRE's vaccine mandate violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

146.   In deciding whether Substantive Due Process rights have been violated, a court must determine "that a person has a 'liberty interest' under the Due Process Clause." *Cruzan by Cruzan*, 497 U.S. at 279.   The Fifth Circuit decision, issued before MITRE enforced its mandate clearly informed MITRE that mandates threaten to "substantially burden the liberty interests of reluctant individual recipients put to a choice between their job(s) and the jab(s)." *BST Holdings, L.L.C.*, 17 F.4th at 618.

147.   When there exists a liberty interest, "whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Cruzan by Cruzan*, 497 U.S. at 279 (citing *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)). The Due Process Clause "forbids the government to infringe ... 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Washington*, 521 U.S. at 721 (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)).

148.   It is well-established that there exists a "constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan*, 497 U.S. at 278; *see also,* e.g., *Jacobson v. Massachusetts*, 197 U.S. 11, 24-30 (1905) (recognizing this liberty interest in the context of a smallpox vaccine); *Washington v. Harper*, 494 U.S. 210, 221-222 (1990) (recognizing the liberty interest of a prisoner in refusing involuntary administration of antipsychotic medication). Courts have also recognized a constitutionally protected liberty interest in freedom from bodily restraint. *See,* e.g., *Youngberg*, 457 U.S. at 316.

149.   MITRE, a state actor, infringed on Plaintiffs' Substantive Due Process rights. Plaintiffs had a fundamental liberty interest in refusing medical treatment and maintaining bodily integrity. MITRE's company-wide vaccine mandate did not serve a compelling interest. COVID-19 vaccines have proven ineffective in

combatting the virus for longer than short periods of time. The vaccine mandate did not effectively promote public health among the public in general or among MITRE's staff in particular. MITRE could not show that its vaccine mandate was narrowly tailored as it was applied as a *per se* rule, allowing for very few exemptions, including for valid religious or medical reasons. Additionally, Plaintiffs could have easily achieved the same goals through remote work, masking, social distancing, and regular testing. This is further underscored by the fact that most Plaintiffs worked fully remotely, with rare instances of in-person duties.

**COUNT X**
**VIOLATION OF PROCEDURAL DUE PROCESS**
**OF THE FIFTH AND FOURTEENTH AMENDMENTS**
**(PROCEDURAL DUE PROCESS)**
**(U.S. Const. Amend. V; 42 U.S.C. § 1983)**

150.   Plaintiffs incorporate by reference the factual allegations set forth in the Paragraphs above, as if fully set forth herein.

151.   This Count is common to all Plaintiffs.

152.   MITRE's vaccine mandate violates the Due Process Clause of the Fifth and Fourteenth Amendment to the United States Constitution.

153.   The Fifth Amendment Due Process Clause provides that no person may "be deprived of life, liberty or property without due process of law." U.S. CONST. AMEND.   MITRE's mandate would deprive Plaintiffs of all three and does so without providing "fair notice" of the rules to which they are subject.  The mandate

requires Plaintiffs to take a vaccine without their consent and thereby exposes them to a non-negligible risk of death or serious injury. The MITRE mandate "threatens to substantially burden the liberty interests" of Plaintiffs "put to a choice between their job(s) and their jab(s)." *BST Holdings, L.L.C.*, 17 F.4th at 618.

154.   Plaintiffs face not only the loss of the MITRE employment, but also will be barred from employment by the federal government or federal contractors due to the Federal Employee and Federal Contractor Mandates, and they will also face significant difficulties with private employers due to their vaccination status, loss of security clearances for "misconduct," and discharge status. Vaccine refusal may also result in deprivation of protected property interests. Loss of pay and benefits amount to hundreds of thousands or even millions of dollars in many cases.

155.   The injections are not vaccines, but are, as a factual, legal, and scientific matter, medical treatments. The CDC intentionally changed its own definitions of "Vaccine" and "Vaccination" overnight on Sep. 1, 2021, to eliminate the word "immunity" from the definition. Immunity is the *sine qua non* of all vaccines; it is the entire point of vaccination as a public health measure. This definitional change without public comment or input deprived Plaintiffs of procedural due process.

156.   In deciding whether Due Process rights have been violated, a court must determine "that a person has a 'liberty interest' under the Due Process Clause." *Cruzan by Cruzan*, 497 U.S. at 279.

157.  The Fifth Circuit decision, issued before MITRE enforced its mandate, clearly informed MITRE that mandates threaten to "substantially burden the liberty interests of reluctant individual recipients put to a choice between their job(s) and the jab(s)." *BST Holdings, L.L.C.*, 17 F.4th at 618.

158.  When there exists a liberty interest, "whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Cruzan by Cruzan*, 497 U.S. at 279 (citing *Youngberg*, 457 U.S. at 321. The Due Process Clause "forbids the government to infringe … 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Washington*, 521 U.S. at 721 (quoting *Reno*, 507 U.S. at 302 .

159.  It is well-established that there exists a "constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan*, 497 U.S. at 278; *see also*, e.g., *Jacobson*, 197 U.S. at 24-30 (recognizing this liberty interest in the context of a smallpox vaccine); *Harper*, 494 U.S. at 221-222 (recognizing the liberty interest of a prisoner in refusing involuntary administration of antipsychotic medication). Courts have also recognized a constitutionally protected liberty interest in freedom from bodily restraint. *See*, e.g., *Youngberg*, 457 U.S. at 316.

160.   MITRE, a state actor for the reasons stated above, infringed on Plaintiffs' Procedural Due Process Rights. Plaintiffs had a fundamental liberty interest in refusing medical treatment and maintaining bodily integrity. MITRE's company-wide vaccine mandate did not serve a compelling interest. COVID-19 vaccines have proven ineffective in combatting the virus for longer than short periods of time. The vaccine mandate did not effectively promote public health among the public in general or among MITRE's staff in particular. MITRE could not show that its vaccine mandate was narrowly tailored as it was applied as a *per se* rule, allowing for very few exemptions, including for valid religious or medical reasons. Additionally, Plaintiffs could have easily achieved the same goals through remote work, masking, social distancing, and regular testing. This is further underscored by the fact that most Plaintiffs worked fully remotely, with rare instances of in-person duties.

161.   Plaintiffs were not provided with a process to challenge MITRE's decision to terminate them before that deprivation occurred.

**COUNT XI**
**VIOLATION OF DUE PROCESS CLAUSE**
**OF THE FIFTH AMENDMENT**
**(UNCONSTITUTIONAL CONDITIONS)**
**(U.S. Const. Amend. V; 42 U.S.C. § 1983)**

162.   Plaintiffs incorporate by reference the factual allegations set forth in the Paragraphs above, as if fully set forth herein.

71

163.   This Count is common to all Plaintiffs.

164.   It is well-established that "the government may not deny a benefit to a person because he exercises a constitutional right." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) (citations and quotations marks omitted). The Unconstitutional Conditions Doctrine forbids "the government from coercing people into giving [ ] up" "the Constitution's enumerated rights." *Id*. (in the context of the Takings Clause of the Fifth Amendment); *Perry v. Sindermann*, 408 U.S. 593 (1972) (in the context of freedom of speech under the First Amendment); *Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250 (1974) (in the context of the right to travel under the Fourteenth Amendment).

165.   Here, MITRE, as a state actor, violated the Unconstitutional Conditions Doctrine through its vaccine mandate and related examinations and inquiries. MITRE forced Plaintiffs to choose between their employment and their constitutionally protected interest in refusing medical treatment and maintaining bodily integrity.

## COUNT XII
## COMMON LAW WRONGFUL DISCHARGE FOR VIOLATING THE PUBLIC POLICY ARTICULATED IN THE EMERGENCY USE AUTHORIZATION
## PROVISIONS OF THE UNITED STATES CODE,
### (21 U.S.C. §360bbb-3*, et seq.;* 42 U.S.C. § 1983)

166.   Plaintiffs hereby reallege and adopt each and every factual allegation in the paragraphs above as if fully set forth herein.

167.   At the time of Plaintiffs' terminations, there were no vaccines being administered in the United States that were fully approved by the U.S. Food and Drug Administration ("FDA").   Rather, the FDA issued Emergency Use Authorizations for several vaccines.  The FDA did grant the COMIRNATY vaccine final approval.  However, that vaccine was not available in the United States at the time of Plaintiffs' terminations and is "legally distinct" from the vaccines that were available.

168.   Under federal law, a drug that is given emergency use authorization is considered experimental.  Under 45 CFR Subpart A, the use of experimental drugs requires informed consent.   At no point did the Plaintiffs in this case receive informed consent to the vaccines available in the United States.

169.   The United States Code provides that:

[S]ubject to the provisions of this section, the Secretary (of the Department of Health and Human Services) may authorize the introduction into interstate commerce, during the effective period of a declaration under subsection (b), of a drug, device, or biological product intended for use in an actual or potential emergency (referred to in this section as an "emergency use.")

21 U.S.C. §360bbb-3(a)(1).  For ease of reference, Plaintiffs will refer to the general provisions of 21 U.S.C. §360bbb-3 as the "Emergency Use Authorization Statute"

or "EUA Statute."  Part of the explicit statutory conditions for an Emergency Use

Authorization under the Emergency Use Authorization Statute mandates that all

individuals authorized for the product's emergency use be given the option to accept

or refuse administration of the product.  Specifically, 21 U.S.C. §360bbb-

3(e)(1)(A)(ii), states:

> With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall for a person who carries out an activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following: Appropriate conditions designed to ensure that individuals to whom the product is administered are informed— (I) that the Secretary has authorized the emergency use of the product; (II) of the significant known potential benefits and risks of such use, and of the extent to which such benefits are unknown; and, (III) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

21 U.S.C. §360bbb-3(e)(1)(A)(ii)(I)-(III). Put simply, the EUA Statute provides that,

as a condition of receiving authorization for emergency use, all individuals to whom

the product may be administered have the right to accept or refuse administration of

the product.

170.  The only COVID-19 vaccine available at the time of Plaintiffs'

terminations authorized for use under the EUA Statute had no general approval

under the United States Code.

171.   Because all three of the COVID-19 vaccines were subject only to emergency use under the EUA Statute, the EUA Statute mandates that all individuals to whom the product may be administered, including Plaintiffs, have the right to accept or refuse administration of the product.

172.   The FDA did grant final approval to one vaccine known as COMIRNATY.  However, that vaccine was not available at the time of Plaintiffs' terminations.

173.   COMIRNATY and the other COVID-19 vaccines "are legally distinct" products.   Moreover, the now "approved" COMIRNATY vaccine cannot be distributed for use until BioNTech submits "final container samples of the product in final containers together with protocols showing results of all applicable tests" and BioNTech receives "a notification of release from the Director, Center for Biologics Evaluation and Research (CBER)."

174.   Thus, it is not clear when (or if) any employee will have access to the "approved" COMIRNATY vaccine, leaving all employees who may elect to receive the "Pfizer" vaccine pursuant to MITRE's mandatory vaccine policy to receive a dose of the current stock of Pfizer-BioNTech vaccine still being administered subject to EUA rules.

175.   At the time of Plaintiffs' termination, this distinction was particularly important.  Neither the Plaintiffs nor MITRE knew whether the FDA would approve

other vaccines.  If Plaintiffs allowed themselves to be vaccinated with one of the then available vaccines, they might not have been eligible to receive a different vaccine later, that had been fully approved by the FDA.

176.   Put simply, because all three of the then available COVID-19 vaccines were subject only to emergency use under the EUA Statute, the EUA Statute prohibits MITRE from making the COVID-19 vaccines mandatory.

177.   As of the date of Plaintiffs' terminations, there were no doses of COMIRNATY in the United States and it was not being manufactured for production or distribution in the United States at that time.

178.   In order for the FDA to have even continued the EUA for the Pfizer-BioNTech COVID-19 Vaccine, it was required to find that there were no alternatives available for the Pfizer-BioNTech vaccine. *See* Pfizer-BioNTech COVID-19 Vaccine EUA Amendment Review Memorandum (05/10/21), https://www.fda.gov/media/148542/download ("There is no adequate, approved, and available alternative to the Pfizer-BioNTech COVID-19 Vaccine to prevent COVID-19….").

179.   Thus, the only available COVID-19 vaccines were subject solely to EUA approval and therefore could not have been legally mandated by MITRE.  In addition, consistent with the requirement in the Emergency Use Authorization Statute that all potential recipients of the COVID-19 vaccine be informed of the

option to accept or refuse the vaccine, the Emergency Use Authorization Fact Sheet for all three of the currently available COVID-19 vaccines specifically states – as required by the EUA Statute – that individuals have the right to refuse administration of the COVID-19 vaccine.

180.  By imposing its Mandatory COVID-19 Vaccination Policy on Plaintiffs, MITRE is denying Plaintiffs their right to accept or refuse administration of the three currently available COVID-19 vaccines, which were subject only to emergency use approval under the EUA Statute.  By denying Plaintiffs the right to accept or refuse administration of the three currently available COVID-19 vaccines, MITRE is violating the public policy articulated in the EUA Statute.

## COUNT XIII
### Title VII Retaliation
### (42 U.S.C. § 2000e-3(a); 29 CFR § 1630.12(a))

181.  Plaintiffs hereby reallege and adopt each and every factual allegation in the paragraphs above as if fully set forth herein.

182.   All of the Plaintiffs in this case opposed MITRE's decision to impose a vaccine mandate without exempting those who claimed religious or medical reasons for opposing the vaccine mandate.  Plaintiffs expressed their opposition to MITRE's vaccine mandate and articulated the contention that it violated their religious freedoms and/or that they were entitled to a medical exemption.  Prior to terminating Plaintiffs, MITRE was aware of Plaintiffs' opposition to the vaccine

mandate and Plaintiffs' contentions regarding religious and disability discrimination.

183.   MITRE retaliated against Plaintiffs by terminating Plaintiffs because they expressed their opposition to the vaccine mandate and because they opposed imposition of such a mandate based on religious and disability discrimination arguments and contending that it violated Title VII.

**COUNT XIV**
**Violation of First Amendment Freedom of Speech**
**(U.S. Const. Amend. I; 42 U.S.C. § 1983)**

184.   Plaintiffs hereby reallege and adopt each and every factual allegation in the paragraphs above as if fully set forth herein.

185.   All of the Plaintiffs in this case opposed MITRE's decision to impose a vaccine mandate without exempting those who claimed religious or medical reasons for opposing the vaccine mandate.  Plaintiffs expressed their opposition to MITRE's vaccine mandate and articulated the contention that it violated their religious freedoms and/or that they were entitled to a medical exemption.  Prior to terminating Plaintiffs, MITRE was aware of Plaintiffs' opposition to the vaccine mandate and Plaintiffs' contentions regarding religious and disability discrimination.

186.   MITRE violated Plaintiffs' right to freedom of expression protected by the First Amendment by terminating Plaintiffs because of their voiced opposition to the vaccine mandate.

187.   As described above, MITRE is subject to the constraints set forth in the First Amendment of the U.S. Constitution.

188.   MITRE's conduct was undertaken with malice against the employees it viewed as disagreeing with its political leanings.  As an arm of the government, MITRE is prohibited by the First Amendment from collecting information about Plaintiffs' political views and from discriminating against Plaintiffs because of those views.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request relief as follows:

a.   For Plaintiffs to be reinstated to their position or a similar one and receive all economic losses resulting from the unlawful termination, including but not limited to back pay, liquidated damages, front pay, reinstatement of accrued benefits including but not limited to sick pay, pension accrual, vacation pay, FICA contributions and other employment benefits, in an amount that exceeds $75,000.

b.   For MITRE to be enjoined from further illegal discriminatory acts against Plaintiffs.

c.      For Plaintiffs' other non-economic and economic losses both retrospective and prospective as proved at trial including, but not limited to, damages resulting from mental anguish and economic hardship of an amount more than $75,000.

d.      For punitive damages in excess of $75,000,

e.      For the cost of this suit and reasonable attorney's fees, including under 42 U.S.C. § 1988; and

f.      For other and further relief as may be requisite.

Respectfully submitted,

KAHN, SMITH & COLLINS, P.A.

By: _____
Francis J. Collins, Esq.
CPF ID No. 8501010118
Fed Ct. # 04272
fjcollins@kahnsmith.com
201 N. Charles Street, Tenth Floor
Baltimore, Maryland 21201
(410) 244-1010 (telephone)
(410) 244-8001 (fax)

**PRAYER FOR JURY TRIAL**

Plaintiffs, by their attorney, Francis J. Collins and Kahn, Smith and Collins,

P.A., pray to have this case tried by jury.

_____

Francis J. Collins, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of January, 2023, a copy of the foregoing Plaintiffs' Complaint with exhibits was served via certified mail, return receipt requested, restricted delivery, to:

THE MITRE CORPORATION
7515 Colshire Dr.,
McLean, VA 22102

      Resident Agent:
      THE CORPORATION TRUST, INC.
      2405 York Road, Suite 201
      Lutherville-Timonium, MD 21093-2264,

      _____
      Francis J. Collins, Esq.