## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**CHARLES G. MENK, III,** *et al.*,

    *Plaintiffs*,

**v.**

**THE MITRE CORPORATION,**

    *Defendant*.

Civil No.: **1:23-cv-00053-JRR**

## <u>MEMORANDUM OPINION</u>

  This matter comes before the court on Defendant The MITRE Corporation's Motion to Transfer Venue and Motion to Dismiss Plaintiffs' Complaint. (ECF Nos. 26 and 27.) The court has reviewed all papers. No hearing is necessary. Local Rule 105.6 (D. Md. 2023).

## I. <u>BACKGROUND</u>[1]

  Defendant The MITRE Corporation ("MITRE") is a nonprofit organization that operates federally funded research and development centers ("FFRDC") to assist the federal government with scientific research and analysis, development and acquisition, and systems engineering and integration. (Complaint, ECF No. 1 ¶ 9.) This case arises from the alleged termination of a large group of MITRE employees for refusal to comply with a mandatory COVID-19 vaccine workplace policy. *Id.* ¶ 1.

  Plaintiffs are former employees of MITRE and reside in various states including Maryland, Florida, Virginia, South Carolina, Tennessee, Massachusetts, Colorado, Kansas, Texas, West

---

[1] For purposes of this memorandum, the court accepts as true the well-pled facts set forth in the Complaint. (ECF No. 1.)

Virginia, Arizona, New Hampshire, California, Minnesota, Utah, and Missouri.  (Complaint caption and ¶ 8.)  In March 2020, when the COVID-19 pandemic was declared, MITRE instituted a work-at-home policy for most of its employees.  *Id.* ¶ 13.  Plaintiffs' jobs were generally limited to computer work.  *Id.* ¶ 14.  Plaintiffs allege that their work could be accomplished by sitting in front of a computer screen, socially distanced from others, and wearing facial masks.  *Id.*

On September 9, 2021, President Joseph Biden issued Executive Order Number 14042 (the "Executive Order") requiring federal government contractor employees and direct work subcontractors to be fully vaccinated against the COVID-19 virus except where an employee or worker was entitled to a religious or medical exemption.  (ECF No. 1 ¶ 16.)  On October 11, 2021, MITRE's Chief Executive Officer, Jason Providakes, announced that, effective November 22, 2021, MITRE would implement a mandatory vaccination policy for all employees and workers subject to religious, disability and medical exemptions where applicable.  *Id.* ¶ 17.  Subsequently, Providakes and Kathleen Federico, MITRE's Senior Vice President, emailed MITRE's employees outlining the new vaccination policy.  (ECF No. 1 ¶ 18.)  Under the policy, employees were required to upload proof of vaccination between October 25, 2021, and November 15, 2021.  *Id.* The deadline was later extended to November 22, 2021.  *Id.*  Pursuant to the policy, MITRE employees seeking an exemption from the mandate because of a documented medical condition, disability, or sincerely held religious belief had to submit a request for reasonable accommodation by October 22, 2021.  *Id.*

Plaintiffs allege they requested exemption from the vaccine mandate as a reasonable accommodation of their sincerely held religious beliefs.[2]  (ECF No. 1 ¶ 25.)  "Many of the

---

[2] The Complaint is unclear as to how many Plaintiffs sought a religion-based exemption.  At paragraph 25, the Complaint alleges that all Plaintiffs submitted a religious exemption.  (ECF No. 1 ¶ 25.)  Thereafter, the Complaint alleges that Plaintiffs Johnson, Rahm, and Kemon did not submit a request for religious exemption because they believed it would be futile (". . . MITRE would deny it no matter what."); and that Plaintiff Badillo failed to submit a

Plaintiffs objected [to the vaccine policy] specifically because, in their view, utilizing a product that was developed and/or produced using cell lines derived from aborted fetal tissue, even years after the tissue was obtained, is participation in, and encouragement of, evil." *Id.* ¶ 29.  Plaintiffs allege that, following receipt of Plaintiffs' written exemption requests, MITRE conducted telephone interviews during which MITRE "showed no inclination to provide Plaintiffs their requested accommodations and did not discuss alternative accommodations." *Id.*  Plaintiffs allege further that although MITRE was "aware" through "media reports and its own investigations that around 20 percent of Catholics and other Christians were against the COVID-19 vaccination," MITRE "set out with a plan" to reject their requests from the start as evidenced by MITRE's near universal rejection of requested religious exemptions and aggressive, interrogation-style approach to the interviews.  (ECF No. 1 ¶¶ 27-31.)  On or around November 5, 2021, MITRE provided written notice that Plaintiffs' exemption requests were denied; no explanation or appeals process was provided.  *Id.* ¶ 33.

In addition to submitting requests for religious exemption, five Plaintiffs (Kendall, Fandozzi, Bager, Grieco, and Harris-Aguirre) requested exemptions under the Americans with Disabilities Act ("ADA").  (ECF No. 1 ¶ 36.)  MITRE engaged in the same telephonic interview process to evaluate these requests and also denied these requests without explanation. Additionally, three Plaintiffs (Merrick, Crabtree, and Connery) generally objected to the vaccine mandate for "personal reasons, including protesting MITRE's violation of employee rights and condoning a hostile work environment toward unvaccinated employees," but did not submit exemption requests citing these grounds.  (ECF No. 1 ¶ 40.)

---

request for exemption because MITRE did not respond to his email posing "questions about the reasonable accommodation."  Because MITRE did not respond to his email, Badillo "never formally submitted the forms."  He contends MITRE's failure to respond "further frustrat[ed] the interactive process."  *Id.* ¶¶ 34, 65.

On November 22, 2021, MITRE terminated 61 Plaintiffs; four Plaintiffs resigned "under duress in lieu of termination," and five others "retired under duress to avoid termination," all of whom Plaintiffs assert "should be considered constructively terminated." *Id.* ¶ 45.

Plaintiffs, in essence, take the position that MITRE's exemption process was a sham, and that MITRE engaged in the process with "malicious intent" rooted in its leadership's "well-known" "liberal-leaning tendencies" and "anti-religious . . . outlook." (ECF No. 1 ¶ 51.) Plaintiffs allege further that "[b]y forcing employees who opposed the vaccine to divulge that opposition, MITRE essentially 'unmasked' its conservative religious employees in a way that left Plaintiffs vulnerable to judgment, ridicule, and isolation from their vaccinated coworkers." *Id.* ¶ 54. According to Plaintiffs, "MITRE was aware that persons who opposed vaccine mandates tend to hold conservative religious views" and that "if it issued a vaccine mandate and did not honor religious exemption requests, terminating employees for refusing the vaccination would have a disparate impact on employees holding conservative religious views." *Id.* ¶ 55. Plaintiffs allege that "MITRE intentionally planned the mandatory vaccination policy with the conscious intention of eliminating employees with conservative views." *Id.* ¶ 56.

On January 9, 2022, Plaintiffs filed their Complaint, which sets forth 14 counts: (Count I) Religious Discrimination, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*; (Count II) Disability Discrimination under the ADA – Failure to Accommodate, 42 U.S.C. §§ 12101, *et seq.*; (Count III) Disability Discrimination under the ADA – Unlawful Medical Examination or Inquiry, 42 U.S.C. §§ 12101, *et seq.*; (Count IV) Disability Discrimination under the ADA – Regarded as Disabled, 42 U.S.C. §§ 12101, *et seq.*; (Count V) Religious Discrimination under the First Amendment – Free Exercise Clause, 42 U.S.C. § 1983; (Count VI) Violation of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb, *et seq.*; (Count VII)

Violation of the Fifth and Fourteenth Amendments Equal Protection Clause, 42 U.S.C. § 1983; (Count VIII) Common Law Wrongful Discharge Based on Violation of the Public Policy Articulated in the Procurement Act; (Count IX) Violation of the Fifth Amendment Substantive Due Process Clause, 42 U.S.C. § 1983; (Count X)  Violation of Fifth and Fourteen Amendments Procedural Due Process Clause, 42 U.S.C. § 1983; (Count XI) Violation of Due Process Clause of the Fifth Amendment – Unconstitutional Conditions, 42 U.S.C. § 1983; (Count XII) Common Law Wrongful Discharge for Violating the Public Policy Articulated in the Emergency Use Authorization Provisions of the U.S. Code, 21 U.S.C. §§ 360bbb-3, 42 U.S.C. § 1983; (Count XIII) Title VII Retaliation, 42 U.S.C. § 2000e-3(a); 29 CFR § 1630.12(a)); and (Count XIV) Violation of the First Amendment Freedom of Speech, 42 U.S.C. § 1983.  (ECF No. 1 at pp. 33-78.)

The prayer for relief requests: (i) Plaintiffs' reinstatement "to their position or a similar one and . . . all economic losses, including but not limited to back pay, liquidated damages, front pay, reinstatement of accrued benefits including but not limited to sick pay, pension accrual, vacation pay, FICA contributions and other employment benefits, in an amount that exceeds $75,000"; (ii) that Defendant be "enjoined from further illegal discriminatory acts against Plaintiffs"; (iii) Plaintiffs' "other non-economic and economic losses both retrospective and prospective as proved at trial, including but not limited to, damages resulting from mental anguish and economic hardship of an amount more than $75,000"; (iv) punitive damages; (v) costs and reasonable attorney's fees, "including under 42 U.S.C. § 1988"; and (vi) any other relief this court deems just and proper.  *Id.* at pp. 79-80.

On March 20, 2023, Defendant filed the pending motions. (ECF Nos. 26 and 27.) Defendant requests that the court transfer this action to the Eastern District of Virginia (Alexandria

Division) pursuant to 28 U.S.C. § 1404(a).  Defendant also moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on several grounds examined below.  *See* Section III.B., *infra*.  The court first addresses the Motion to Transfer.

## II.    LEGAL STANDARDS

### A.    Motion to Transfer – 28 U.S.C. § 1404(a)

Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." "In a motion to transfer venue pursuant to § 1404(a), the moving party bears the burden of showing, by a preponderance of the evidence, that transfer to another venue is proper."  *Kimber v. Plus3 IT Sys., LLC*, No. CV ELH-18-3046, 2019 WL 1518970, at *3 (D. Md. Apr. 5, 2019).  "The decision whether to transfer is committed to the sound discretion of the trial court."  *Mamani v. Bustamante*, 547 F. Supp. 2d 465, 469 (D. Md. 2008).

"Based on the statutory language, the standard for a § 1404(a) transfer can be distilled, as follows: '(1) the transferee court must be a court in which the action could have been brought initially; (2) the transfer must be convenient to the parties and witnesses; and (3) the transfer must be in the interest of justice.'"  *Kimber*, 2019 WL 1518970, at *3 (quoting *Dow v. Jones*, 232 F. Supp. 2d 491, 499 (D. Md. 2002)).  "Thus, '[a] motion to transfer under § 1404(a) . . . calls on the district court to weigh in the balance a number of case-specific factors.'"  *Id.* (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)).  "These include: '(1) the weight accorded to plaintiffs' choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice.'"  *Id.* (quoting *Tr. of the Plumbers and Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015)).

6

"In reviewing a motion to transfer, [the] [c]ourt may consider evidence outside the pleadings." *Siemens Energy, Inc. v. CSX Transp., Inc.*, No. RDB-15-1072, 2016 WL 1059261, at *2 n.2 (D. Md. Mar. 17, 2016); *see also Ancient Sun Nutrition, Inc. v. Oregon Algae, LLC*, No. 1:10cv140, 2010 WL 3719503, at *1 (W.D.N.C. Sept. 17, 2010) ("Unlike a Rule 12(b) motion, which is limited to facts contained in the Complaint, a motion to transfer allows for review of materials submitted outside the pleadings").

### B. <u>Motion to Dismiss – Federal Rule of Civil Procedure 12(b)(6)</u>

"'The purpose of Rule 12(b)(6) is to test the sufficiency of a complaint' and not to 'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). Accordingly, a "Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling [her] to relief." *Edwards*, 178 F.3d at 244 (*citing Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).

"While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "A complaint that provides no more than 'labels and conclusions,' or 'formulaic RECITATION of the elements of a cause of action,' is insufficient." *Bourgeois v. Live Nation Ent., Inc.*, 3 F. Supp. 3d 423, 434 (D. Md. 2014) (quoting *Twombly*, 550 U.S. at 555). "The [c]ourt must be able to deduce 'more than the mere possibility

of misconduct'; the facts of the complaint, accepted as true, must demonstrate that the plaintiff is entitled to relief." *Evans v. 7520 Surratts Rd. Operations, LLC*, No. PX-21-1637, 2021 U.S. Dist. LEXIS 221041, at *4 (D. Md. Nov. 16, 2021) (quoting *Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 526 (D. Md. 2015)).

## III.   ANALYSIS

### A.   Motion to Transfer[3]

Defendant argues that, pursuant to 28 U.S.C. § 1404(a), the court should transfer this case to the Eastern District of Virginia due to the lack of connection between Plaintiffs' claims and Maryland and for the convenience of the witnesses and parties.  (ECF No. 26-2 at 1.)  As stated above, Defendant must first show that the transferee court is a court in which the action could have been brought.  Then, Defendant "must show by a preponderance of the evidence that the proposed transfer will better and more conveniently serve the interests of the parties and witnesses and better promote the interests of justice." *Helsel v. Tishman Realty & Constr. Co.*, Inc., 198 F. Supp. 2d 710, 711 (D. Md. 2002) (internal quotation marks and citation omitted).  "Mere assertions of inconvenience or hardship, without more, are insufficient to sustain a motion under Section 1404(a)." *Jones v. Koons Auto., Inc.*, 752 F. Supp. 2d 670, 681 (D. Md. 2010).  "Therefore, to satisfy its burden the defendant should submit, for example, 'affidavits from witnesses and parties explaining the hardships [it] would suffer if the case were heard in the plaintiff's chosen forum.'" *Id.* (quoting *Dow v. Jones*, 232 F. Supp. 2d 491, 499 (D. Md. 2002)).

---

[3] As stated above, "[i]n reviewing a motion to transfer, [the] [c]ourt may consider evidence outside the pleadings." *Siemens Energy, Inc. v. CSX Transp., Inc.*, No. RDB-15-1072, 2016 WL 1059261, at *2 n.2 (D. Md. Mar. 17, 2016). Defendant attaches three exhibits to the Motion to Transfer: Exhibit 1 – Declaration of Colleen Long (ECF No. 26-3); Exhibit 2 – Charges of Discrimination (ECF No. 26-4); and Exhibit 3 – Declaration of Christine Costantino (ECF No. 26-5.)  Plaintiffs attach one exhibit to the Response in Opposition to the Motion to Transfer: Exhibit 1 – Affidavit of Jerry Kim (ECF No. 36-1.)  For purposes of resolving the Motion to Transfer, the court will consider the exhibits attached to Defendant's Motion to Transfer and Plaintiffs' Opposition.  *See Siemens Energy, Inc., supra.*

The preliminary inquiry under 28 U.S.C. § 1404(a) is whether the civil action could have been brought in the transferee district. *D2L Ltd. v. Blackboard, Inc.*, 671 F. Supp. 2d 768, 777 (D. Md. 2009). "To establish that an action could have been brought in the proposed transferee district, the movant must show that the district is a proper venue and that the transferee court would have personal jurisdiction over the defendant." *Id.* at 778. "Under 28 U.S.C. § 1391(b), venue is proper in a judicial district where (1) any defendant resides or (2) the claim arose." *Id.*

Plaintiffs do not dispute, and the court is satisfied, that the instant case could have been brought in the United States District Court for the Eastern District of Virginia.[4] Accordingly, the court will proceed to consider the four requisite factors to determine whether transfer is appropriate: (1) Plaintiffs' choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interests of justice.

### 1.    Plaintiffs' Choice of Venue

"As a general rule, a plaintiff's 'choice of venue is entitled to substantial weight in determining whether transfer is appropriate.'" *Trustees of the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015) (quoting *Bd. of Trs. v. Sullivant Ave. Props., LLC*, 508 F. Supp. 2d 473, 477 (E.D. Va. 2007)). "Indeed, unless the balance of factors points 'strongly in favor of the defendant, the plaintiffs' choice of forum should rarely be disturbed.'" *Kimber v. Plus3 IT Sys., LLC*, No. CV ELH-18-3046, 2019 WL 1518970, at *4 (D. Md. Apr. 5, 2019) (quoting *Collins v. Straight, Inc.*, 748 F.2d 916, 921 (4th Cir. 1984)). "This is particularly true where 'the chosen forum is the plaintiff's home or bears a substantial relation to

---

[4] MITRE is headquartered in McLean, Virginia. Further, as of March 3, 2023, MITRE had 12 offices in Virginia and employed 4,685 individuals. At the time of their termination, 34 Plaintiffs reported to one of MITRE's Virginia locations or worked remotely in Virginia. The requests for accommodation or exemption from the COVID-19 vaccination policy were reviewed in Virginia and the decision to terminate Plaintiffs was made in Virginia. (Def.'s Mot., Colleen Long Decl., Exhibit 1, ECF No. 26-3 ¶¶ 3, 8, 16.)

the cause of action.'"  *Id.* (quoting *comScore, Inc. v. Integral Ad Science, Inc.*, 924 F. Supp. 2d 677, 682 (E.D. Va. 2013)).  "However, in cases in which 'none of the conduct complained of occurred in the forum selected by the plaintiff and said forum has no connection with the matter in controversy,' deference is less appropriate."  *Manne v. Jaddou*, No. CV 21-1092-PJM, 2022 WL 102853, at *7 (D. Md. Jan. 11, 2022) (quoting *United States ex rel. Salomon v. Wolff*, 268 F. Supp. 3d 770, 774-75 (D. Md. 2017)).  "In particular, when a plaintiff chooses to bring suit in a forum that is not plaintiff's home forum, deference is less likely."  *Id.*

Defendant argues that Plaintiffs' choice of forum should not be accorded any significant weight because only six Plaintiffs live in Maryland and Maryland has no connection to the facts of this case.  (ECF No. 26-2 at 8-9.)  The court disagrees.

The 69 Plaintiffs reside in various locations, including Maryland and Virginia.[5]  Seven Plaintiffs worked and/or resided in Maryland at the time their employment with MITRE was terminated.  (Pls.' Resp., Jerry Kim Decl., Exhibit 1, ECF No. 36-1 ¶ 3.)  The EEOC office in Baltimore, Maryland conducted the investigation and issued the right to sue letters for most Plaintiffs.  *See* ECF No. 4.  While the court considers that certain events giving rise to the action occurred at MITRE's headquarters in Virginia, it cannot be said that Maryland has no connection to the facts of this case.  Indeed, MITRE employed 521 employees in Maryland and had eight locations in Maryland at the time Plaintiffs were terminated.  (Kim Decl., Exhibit 1, ECF No. 36-1 ¶ 18.)  The court notes further that, during the relevant period, most MITRE employees worked remotely and at the time of Plaintiffs' terminations, only a few Plaintiffs were apparently working at MITRE's McLean, Virginia location.  *Id.* ¶ 8.  Plaintiffs live in various states across the country; MITRE has locations across the country and internationally.  *Id.* ¶ 14.  Plaintiffs collectively chose

---

[5] The court rejects Plaintiffs' argument that Plaintiff Menk is afforded "lead plaintiff" status or that cases pertaining to "home forum" apply to this non-class action.

to file the instant case in this district "for the benefit of all the Plaintiffs." *Id.* ¶ 15. While the weight accorded this factor is less than if all Plaintiffs were residents of, or employed in, Maryland, Plaintiffs' choice of venue in this district is entitled to weight.[6] *See Bannister v. Wal-Mart Stores E., L.P.*, 843 F. Supp. 2d 610, 615 (E.D.N.C. 2012) (granting motion to transfer from North Carolina to Virginia where two plaintiffs resided in, and were employed in, Virginia, and noting that the weight given to this factor "is less than it might if [the plaintiffs] were residents of or were employed in North Carolina); *GTE Wireless, Inc. v. Qualcomm, Inc.*, 71 F. Supp. 2d 517, 519 (E.D. Va. 1999) (declining to give dispositive deference where the defendant conducted substantial retail business in Virginia, but Virginia was not the plaintiff's home forum); *Kimber*, 2019 WL 1518970, at *4 (noting that "the plaintiff's choice of forum should rarely be disturbed" particularly where "the chosen forum is the plaintiff's home or bears a substantial relation to the cause of action") (internal citations and quotation marks omitted); *GTE Wireless, Inc.*, 71 F. Supp. 2d at 519 (explaining that "[t]he weight given the plaintiff's choice varies in proportion to the connection between the forum and the cause of action"); *Mamani v. Bustamante*, 547 F. Supp. 2d 465, 473 (D. Md. 2008) ("[A] court need not accord the choice as much weight when the 'forum has no connection with the matter in controversy.'") (citation omitted).

## 2.    Witness Convenience/Access and Convenience of Parties

The second and third factors for the court to consider are convenience of the witnesses and parties. "The convenience of the witnesses is 'perhaps the most important factor' in determining whether a transfer of venue should be granted." *Mamani*, 547 F. Supp. 2d at 473 (quoting *Cronos*

---

[6] Plaintiffs' counsel's place of business and licensure, however, is immaterial, and the court affords it no weight. *See Manne v. Jaddou*, No. CV 21-1092-PJM, 2022 WL 102853, at *8 (D. Md. Jan. 11, 2022) (noting that "the location of counsel is not really a factor that even enters into the equation . . . ."); *Armanno v. Puricle Inc.*, No. CV WDQ-05-2904, 2006 WL 8456736, at *3 (D. Md. June 1, 2006) (explaining that "[t]he location of counsel, however, is not a factor to be assessed in determining whether to transfer a case under § 1404(a) . . . .").

*Containers Ltd. v. Amazon Lines, Ltd.*, 121 F. Supp. 2d 461, 466 (D. Md. 2000)).  "The party asserting witness inconvenience has the burden to proffer, by affidavit or otherwise, sufficient details respecting the witnesses and their potential testimony to enable the court to assess the materiality of evidence and the degree of inconvenience."  *Koh v. Microtek Int'l*, 250 F. Supp. 2d 627, 636 (E.D. Va. 2003).  Further "[t]he convenience of the parties' factor is 'chiefly operative' in cases where a plaintiff has chosen a forum away from either party's home."  *Manne v. Jaddou*, No. CV 21-1092-PJM, 2022 WL 102853, at *8 (D. Md. Jan. 11, 2022).  "[T]he party convenience factor includes assessment of the ease of access to sources of proof, the cost of obtaining the attendance of witnesses, and the availability of compulsory process."  *Samsung Elecs. Co. v. Rambus, Inc.*, 386 F. Supp. 2d 708, 717 (E.D. Va. 2005).  "A defendant moving for transfer must show both that the original forum is inconvenient for it and that the plaintiff would not be substantially inconvenienced by a transfer."  *Kimber v. Plus3 IT Sys., LLC*, No. CV ELH-18-3046, 2019 WL 1518970, at *5 (D. Md. Apr. 5, 2019) (quoting WRIGHT & MILLER, FED. PRACTICE AND PROCEDURE § 3849 (4th ed. 2023)).

Defendant argues that at least eight witnesses who live or work in Virginia would be inconvenienced if this action proceeds here.  (ECF No. 26-2 at 11.)  Defendant further argues that few of the parties and none of the witnesses appear to live in Maryland.  *Id.*  In response, Plaintiffs maintain that MITRE is a large corporation with worksites across the United States, including eight in Maryland.  (ECF No. 36 at 6.)  Moreover, Plaintiffs argue that most of MITRE's employees worked remotely from their homes during the relevant time of the operative facts.  *Id.*

Defendant directs the court's attention to two cases: *Smart v. MedStar Washington Hospital Center* and *Atlantic City Associates Number Two (S-1), LLC v. Reale*.  In *Smart*, the plaintiff brought suit against the defendants, Medstar Washington Hospital Center and MedStar National

Rehabilitation Hospital.  No. TJS-21-2072, 2022 WL 616827, at *1 (D. Md. Mar. 2, 2022).  There, the defendants argued for transfer to the District of Columbia pursuant to 28 U.S.C. § 1404(a).  *Id.* Specifically, the defendants argued:

> "[t]here is no question that the alleged negligence occurred in the District of Columbia," and that "all care provided by MWHC and MNRH personnel . . . was rendered" in the District. Defendants submit that most of their witnesses work at MWHC and MNRH in the District, and suggest it would be a "substantial hardship for these health care providers to travel to Greenbelt instead of D.C., where they work each and every day." According to Defendants, the ongoing Covid-19 pandemic only compounds these hardships because the medical providers at MWHC and MNRH are "already stretched thin." The only connection this case has to Maryland, Defendants argue, is that Mr. McFadden lived in Maryland prior to his death. Finally, Defendants state that the case should be transferred to the District because the judges there are more familiar with the substantive D.C. law that will govern this case.

2022 WL 616827, at *1 (internal citations omitted).  With regard to the second and third factors, the plaintiff argued they were neutral, but the plaintiff did "not contest that [the d]efendants [were] likely to have more fact witnesses than she [would], nor [did] she contest that [the d]efendants' witnesses mostly reside and work in the District."  *Id.* at *3.  The *Smart* court found that the second and third factors weighed in favor of transfer because many of the witnesses were healthcare providers who worked in Washington D.C., and it was more convenient for the majority of witnesses to appear at the courthouse closer to their place of employment.  *Id.*[7]

In *Reale*, the court found that the defendants demonstrated that transferring the action to New Jersey would serve the convenience of the parties.  No. CIV. CCB-11-78, 2011 WL 1769842, at *2 (D. Md. May 9, 2011).

---

[7] In granting the motion to transfer, the *Smart* court noted that the plaintiff did not claim it would be inconvenient for her to prosecute the case in Washington D.C.  This court, however, notes it is not Plaintiffs' burden to persuade the court that Virginia is inconvenient.  *Id.*

The defendants have demonstrated that transferring this action to New Jersey will serve the convenience of the parties. Mr. Reale has declared through an affidavit that he is a small business owner with only one other employee and that his wife is an emergency nurse in Atlantic City who is required to be available on limited notice. Requiring them to travel to Maryland for trial, therefore, would be a hardship on both defendants. The Reales also care for their elderly father who currently resides in their home. Finally, all of the Reales's documents and records related to the property at issue in this case are located in Atlantic City, New Jersey. While Atlantic City Associates correctly notes that a transfer cannot be granted if the effect would be merely to shift the balance of convenience to the Plaintiff, it does not assert that proceeding with the case in New Jersey would cause any particular hardship to it or its employees other than noting that its records are maintained in its Baltimore office. Nothing else in the record indicates that Atlantic City Associates would be particularly burdened by attending a trial in New Jersey. Indeed, that it agreed to submit to the jurisdiction of New Jersey in the guaranty agreement's forum selection clause suggests that the plaintiff considered New Jersey a convenient, and even a favored, forum.

Transfer to New Jersey also may serve the convenience of the witnesses. The Reales have identified at least six third-party witnesses they intend to call at trial, all of whom reside in Atlantic County, New Jersey, more than 100 miles from Baltimore, Maryland. In comparison, the plaintiff has identified only party-witnesses, its own employees, as potential witnesses at trial. Convenience of the witnesses, therefore, appears to favor transfer.

*Reale*, 2011 WL 1769842, at *2 (internal citations and quotation marks omitted).

The instant case differs materially from *Smart* and *Reale*. *Smart* and *Reale* involved one plaintiff; here, there are 69 Plaintiffs that reside in different states across the country. Moreover, in contrast to *Reale*, to the extent Defendant maintains it would call its CEO and the six MITRE committee members as witnesses, Defendant does not articulate with specificity why these witnesses would be inconvenienced or face hardship by litigating the case in Maryland. *See Helsel v. Tishman Realty & Const. Co.*, 198 F. Supp. 2d 710, 712 (D. Md. 2002) (noting that "the party seeking a change of venue is required to submit affidavits from the witnesses and/or parties

14

involved [that contain] information detailing to the court why or to what extent he or she will be inconvenienced by . . . allowing the case to remain in the district where it was brought") (internal quotation marks omitted)); *Affinity Memory & Micro, Inc. v. K & Q Enterprises, Inc.*, 20 F. Supp. 2d 948, 955 (E.D. Va. 1998) (explaining that "[n]either party provides the 'requisite particularity' about the expected witnesses and their potential testimony to accord this factor much weight"); *Bd. of Trustees, Sheet Metal Workers Nat. Fund v. Baylor Heating & Air Conditioning, Inc.*, 702 F. Supp. 1253 (E.D. Va. 1988) (finding that the defendant has failed to persuade the court that the inconvenience to its witnesses rises to the level required for transfer where there is no "persuasive showing that all six supervisors would be needed" and "[t]here is no detailed description of the supervisors' testimony and no convincing showing that the supervisors' testimony would be probative"); *see also Pauli v. Ollie's Bargain Outlet, Inc.*, No. 522CV00279MADML, 2022 WL 14760084, at *4 (N.D.N.Y. Oct. 25, 2022) (noting that the defendant failed to provide "the names or location of their employees or former employees, or with any evidence to suggest that these employees would be unwilling to testify or unable").

Defendant merely cites the general inconvenience associated with a commute from Northern Virginia to Baltimore, but does not suggest that any witness would be unwilling or unable to testify, or suffer any particularized hardship. The court is not persuaded that Defendant will be unduly inconvenienced by having to litigate the case 48 miles from its headquarters. *See Jones v. Koons Auto., Inc.*, 752 F. Supp. 2d 670, 681 (D. Md. 2010) (noting that "the court is confident that [the defendant] will not be unduly inconvenienced by having to litigate a case just 70 miles away from its place of business"). Defendant further offers no factually-supported argument as to why Virginia is the more convenient forum for Plaintiffs. A transfer would therefore appear simply to shift inconveniences from one party to the other. *See Byerson v. Equifax Info. Servs.*, LLC, 467

F. Supp. 2d 627, 633 (E.D. Va. 2006) (noting that the defendants offer no argument as to why South Carolina is more convenient for the plaintiffs and "thus, transfer would, at most, 'only shift the balance of inconvenience from defendant[s] to plaintiffs' and therefore 'does not militate persuasively in favor of transfer'") (quoting *Bd. of Tr., Sheet Metal Workers Nat'l Fund*, 702 F. Supp. at 1260).

With regard to the access to sources of proof, Plaintiffs argue, and the court agrees, the location of documents and sources of proof is entitled to little weight "because with the advent of modern technology, the physical location of proof is less of a barrier to gaining access to proof for litigation." *Pauli*, 2022 WL 14760084, at *5; *see Wyandotte Nation v. Salazar*, 825 F. Supp. 2d 261, 271 (D.D.C. 2011) (explaining that "[w]ith respect to the location of documents, in this digital age of easy and instantaneous electronic transfer of data, the Court does not find that the ease of access to sources of proof factor carries any weight in the transfer analysis" particularly "where both sides are sophisticated litigants and have the necessary resources to manage and exchange documents electronically"). Accordingly, the weight afforded to Plaintiffs' choice of forum is not clearly outweighed by the second and third factors.

### 3.    Interest of Justice

The final factor is the interest of justice. "This factor is 'amorphous and somewhat subjective,' and allows a court to 'consider many things.'" *Kimber v. Plus3 IT Sys., LLC*, No. CV ELH-18-3046, 2019 WL 1518970, at *6 (D. Md. Apr. 5, 2019). "In assessing whether transfer would meet the interest of justice, additional factors that the courts consider are the pendency of a related action, the court's familiarity with the applicable law, docket conditions, and the ability to join other parties." *Id.* at *6. It "encompasses public interest factors aimed at 'systemic integrity and fairness.'" *Samsung Elecs. Co. v. Rambus, Inc.*, 386 F. Supp. 2d 708, 721 (E.D. Va. 2005).

"Most prominent among the elements of systemic integrity are judicial economy and the avoidance of inconsistent judgment." *Byerson v. Equifax Info. Servs., LLC*, 467 F. Supp. 2d 627, 635 (E.D. Va. 2006). "Fairness is assessed by considering docket congestion, interest in having local controversies decided at home, knowledge of applicable law, unfairness in burdening forum citizens with jury duty, and interest in avoiding unnecessary conflicts of law." *Id.* "In some cases, 'the interest of justice may be decisive in ruling a transfer motion, even though the convenience of the parties and witnesses point in a different direction.'" *Id.* at 637 (quoting *Samsung*, 386 F. Supp. 2d at 716).

Defendant relies on the local interest, jury duty, docket congestion, applicable law, and access to evidence to support transfer. (ECF No. 26-2 at 13-15.) As Defendant notes, Virginia has an interest in adjudicating this case because MITRE has an office in Virginia and many of the decisions involving Plaintiffs' terminations were made in Virginia. However, several of the 69 Plaintiffs are Maryland residents; others worked in Maryland and/or were terminated from employment in Maryland. Thus, it does not appear that burdening jurors in Maryland is unfair or offends the interest of justice. Additionally, conflicts of law and knowledge of applicable law does not weigh in favor of transfer, as the Complaint sets forth 12 federal claims and two common law claims. *See Byerson*, 467 F. Supp. 2d at 635 (noting that "because this action arises under federal law, this [c]ourt cannot be presumed to have greater knowledge of the applicable law than does the federal court in South Carolina"). The court acknowledges that transfer of this case to the Eastern District of Virginia may allow for a more expeditious resolution, but the court is not persuaded that this factor advances the ball for Defendant to the point of transfer. *See Kimber*, 2019 WL 1518970, at *6 (finding that this factor favors transfer because "[t]ransfer will allow for a more expeditious resolution of this case because the time to trial in civil cases in the Eastern

District of Virginia is shorter than in Maryland"). While docket conditions are relevant, the other factors weigh against transfer of this action to the Eastern District of Virginia. Therefore, the court is not persuaded that the interest of justice factor weighs in favor transferring this case to the Eastern District of Virginia.

The Motion to Transfer will be denied. Because the court declines to transfer the case, the court will address the pending Motion to Dismiss.

**B.**   **Motion to Dismiss**

As discussed above, Defendant seeks to dismiss the Complaint on several grounds: (1) Plaintiffs' Religious Discrimination claim—Count I—fails because Plaintiffs do not allege a sincerely held religious belief conflicting with Defendant's vaccination requirement; (2) Plaintiffs' Disability Discrimination claim—Count II—fails because Plaintiffs do not allege they are qualified individuals with disabilities; (3) Plaintiffs' Disability Discrimination Unlawful Medical Examination or Inquiry claim—Count III—fails because inquiring about vaccination status is not an impermissible medical inquiry under the ADA; (4) Plaintiffs' Disability Discrimination Regarded as Disabled claim—Count IV—fails because requiring employees to comply with a vaccination policy cannot plausibly support an inference that the employer regarded the employee as disabled; (5) Plaintiffs' Constitutional and RFRA claims—Counts V through VII, IX through XI, and XIV—fail because Defendant is not a state actor and, even were Defendant a state actor, neither vaccination nor employment implicate a fundamental right, and Plaintiff cannot establish that Defendant's policy lacks a rational relation to a legitimate government interest; (6) the First Amendment Retaliation claim[8]—Count XIV—fails because the vaccination policy was enacted before Plaintiffs sought an accommodation and Plaintiffs fail to identify any statement made in

---

[8] Defendant refers to Count XIV as a First Amendment Retaliation claim; however, the Complaint titles Count XIV "Violation of the First Amendment Freedom of Speech."

opposition to the policy; (7) Plaintiffs' claims pursuant to the EUA and Procurement Act—Counts VIII and XII—fail because the EUA and Procurement Act are federal, not state, statutes; therefore these claims do not state a claim of termination in violation of public policy; and neither law governs private actors or creates a private right of action; (8) the Religious Accommodation Retaliation claim—Count XIII—fails because requesting an accommodation is not a protected activity; and (9) Plaintiffs' Title VII and ADA claims—Counts I through IV—fail because Plaintiffs failed to exhaust their administrative remedies.  (ECF No. 27-1 at 18-19.)

### 1.    <u>Exhaustion of Administrative Remedies</u>

Regarding Plaintiffs' Title VII and ADA claims (Counts I through IV), Defendant argues that Plaintiffs filed "nearly identical 'copycat' [EEOC] charges" and "did not provide information specific to their individuals claims," thereby denying "the EEOC and MITRE the ability to investigate and respond."  On this basis, MITRE argues that Plaintiffs "subverted the important administrative agency process and cannot fairly be said" to have exhausted their administrative remedies as required before filing suit.  (ECF No. 27-1 at 31.)

Title VII and the ADA require a plaintiff to exhaust administrative remedies prior to bringing suit in court.  *See Walton v. Harker*, 33 F.4th 165, 172 (4th Cir. 2022) (citing 42 U.S.C. § 2000e-5(b), (f); 29 U.S.C. § 633a(d)) (explaining that "[i]t is well settled that before filing suit under Title VII [], a plaintiff must exhaust her administrative remedies by bringing a charge with the EEOC"); *Sydnor v. Fairfax Cnty., Va.*, 681 F.3d 591, 593 (4th Cir. 2012) (holding ADA incorporates Title VII's enforcement procedures, including the administrative exhaustion requirement).

An EEOC charge serves two important purposes: (1) "it notifies the charged party of the asserted violation" and (2) "it brings the charged party before the EEOC and permits effectuation

of the [Civil Rights] Act's primary goal, the securing of voluntary compliance with the law."

*Dickey v. Greene*, 710 F.2d 1003, 1005 (4th Cir. 1983), *rev'd on other grounds*, 729 F.2d 957 (4th

Cir. 1984).  In *Balas v. Huntington Ingalls Indus., Inc.*, the Fourth Circuit explained the EEOC

process:

> An employee complaining of illegal discrimination must first contact the EEOC and present it with information supporting the allegations. After receiving an employee's intake questionnaire and any other information the employee has provided, the EEOC typically assists the employee with filing a charge. This assistance often includes drafting a charge—as it did here—and then asking the employee to sign it.
>
> The EEOC sends a notice and copy of the charge to the employer. This notice gives the employer the chance to voluntarily conduct its own investigation and attempt to resolve any discriminatory actions internally. Concurrently, the EEOC investigates the charge.
>
> The filing of a charge also "initiates agency-monitored settlement, the primary way that claims of discrimination are resolved." This procedure "reflects a congressional intent to use administrative conciliation as the primary means of handling claims, thereby encouraging quicker, less formal, and less expensive resolution of disputes." Prior to making any determination as to the merit of a charge, the EEOC may encourage and facilitate settlement between the parties.
>
> If the EEOC finds "reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." If the EEOC cannot reach a voluntary settlement with the employer, the agency may file a lawsuit or issue a Notice–of–Right–to–Sue to the employee. If the EEOC does not make a reasonable cause determination or the employee requests a right to sue, the agency may issue one, thus allowing the employee to file suit.

711 F.3d 401, 407 (4th Cir. 2013) (internal citations omitted).  The exhaustion requirement "serves

a vital function in the process of remedying an unlawful employment practice."  *Chacko v.*

*Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005).   It is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Balas,* 711 F.3d at 407.

Generally, "a plaintiff fails to exhaust his administrative remedies where . . . his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit." *Chacko*, 429 F.3d at 506.  In *Walton v. Harker*, the Fourth Circuit succinctly explained:

> A plaintiff's EEOC charge defines the scope of her subsequent right to institute a civil suit. The allegations contained in the administrative charge of discrimination generally limit the scope of any subsequent judicial complaint. [F]actual allegations made in formal litigation must correspond to those set forth in the administrative charge.  Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.

33 F.4th 165, 172 (4th Cir. 2022).  The court also recognizes that "EEOC charges often are not completed by lawyers and as such 'must be construed with utmost liberality.'" *Balas*, 711 F.3d at 408 (quoting *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 848 F.2d 457, 460 (4th Cir. 1988)).  The court, however, is not "at liberty to read into administrative charges allegations they do not contain." *Id.*

Relying on *Koch v. White*, Defendant asserts that because Plaintiffs filed nearly identical charges with the EEOC, the EEOC was deprived of the ability to investigate Plaintiffs' claims, and therefore, Plaintiffs failed to exhaust their administrative remedies.  (ECF No. 27-1 at 32.)  The court disagrees.  In *Koch v. White*, the plaintiff filed a complaint with the Securities and Exchange Commission's ("SEC") Office of Equal Employment Opportunity.  During the administrative process, the plaintiff stopped cooperating and participating in the investigation. 744 F.3d 162, 164 (D.C. Cir. 2014).  Specifically, the plaintiff failed to provide the investigator access to his medical

records and refused to provide testimony. *Id.* Thus, the SEC's Office of Equal Employment Opportunity dismissed the plaintiff's complaint for failure to cooperate. *Id.* The plaintiff unsuccessfully appealed the dismissal to the EEOC and then filed suit in the district court against the SEC. *Id.* The district court granted summary judgment in favor of the SEC, "holding, among other things, that 'Mr. Koch's refusal to participate in his administrative proceedings constitutes a failure to exhaust his administrative remedies and that there is no reason to excuse such failure.'" *Id.* (quoting *Koch v. Schapiro*, 777 F. Supp. 2d 86, 91-92 (D.D.C. 2011)).

On appeal, the Court of Appeals for the District of Columbia affirmed the district court's dismissal of the Rehabilitation Act claim:

> First, the legal question: did Koch exhaust his administrative remedies? A plaintiff's suit "will be barred for failure to exhaust administrative remedies" if he "forces an agency to dismiss or cancel the complaint by failing to provide sufficient information to enable the agency to investigate the claim." *Wilson v. Peña*, 79 F.3d 154, 164 (D.C. Cir. 1996). Here, the Office made clear that its investigation would require, at a minimum, Koch's testimony and possibly Koch's medical records as well. Koch provided neither and concedes as much. He argues instead that the medical records he had provided during counseling—but which he insisted be withheld from Jewell—were sufficient to allow the investigation to proceed.
>
> We disagree. *Rann v. Chao*, 346 F.3d 192 (D.C. Cir. 2003), is materially indistinguishable from this case and controls our analysis. Rann had filed an age discrimination complaint with his agency's Equal Employment Opportunity Office and, though he provided the counselor with written information, he refused to provide a signed affidavit. *Id.* at 196. The Office dismissed his complaint, and this court ultimately found that Rann failed to exhaust his administrative remedies. *Id.* at 196-97. So it must be here. Koch "neither complied with [the Agency's] requests nor provided any information beyond his initial submission." *Id.* at 196. Under *Rann*, he provided insufficient information to the agency and thus failed to exhaust his administrative remedies.

*Koch*, 744 F.3d at 165.

The instant case is materially distinguishable from *Koch*.  Defendant attaches to the Motion to Dismiss one exhibit containing five separate EEOC charges.[9]  (ECF No. 27-2.)  In each EEOC charge, the complainant (a Plaintiff here) checked boxes indicating discrimination based on religion and disability.  *Id.* at 2, 7, 12, 17, 22.  In addition, each EEOC charge attaches a four-page factual statement to support the charge.  *Id.* at 2-26.  Each charge contends that the complainant (a Plaintiff here) filed for "a religious and/or medical exemption from the vaccine" and that MITRE denied the request without explanation.  *Id.* at 4.  The charge also references the religious accommodation for medical and non-medical exemptions through the ADA and Title VII.  *Id.*  The charge further states that a vaccine mandate as applied in the context of their employment, violates the ADA.  (ECF No. 27-2 at 5.)  Finally, the charge indicates that Plaintiffs believe and assert "that MITRE wrongfully and intentionally violated complainant's right to be free of religious and/or medical discrimination because it was attempting to garner favor with the current administration – all of its funding comes from the Federal government, and it wanted to demonstrate solidarity with the President instead of accommodating complainant's religious convictions."  *Id.* at 6.

On October 27, 2022, Plaintiffs received EEOC right-to-sue notices informing them, *inter alia*, that they could file suit under Title VII, ADA, or the Genetic Information Nondiscrimination

---

[9] Plaintiffs did not attach the EEOC Charges to the Complaint; instead Plaintiffs attach the right-to-sue letters.  (ECF No. 4.)  MITRE attached the EEOC Charges to their Motion.  (ECF No. 27-2.)  In ruling on a motion to dismiss pursuant to Rule 12(b)(6), a court usually does not consider evidence outside of the complaint.  A court may consider documents attached to a motion to dismiss if the document is "integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity."  *Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)).  "An integral document is a document that by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'"  *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point*, LLC, 794 F. Supp. 2d. 602, 611 (D. Md. 2011) (quoting *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007)).  "In addition to integral and authentic exhibits, on a 12(b)(6) motion the court 'may properly take judicial notice of matters of public record.'"  *Id.* (quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).  The court may consider the EEOC Charges attached to MITRE's Motion because the documents' very existence are necessary for Plaintiffs to file the instant action and Plaintiffs do not dispute their authenticity.  Further, the information in the EEOC Charges is necessary in determining the scope of the claims Plaintiffs are entitled to bring before this court under Title VII and the ADA.  The court will, therefore, consider the EEOC Charges in resolving the Motion to Dismiss.

Act.  (ECF No. 4.)  The right-to-sue letters provide: "more than 180 days have passed since the filing of this charge" and "[t]he EEOC is terminating its processing of this charge."  *See id.*  While the right-to-sue letters indicate that they were issued at Plaintiffs' request, that does not imply, as Defendant argues, that the EEOC closed or dismissed the complaints on the basis of non-cooperation.[10]

Nothing before the court suggests that Plaintiffs failed to comply with the EEOC investigation.  The court is satisfied that the factual allegations contained in the Complaint regarding Plaintiffs' Title VII and ADA claims are reasonably related to the factual allegations set forth in Plaintiffs' EEOC charges.  Accordingly, the court declines to dismiss Counts I through IV for failure to exhaust administrative remedies.

**2.      Title VII 42 U.S.C. § 2000e (Counts I and XIII)**

In Count I, Plaintiffs bring a religious discrimination claim on the basis of failure to accommodate.  (ECF No. 1 at 34.)  In Count XIII, Plaintiffs bring a Title VII retaliation claim.  *Id.* at 77.

"Title VII forbids (i) employment practices that discriminate against an employee on the basis of race, color, religion, sex, or national origin, 42 U.S.C. § 2000e-2, and (ii) retaliation against an employee for opposing adverse actions that she reasonably suspects to be unlawful under Title VII, 42 U.S.C. § 2000e-3."  *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 326-27 (4th Cir. 2018). "A plaintiff pursuing a claim under Title VII may either offer direct evidence of discrimination or, using indirect evidence, [he] may rely on the burden shifting framework that was adopted by the

---

[10] Indeed, "Section 2000e-16(c) permits aggrieved federal employees to file a civil action 180 days 'from the filing of the initial charge with the department, agency, or unit' if the agency has 'fail[ed] to take final action on his complaint.'" *Stewart v. Iancu*, 912 F.3d 693, 702 (4th Cir. 2019) (quoting 42 U.S.C. § 2000e-16(c)); *see White v. Univ. of Md. Med. Ctr.*, 642 F. Supp. 3d 504, 512 (D. Md. 2022) (explaining that "Congress provided exactly four avenues for the EEOC to dispose of a charge: dismissal, conciliation, agency litigation, or a private action after 180 days").  Given the statute's express language, Plaintiffs filing of the instant case 180 days after filing with the EEOC does not amount to a failure to exhaust.

Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Coleman v. Whitley*, No. 21-1181, 2022 WL 16630570, at *2 (4th Cir. Nov. 2, 2022).  Pursuant to *McDonnell Douglas*, the plaintiff bears the initial burden of establishing by a preponderance of the evidence a prima facie case of discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  However, at the motion to dismiss stage, "[i]t has long been the rule that 'an employment discrimination plaintiff need not plead a prima facie case of discrimination under the evidentiary framework set forth in *McDonnell Douglas Corp.*"  *Holloway v. Md.*, 32 F.4th 293, 298 (4th Cir. 1973).  "Instead, a Title VII plaintiff is 'required to allege facts to satisfy the elements of a cause of action created by that statute.'"  *Bing v. Brivo Systems, LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015)).

### a.  *Religious Discrimination – Failure to Accommodate (Count I)*

Defendant argues that Plaintiffs' religious discrimination claim brought pursuant to 42 U.S.C. § 2000e—Count I—fails because Plaintiffs allegations are conclusory and do not allege a sincerely held religious belief conflicting with Defendant's vaccination requirement.  (ECF No. 27-1 at 8-12.)  Further, Defendant argues that Plaintiffs must provide sufficient factual allegations to demonstrate "that, whatever they believe . . . addresses 'fundamental and ultimate questions having to do with deep and imponderable matters,' are 'comprehensive in nature,' and are accompanied by 'certain formal and external signs.'"  *Id.* at 10 (quoting *Fallon v. Mercy Catholic Med. Ctr. Of Southeastern Penn.*, 877 F.3d 487, 491-93 (3d Cir. 2017)).

Relevant here, Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's religion."  42 U.S.C. § 2000e-2.  Religion "includes all aspects of religious observance and practice, as well as belief, unless an

employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).  "Courts have recognized that employees may utilize two theories in asserting religious discrimination claims."  *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017 (4th Cir. 1996).  "These theories are denominated as the 'disparate treatment' and 'failure to accommodate' theories."  *Id.*

Under Title VII, 42 U.S.C. § 2000e(j), "an employer has a 'statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship.'"  *E.E.O.C. v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)).  "To state a prima facie failure-to-accommodate claim, an employee must allege that: '(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement.'"  *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 509 (D. Md. 2019) (quoting *U.S. Equal Emp't Opportunity Comm'n v. Consol Energy, Inc.*, 860 F.3d 131, 141 (4th Cir. 2017).  "If a prima facie case is made, the burden shifts to the employer to show 'either (1) that it provided the plaintiff with a reasonable accommodation for his or her religious observances or (2) that such accommodation was not provided because it would have caused undue hardship[.]'"  *Stroup v. Coordinating Ctr.*, No. CV MJM-23-0094, 2023 WL 6308089, at *5 (D. Md. Sept. 28, 2023) (quoting *E.E.O.C. v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008)).  "To demonstrate undue hardship, 'an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business.'"  *Id.* (quoting *Groff v. DeJoy*, 600 U.S. 447, 470 (2023)).

Defendant does not dispute that Plaintiffs allege the second and third factors for a prima facie failure-to-accommodate claim. Rather, Defendant argues that Plaintiffs do not adequately allege the first factor – a bona fide religious belief that conflicts with an employment requirement.

In *Ellison v. Inova Health Care Services*, the court succinctly explained:

> Title VII does not protect just any belief. To be protected, an employee's belief must be religious in nature. *McManus v. Bass*, No. 2:05-cv-117, 2006 WL 753017, at *4 (E.D. Va. Mar. 21, 2006) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 215-16, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) ("Yoder"); *see also Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015) (noting, in the First Amendment context, that a "request for an accommodation must be sincerely based on a religious belief and not some other motivation"). Of course, courts are in no position to "question the centrality of particular beliefs or practices of faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989). Indeed, the determination of whether a plaintiff's beliefs are religious must not turn upon a judicial perception of the belief or practice in question. *See Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 714 (1981); *see also United States v. Seeger*, 380 U.S. 163, 185 (noting that courts are not free to reject beliefs because they consider them "incomprehensible").

No. 1:23-cv-00132(MSN/LRV), 2023 WL 6038016, at *4. Thus, "[t]he [c]ourt must [] determine whether the Plaintiffs' purported beliefs are both (1) 'sincerely held' and (2) 'religious' in nature." *Id.* (quoting *Welsch v. United States*, 398 U.S. 333, 339 (1970).

At this stage, the question of the sincerity of Plaintiffs' religious beliefs is not at issue. The sincerity of Plaintiffs' religious beliefs is "one for the finder of fact and would not be amenable to disposition on a motion to dismiss." *Foshee v. AstraZeneca Pharms. LP*, No. CV SAG-23-00894, 2023 WL 6845425, at *4 (D. Md. Oct. 17, 2023). Therefore, the precise issue is whether Plaintiffs' beliefs are religious in nature.[11]

---

[11] Defendant argues, and the court disagrees, that Plaintiffs failed to identify any belief in the first instance. In the Complaint, Plaintiffs allege that "[m]any of the Plaintiffs objected specifically because, in their view, utilizing a product that was developed and/or produced using cell lines derived from aborted fetal tissue, even years after the tissue was obtained, is participation in, and encouragement of, evil." (ECF No. 1 ¶ 29.)

27

In analyzing whether Plaintiffs adequately allege beliefs that are religious in nature, the

*Ellison* court provides guidance:

> Whether one's beliefs and practices are religiously motivated is of
> course a difficult question for courts of law to decide. *Doswell v.
> Smith*, 139 F.3d 888 (4th Cir. 1998). For that reason, courts must be
> sure to avoid any "predisposition toward conventional religions" as
> to ensure that unfamiliar or unconventional beliefs are not
> incorrectly labeled as "secular." *Id.* (citing *Africa v. Pennsylvania*,
> 662 F.2d 1025, 1031 (3d Cir. 1981)). Still, "the very concept of
> ordered liberty precludes allowing every person to make his [or her]
> own standards on matters of conduct in which society as a whole has
> important interests." *Yoder*, 406 U.S. at 215-16, 92 S. Ct. 1526.
> Indeed, "[a] system of religious beliefs, however, is distinct from a
> way of life, even if that way of life is inspired by philosophical
> beliefs or other secular concerns." *Versatile v. Johnson*, No. 3:09-
> cv-120, 2011 WL 5119259, at *4 (E.D. Va. Oct. 27, 2011) (internal
> quotation omitted). Thus, in determining whether an employee's
> beliefs are religious in nature, courts have analyzed whether the
> beliefs in question (1) "address fundamental and ultimate questions
> having to do with deep and imponderable matters," (2) are
> "comprehensive in nature," and (3) "are accompanied by certain
> formal and external signs." *Africa*, 662 F.2d at 1032.6 It is also
> worth noting that the religiosity inquiry is a necessarily
> individualized one. *Cf.* EEOC Compliance Manual at § (a)(1)
> (explaining that deciding whether a belief or practice is religious
> requires a "case-by-case inquiry"); *see also Dachman v. Shalala*, 9
> F. App'x 186, 191-93 (4th Cir. 2003) (holding that an employee was
> required to accommodate a plaintiff who requested time off to
> observe the sabbath but noting that the same would not be true if the
> plaintiff's request was spurred by secular obligations like household
> chores).

2023 WL 6038016, at *4; *see Foshee v. AstraZeneca Pharms., LP*, No. CV SAG-23-00894, 2023

WL 6845425 (D. Md. Oct. 17, 2023) (noting that "[b]ecause religious beliefs are individual in

nature, it is not essential that the beliefs be shared by an organized religious group to qualify as

religious in nature") (citing *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 715-16

(1981)).

Plaintiffs allege:

Plaintiffs MENK, AMARAL, ASFAW, BADILLO, BAGER, BATE, BERG, BLAKE, BOIN, BROOKS, CASTILLO, CONNERY, COOK, CRABTREE, CROSS-DAWKINS, DALTON, DAVIS, DELISLE, DIGIOIA, ELLIS, ESTRADA, FANDOZZI, FREEMAN, FRICK, GEORGE, FRIECO, GUENSCH, HADYK, HARRIS-AGUIRRE, HOBBS, JACOBY JARVI, JOHNSON, KEMON, KENDALL, KIIHNE, KIM, KOLLIGS, KUHN, KUNZ, MERRICK, MILLER. KEVIN, MILLER. LYNNE, MONTELLA, NEFF, PARRISH, PELLERIN, PENG, PIZZOLATTO, RAHM, ROGERS, SACHER, SCARBROUGH, SCHWARTZ, SILVER, SINGH, SPOONER, STEIBER, TACKETT, TAVENNER, WAN, WARD, WERNER, WHEELER, WHITTAKER, WICKIZER, WORRELL, ZAPLETAL, and ZHENG requested to be exempt from the vaccine mandate, as a reasonable accommodation of their sincerely held religious beliefs.

***

MITRE interviewed Plaintiffs over the phone after they submitted their written exemption requests. During those interviews, MITRE showed no inclination to provide Plaintiffs their requested accommodations and did not discuss alternative accommodations. MITRE did not accept that employees could have a sincere conscientious and religious objection to the vaccine . . . .

Many religious objections to the COVID-19 vaccines centered on the role of human embryonic stem cell products used in the development and/or production of the vaccines. The pharmaceutical industry's use of embryonic stem cells derived from aborted fetuses is a longstanding and widespread concern voiced by religious adherents that predates the COVID-19 vaccines . . . .

The cell lines sold under the trade names HEK 293 and PER.C6 are derived from the cells of human fetuses. The vaccines available in October and November 2021 were developed and/or produced using those cell lines. Many of the Plaintiffs objected specifically because, in their view, utilizing a product that was developed and/or produced using cell lines derived from aborted fetal tissue, even years after the tissue was obtained, is participation in, and encouragement of, evil. Similar objections have been raised in the field of religious morality and bioethics to the use of information derived from Nazi medical experiments on Jewish prisoners during the Second World War and U.S. governmental research performed on African Americans at Tuskegee . . . .

***

Instead, MITRE set out with a plan to undermine, question, dispute, and reject the stated objections articulated by its employees. In nearly all cases, MITRE rejected the requested religious exemptions contending that the objections were not sincerely held.

MITRE also engaged in adversarial interviews with the Plaintiffs. It did not allow Plaintiffs to bring attorneys, religious leaders, or others to the interviews. In the absence of objective evidence suggesting that the Plaintiffs were not sincere in their religious objections, such interviews should have been limited to an interactive process with Plaintiffs with the goal of finding possible accommodations. MITRE used those interviews to interrogate Plaintiffs on the sincerity of their religious beliefs despite the fact that MITRE had no objective evidence the Plaintiffs' stated religious opposition to the vaccine mandate was not sincerely held . . .

On or around November 5, 2021, Plaintiffs received a letter from MITRE informing them that their requests to be exempt were denied. The letter provided no explanation as to why the requests were denied. At no other time, did MITRE explain the denial to Plaintiffs. MITRE did not allow Plaintiffs to appeal the decision. It is believed, and therefore averred, that to the extent MITRE granted any religious exemption requests, it did so arbitrarily and, often, because the religion relied upon was not a mainstream religion with which MITRE was acquainted.

(ECF No. 1 ¶¶ 25, 27-29, 31-33.)

Plaintiffs direct the court's attention to several cases they contend support their failure-to-accommodate religious discrimination claim. *See* ECF Nos. 42-43, 46-49. The court finds Plaintiffs' reliance on these cases misplaced. In those cases, the courts found that the plaintiffs adequately alleged the first element (*i.e.*, a religious-based objection to vaccination) of a failure-to-accommodate claim where the plaintiffs alleged their religion and their religious-based objection to vaccination. *See Camp v. L.A. Arena Company, LLC*, No. EDCV22-2220JGB, 2023 WL 4680797, at *2, *7 (C.D. Ca. June 15, 2023) (concluding that the plaintiff pled adequate facts to support his failure to accommodate claim where the plaintiff alleged he was a Christian and "believes that his body belongs to God and is a temple of the Holy Spirit" and, therefore, "he

believed that it is against his religion to ingest or inject his body with possible harmful substances"); *Rolovich v. Washington State Univ.*, No. 2:22-CV-0319-TOR, 2023 WL 3733894, at *3 (E.D. Wa. May 30, 2023) (finding that the plaintiff alleged the first element of a failure-to-accommodate claim by alleging "he is a practicing Catholic and his 'study of the Bible, personal prayer, . . . advice from a Catholic priest, and the teachings of the Church . . . precluded him from receiving any available COVID-19 vaccine").

Plaintiffs' reliance on *Keene v. City and County of San Francisco* is similarly misplaced. There, the Ninth Circuit reversed the district court court's finding that the plaintiffs had not made a prima facie case of discrimination.  *Keene v. City and County of San Francisco*, No. 22-16567, 2023 WL 3451687, *1 (9th Cir. May 15, 2023).  In doing so, the Ninth Circuit noted that the plaintiffs were Christians and the record reflected "that COVID-19 vaccine manufacturers used '[f]etal cell lines . . . grown in a laboratory . . . [that] started with cells from elective abortions that occurred several decades ago' to at least test vaccine efficacy."  *Id.* at *2.  In reversing and remanding to the district court, the Ninth Circuit court explained:

> The district court erroneously concluded that "[n]either Plaintiff has demonstrated that their religious beliefs are sincere or that those beliefs conflict with receiving the COVID-19 vaccine. There are no grounds upon which to assert the mistaken conclusion that the FDA-approved vaccines contain fetal cells or are otherwise derived from murdered babies." However, the record reflects that the COVID-19 vaccines are, albeit remotely, "derived" from aborted fetal cell lines. This directly contradicts the district court's conclusion. *See Hinkson*, 585 F.3d at 1263.
>
> Beyond the district court's factual error, its decision reflects a misunderstanding of Title VII law. A religious belief need not be consistent or rational to be protected under Title VII, and an assertion of a sincere religious belief is generally accepted. *Thomas v. Review Bd.*, 450 U.S. 707, 714 (1981) ("[T]he resolution of [whether a belief is religious] is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or

31

comprehensible to others in order to merit First Amendment protection."); *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1176 n.3 (9th Cir. 2021) ("We may not . . . question the legitimacy of [Appellants'] religious beliefs regarding COVID-19 vaccinations." (citing *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018))), *recons. en banc denied*, 22 F.4th 1099 (9th Cir. 2022); EEOC Guidance, § 12–I(A)(2) ("[T]he sincerity of an employee's stated religious belief is usually not in dispute and is generally presumed or easily established." (cleaned up)).

The district court did not explain its conclusion that Appellants had not established sincerity beyond stating that there are "no grounds upon which to assert the mistaken conclusion that the FDA-approved vaccines . . . are . . . derived from murdered babies" and generally stating that personal preferences are not sincere religious beliefs. And CCSF offered no argument or evidence that Appellants' beliefs are insincere. Absent any indication otherwise, it seems that the district court erroneously held that Appellants had not asserted sincere religious beliefs because their beliefs were not scientifically accurate. Remand is warranted for the district court to reevaluate Appellants' claims applying the proper failure-to-accommodate inquiry.

2023 WL 3451687, at *2.

In contrast to *Camp, Rolovhich,* and *Keene*, Plaintiffs fail to allege what religion they practice or what subjective religious beliefs they maintain. The court recognizes that controlling law cautions the court "against second-guessing the reasonableness of an individual's asserted religious belief,"[12] however, to withstand a motion to dismiss, Plaintiffs are obliged to set forth "sufficient allegations regarding [their] subjective personal beliefs, how those beliefs are related to [their] faith, and how those beliefs form the basis of [their] objection to the COVID-19 vaccination." *Ellison*, 2023 WL 6038016, at *6. "[P]laintiffs must provide more than conclusory allegations that a belief is religious; they must allege facts explaining how a subjective belief is religious in nature and connect their objection to that belief." *Id.* at *7 Indeed, "before treating a

---

[12] *Rolovich*, 2023 WL 3733894, at *3 (citing *Bolden-Hardge*, 63 F.4th at 1223, and *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014)).

belief as 'religious,' the [c]ourt must assess whether [the plaintiff's] belief is based on her 'own scheme of things' – regardless of what is widely accepted in her stated religion." *Id.*

Plaintiffs do not allege what religion(s) they practice; they set forth no allegations regarding individualized, subjective personal religious beliefs; and fail to state how (or even that) those religious beliefs or practices form the basis of their objection to MITRE's vaccine policy.  Instead, Plaintiffs allege only that MITRE was aware that "about 20 percent of Catholics and other Christians were against the COVID-19 vaccination" and that "[m]any of the Plaintiffs objected specifically because, in their view, utilizing a product that was developed and/or produced using cell lines derived from aborted fetal tissue, even years after the tissue was obtained, is participation in, and encouragement of, evil."  (Complaint, ¶¶ 27, 29)   In sum, the Complaint alleges that MITRE was generally aware that some members of the Christian faith (and other religious communities) object to the COVID-19 vaccine and that "many" Plaintiffs objected to MITRE's vaccine policy because, "in their view," it required them to participate in evil.  *Id.*

Plaintiffs' Complaint therefore lacks the specificity required by *Ellison* and the authorities cited therein regarding their religious beliefs and/or practices (as to any Plaintiff), and fails to state the exemption/objection basis/bases for all Plaintiffs.  And for those Plaintiffs who are alleged to have objected on the basis that the vaccine required them to comport with evil, the Complaint omits to identify which Plaintiffs grounded their exemption request in that conviction.  Even were the court to assume that the "many" Plaintiffs' who objected to the vaccine as evil are members of a Christian faith, the Complaint is simply too threadbare to pass muster.  *See Ellison*, *supra; Aliano v. Twp. of Maplewood*, No. 22CV5598ESAME, 2023 WL 4398493, at *10 (D.N.J. July 7, 2023) (dismissing the plaintiff's claim and noting that "it is [the plaintiff's] subjective religious belief that is protected, so [the plaintiff] must provide information concerning the religious nature of his

own belief and how his objection to the COVID-19 vaccine is connected to that belief"); *Friend v. AstraZeneca Pharms. LP*, Case No. 22-3308, 2023 WL 3390820, at *3 (D. Md. May 11, 2023) ("While [the plaintiff's] [c]omplaint asserts that he 'had bona fide religious beliefs that conflicted with [the defendant's] COVID-19 vaccine mandate,' it alleges no facts to allow this [c]ourt to assess what [the plaintiff's] religious beliefs are and how they conflict"); *Blackwell v. Lehigh Valley Health Network*, No. 22-cv-03360, 2023 WL 362392, at *8 (E.D. Pa. Jan. 23, 2023) (dismissing the plaintiff's claims because the plaintiff had "fail[ed] to plead any additional information about the religious nature of her beliefs" beyond identifying an organized religion she belonged to and claiming her objection arose from that organized religion).  The Motion will be granted as to Count I.[13]

### b.    *Title VII Retaliation (Count XIII)*

To state a claim for retaliation, Plaintiffs must allege that (1) they engaged in a protected activity; (2) their employer took an adverse employment action against them; and (3) a causal link exists between the protected activity and the adverse employment action.  *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021).  Defendant argues that the Religious Accommodation Retaliation claim—Count XIII—fails because requesting an accommodation is not a protected activity.  (ECF No. 27-1 at 30.)

"Protected activity under Title VII includes complaints of discrimination based upon 'race, color, religion, sex or national origin.'"  *Landino v. Sapp*, 520 Fed. Appx. 195, 198 (4th Cir. 2013) (quoting *Balazs v. Liebenthal*, 32 F.3d 151, 159 (4th Cir. 1994)).  It "includes an employee's opposition to what he or she believes is an unlawful employment practice."  *Bowman v. Balt. City*

---

[13] As set forth in more detail, *infra*, Plaintiffs' Free Exercise Clause claim (Count V) and RFRA claim (Count VI) will also be dismissed for failure to state "[a] sincerely held religious belief," which "is a necessary element" for both claims.  *Cunningham v. City of Shreveport*, 407 F. Supp. 3d 595, 608 (W.D. La. 2019).

*Bd. of School Commissioners*, 173 F. Supp 3d 242, 248 (D. Md. 2016).  For example, "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities" are protected activities. *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir.1998).  While "[c]omplaints about management activities that would not constitute unlawful discrimination do not count as protected activity," *Chang Lim v. Azar*, 310 F. Supp. 3d 588, 604 (D. Md. 2018), "where the employer understood or should have understood that the plaintiff opposed an unlawful practice, that opposition is protected activity."  *Bowman*, 173 F. Supp. 3d at 238 (citing *Burgess v. Bowen*, 466 Fed. Appx. 272, 282 (4th Cir. 2012)).

Plaintiffs allege:

> All of the Plaintiffs in this case opposed MITRE's decision to impose a vaccine mandate without exempting those who claimed religious or medical reasons for opposing the vaccine mandate. Plaintiffs expressed their opposition to MITRE's vaccine mandate and articulated the contention that it violated their religious freedoms and/or that they were entitled to a medical exemption. Prior to terminating Plaintiffs, MITRE was aware of Plaintiffs' opposition to the vaccine mandate and Plaintiffs' contentions regarding religious and disability discrimination.
>
> MITRE retaliated against Plaintiffs by terminating Plaintiffs because they expressed their opposition to the vaccine mandate and because they opposed imposition of such a mandate based on religious and disability discrimination arguments and contending that it violated Title VII.

(ECF No. 1 ¶¶ 182-83.)

Construed appropriately at the responsive motion stage, Plaintiffs allege generally that they opposed the vaccine mandate on grounds of religion or "disability discrimination arguments,"[14] and because they voiced such opposition, they were terminated.

---

[14] The court assumes at this stage that Plaintiffs mean to state that those who claim to have a legally cognizable disability opposed MITRE's policy on the basis that receipt of the vaccine would cause them harm with respect to

The Eighth Circuit's decision in *Equal Emp. Opportunity Comm'n v. N. Mem'l Health Care* provides this court with guidance.  There, the court considered the plaintiff's opposition-clause retaliation claim brought pursuant to § 2000e-3(a) and analyzed the question of "what forms of employment discrimination did the employee oppose?"  908 F.3d 1098, 1101-1102 (8th Cir. 2018).  The court explained:

> The EEOC urges us to follow our decision in *Ollis v. HearthStone Homes, Inc.*, upholding a jury verdict that defendant violated § 2000e-3 by firing an employee because he did not want to participate in an activity that conflicted with his religious beliefs. But in *Ollis*, we defined the plaintiff's prima facie case as requiring a showing he "has a bona fide religious belief that conflicts with an employment requirement." Attempting to shoehorn this case into that standard, the EEOC argues, "Similarly, in requesting accommodation, like *Ollis*, Sure-Ondara necessarily was complaining that requiring her to work Friday shifts conflicted with her religious beliefs." But that is a false equation. Sure-Ondara did not complain that North Memorial unlawfully refused to accommodate. She requested an accommodation, and it is undisputed on this record that North Memorial's non-discriminatory practice was to consider such requests on a case-by-case basis. After she made the request and no mutually acceptable accommodation was reached, Sure-Ondara's Title VII remedy as an unsuccessful job applicant was a disparate treatment claim under § 2000e-2(a) for failure to reasonably accommodate.
>
> For this reason, we agree with the district court that the EEOC failed to establish a prima facie case of opposition-clause unlawful retaliation because "merely requesting a religious accommodation is not the same as opposing the allegedly unlawful denial of a religious accommodation." In our view, it is noteworthy that, prior to *Abercrombie & Fitch*, the EEOC took the position "that Title VII creates a freestanding religious-accommodation claim," a position the Court "rightly put[ ] to rest" in that decision. *Abercrombie & Fitch* precludes allowing the EEOC to repackage its rejected interpretation of unlawful discrimination under § 2000e-2(a)(1) as an unlawful opposition-clause retaliation claim under § 2000e-3(a). Consistent with the plain meaning of the word "oppose," the initial

their individual disabilities.  Plaintiffs fail to state which Plaintiffs claim to be protected due to their status as disabled, and – still further – specifically which  Plaintiffs claim they were unlawfully terminated in retaliation for opposing MITRE's vaccine policy on grounds of disability.  Likewise, the Complaint fails to state which Plaintiffs claim they were unlawfully terminated in violation of their protest of the vaccine policy on religious grounds.

request for a religious accommodation simply does not "implicitly" constitute opposition to the ultimate denial of the requested accommodation.

The EEOC argues, and the dissent apparently agrees, that Sure-Ondara has an opposition-clause retaliation claim under § 2000e-3(a) simply because her request for an accommodation was statutorily protected activity, relying on our decisions applying the retaliation provisions of the Americans with Disabilities Act, 42 U.S.C. § 12203. We disagree.

To establish a claim of disability discrimination under the ADA, an employee must "inform the employer that an accommodation is needed." Thus, a request for accommodation is ADA-protected activity. If an employer denies a good faith request for a disability accommodation because the employee does not have a qualifying disability and fires the employee for making the request, at a minimum the employee has an ADA retaliation claim under 42 U.S.C. § 12203(b) for interfering with the exercise of the employee's ADA rights. That was the factual basis for the retaliation claims in *Kirkeberg* and *Heisler*.

Whether an employee or job applicant must make a request for religious accommodation to maintain a Title VII claim for religious discrimination under 42 U.S.C. § 2000e-2(a) is an open question after *Abercrombie & Fitch*. Even if not required, we construe the express reference to religious accommodation in § 2000e(j) as evidencing Congress' intent to protect requests for religious accommodation. But the fact that such a request is "protected activity" does not mean it is always "oppositional" activity. Sometimes, it clearly is. For example, if an employer were so foolish or ignorant as to adopt a policy of not accommodating religious practices, an employee who was fired because she objected to this unlawful policy in requesting an accommodation would have an opposition-clause retaliation claim under § 2000e-3(a), as well as a disparate treatment claim under § 2000e-2(a). Less fancifully, if an employee or applicant in good faith requested a religious accommodation, and if the employer denied the accommodation on the ground that it was not in fact based on a religious practice and fired or refused to hire the employee or applicant because she made the request, the reasoning in ADA cases such as *Kirkeberg* and *Heisler* would support an opposition-clause retaliation claim under § 2000e-3(a), even if the employer successfully defended a disparate treatment claim under § 2000e-2(a). But when an employee or applicant requests a religious accommodation, and the request is denied by an employer such as North Memorial that accommodates

> reasonable requests that do not cause "undue hardship," there is no basis for an opposition-clause retaliation claim under § 2000e-3(a). Rather, the employee or applicant's exclusive Title VII remedy is an unlawful disparate treatment or disparate impact claim under § 2000e-2(a)(1).

908 F.3d 1098, 1102-1103 (internal citations omitted).  While *North Memorial Health Care* was before the court on a grant of summary judgment, the court's analysis remains persuasive.

Construed broadly in the light most favorable to Plaintiffs, the Complaint alleges that Plaintiffs engaged in "oppositional activity" by seeking exemption from imposition of the vaccine mandate on grounds of religion and/or disability.  (ECF No. 1 ¶ 183, *but see* n.14, *supra.*)  But Plaintiffs conflate requests for accommodation by way of exemption with opposition to allegedly unlawful denial of such accommodation requests.  As the Eight Circuit explained, "merely requesting a religious accommodation is not the same as opposing the allegedly unlawful denial of a religious accommodation."  *See North Memorial Health Care, supra.*  Plaintiffs' allegations of "oppositional activity" by way of requested (and denied) exemptions are fatally conclusory and misapply the law; Plaintiffs also fail to allege that they opposed MITRE's exemption denials as an improper or unlawful refusal to accommodate their religions and/or disabilities.  *See* ECF No. 1 ¶¶ 182-83; *North Memorial Health Care, supra; see also Perlman v. Mayor of Balt.*, No. SAG-15-1620, 2016 WL 640772, at *6 (D. Md. Feb. 18, 2016) (holding that "the making of such a request neither 'oppos[es] any practice' of [Defendant], nor constitutes 'participation in an investigation, proceeding, or hearing' [having] to do with any Title VII violations committed by [Defendant].")

The Motion will be granted as to Count XIII.

### 2.    Disability Discrimination (Counts II-IV)

The ADA makes it unlawful for employers to "discriminate against a qualified individual on the basis of a disability."  42 U.S.C. § 12112(a).  "To state a claim for disability discrimination, a complaint must allege that (1) the plaintiff was disabled, (2) he was a qualified individual, and (3) 'he suffered an adverse employment action based on his disability.'"  *Leggo v. M.C. Dean, Inc.*, No. 122CV374LMBIDD, 2023 WL 1822383, at *4 (E.D. Va. Feb. 7, 2023), *aff'd*, No. 23-1211, 2023 WL 4700998 (4th Cir. July 24, 2023) (quoting *Hice v. Mazzella Lifting Techs.*, 589 F. Supp. 3d 539, 547 (E.D. Va. 2022)).  The ADA defines disability as:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(1).

As set forth in detail below, Plaintiffs bring three ADA-based claims: failure to accommodate, unlawful medical examination or inquiry, and a "regarded as" claim.  Defendant argues that each fails because Plaintiffs do not allege they are qualified individuals with disabilities.  (ECF No. 27-1 at 12.)

### a.    *Failure to Accommodate (Count II)*

"To state a claim for failure to accommodate under the ADA, Plaintiff must allege '(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . .; and (4) that the [employer] refused to make such accommodations.'"  *Wilson v. City of Gaithersburg*, 121 F. Supp. 3d 478, 484 (D. Md. 2015) (quoting *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)).

As set forth above, under the ADA a disability is "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1). The ADA provides a non-exhaustive illustration as follows: "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." And "disability" includes major bodily functions, "including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. §§ 12102(2)(A) and (B).

With regard to Count II, Plaintiffs allege:

> This Count is brought by Plaintiffs KENDALL, FANDOZZI, GRIECO, and HARRIS-AGUIRRE. Each of the Plaintiffs was an "employee" of the MITRE within the meaning of 42 U.S.C. § 12111(4).
>
> ***
>
> Plaintiffs claimed that they have a medical condition that prevented them from being vaccinated against COVID-19, as MITRE required. Plaintiffs requested, as reasonable accommodations, that MITRE exempt them from the vaccine mandate. Plaintiffs could have performed the essential function of their jobs with such an accommodation. Still, MITRE refused to grant them the accommodation.
>
> MITRE terminated Plaintiffs KENDALL and FANDOZZI for not complying with the vaccine mandate. Plaintiffs GRIECO and HARRIS-AGUIRRE were constructively discharged in that they resigned under duress in lieu of discharge.
>
> MITRE could have reasonably accommodated Plaintiffs by allowing them to work remotely, wear face masks, and/or undergo testing during any in-person duties. That MITRE cannot claim undue hardship is further underscored by the fact that most Plaintiffs worked remotely, at least part of the time, at the time of their separation.

40

(ECF No. 1 ¶¶ 71, 76-78.)

Because Plaintiffs fail to allege any facts whatsoever regarding their claimed medical conditions that "prevented them from being vaccinated against COVID-19," they fail to allege a disability within the meaning of the statute.  *See Quarles v. Md. Dep't of Hum. Res.*, Civ. No. MJG-13-3553, 2014 WL 6941336, at *4 (D. Md. Dec. 5, 2014) (dismissing plaintiff's ADA claim where the complaint "lacks specific factual allegations regarding the type of diabetes from which [the plaintiff] suffers, the degree to which the diabetes limits her movement, or how her diabetes otherwise affects her life"); *Eubanks v. Mercy Med. Ctr., Inc.*, No. CV WDQ-15-513, 2015 WL 9255326, at *5 (D. Md. Dec. 17, 2015) (noting that "[c]ourts in the Fourth Circuit have held that allegations are insufficient to support a claim under the ADA when they contain no facts showing that the impairment substantially limited a major life activity"); *Bearbower v. Olmsted Med. Ctr.*, No. CV 22-2459 ADM/JFD, 2023 WL 2776029, at *5 (D. Minn. Apr. 4, 2023) (finding the plaintiffs' fail to state a disability discrimination claim where there were "no allegations about Plaintiffs' health at all, much less allegations that any Plaintiff has or is regarded as having a physical or mental impairment that substantially limits one or more major life activities").  The Motion will therefore be granted as to Count II.

### b.      *Medical Examination or Inquiry (Count III)*

In Count III, Plaintiffs allege Defendant violated the ADA by impermissible medical examination or inquiry:

> Here, MITRE made medical inquiries and required Plaintiffs to undergo a medical examination when it mandated that they receive the COVID-19 vaccination as a condition of their employment. MITRE further made a medical examination or inquiry when, in connection with its vaccine mandate, it inquired into employees' vaccination status and required them to upload proof that they had been vaccinated.

(ECF No. 1 ¶ 84.)  Defendant argues that Count III fails because inquiring about vaccination status is not an impermissible medical inquiry under the ADA.  (ECF No. 27-1 at 12-14.)

The ADA provides:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A).  Importantly, the ADA does not forbid all medical inquiries, only those as to whether such employee is an individual with a disability or as to the nature or severity of the disability.  *Id.*  Further, under the ADA, "[a] medical examination is a procedure or test that seeks information about an individual's physical or mental impairments or health."  *Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans With Disabilities Act (ADA)*, 2000 WL 33407181, at *3 (July 27, 2000) (citing *Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations Under the Americans with Disabilities Act of 1990*, 8 FEP Manual (BNA) 405:7197 (1995)).

Defendant's inquiry regarding, and/or requirement that Plaintiffs provide, their vaccination status "does not constitute a medical examination or an inquiry about a disability or disabling condition."  *Jorgenson v. Conduent Transp. Solutions, Inc*, No. CV SAG-22-01648, 2023 WL 1472022, at *5 (D. Md. Feb. 2, 2023), *aff'd*, No. 23-1198, 2023 WL 4105705 (4th Cir. June 21, 2023); *see also Friend v. AstraZeneca Pharms. LP*, No. CV SAG-22-03308, 2023 WL 3390820, at *5 (D. Md. May 11, 2023) (dismissing medical examination or inquiry claim because the defendant's "inquiry about vaccination status [] did not constitute a medical examination or an inquiry about a disability or disabling condition").  Further, to the extent Plaintiffs allege that

Defendant's vaccine requirement itself is an unlawful medical examination, courts have rejected such a claim because a vaccine mandate does not seek information about an employee's health. *See, e.g., Passarella v. Aspirus, Inc.*, No. 22-CV-287-JDP, 2023 WL 2455681, at *7 (W.D. Wis. Mar. 10, 2023) (dismissing the plaintiffs' ADA claim for medical examinations on the basis that the defendant's "vaccine mandate does not seek information about plaintiffs' health, so it cannot violate subsection 12112(d)");[15] *Bearbower v. Olmsted Med. Ctr.*, No. CV 22-2459 ADM/JFD, 2023 WL 2776029, at *6 (D. Minn. Apr. 4, 2023) (holding that "a vaccine is not a procedure that seeks information about Plaintiffs' health and is not an inquiry into whether Plaintiffs have a disability"). Moreover, no Plaintiff alleges he or she underwent a COVID-19 test or that Defendant demanded they do so.[16] *See Bearbower*, 2023 WL 2776029, at *6 (noting that the plaintiff failed to allege an unlawful medical examination where none of the Plaintiffs allege that they personally underwent any COVID-19 testing). Accordingly, the Motion will be granted as to Count III.

### c.    *Regarded As (Count IV)*

To state an ADA claim on the basis that the employer "regarded [the plaintiff employee] as having a disability," a plaintiff must allege "that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment

---

[15] Plaintiffs' assertion that the *Passarella* court implicitly accepted the plaintiffs' allegations that the employer forced them to undergo an unlawful medical examination is incorrect. (ECF No. 32 at 13.) In *Passarella*, the plaintiffs alleged that the defendant violated 42 U.S.C. § 12112(d)(4)(A) by subjecting them to COVID-19 testing and by imposing a vaccine requirement. 2023 WL 2455681, at *7. The *Passarella* court found that the vaccine mandate did not seek information about the plaintiffs' health, and therefore was not a § 12112(d)(4)(A) violation. *Id.* With regard to the plaintiffs' testing claims, the *Passarella* court dismissed the claims on the basis of failure to exhaust. *Id.* at *8. Unlike *Passarella*, Plaintiffs here do not assert that MITRE violated 42 U.S.C. § 12112(d)(4)(A) by subjecting them to COVID-19 testing. Instead, Plaintiffs allege that Defendant violated 42 U.S.C. § 12112(d)(4)(A) by imposing a vaccine requirement and requiring them to provide their vaccination status.

[16] Further, although the court does not reach this issue here, it is worth noting that even if Defendant's vaccine mandate fell within the statutory definition of "medical examination," the ADA permits such "examination or inquiry" if it "is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A); *see Johnson v. Maximus Servs. LLC*, No. 22CV2935AMDJRC, 2023 WL 5612826, at *5 (E.D.N.Y. Aug. 30, 2023) (dismissing the plaintiff's medical-inquiry and examination claim for failure to state a claim and noting that "even if the defendant's efforts to prevent the spread of a highly transmissible disease in its workplace and in patients' homes, and to adhere to federal Covid-19 guidance, plainly fell within that exception").

whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(3)(A).  Defendant argues that requiring employees to comply with a vaccination policy cannot plausibly support an inference that the employer regarded the employee as disabled.  (ECF No. 27-1 at 14-16.)

The court finds *Jorgenson, supra,* instructive.  There, the plaintiff argued that the defendant employer impermissibly regarded him as disabled because the defendant "is trying to impose medical treatments on him" or "viewed [him] as having a record of a disabling condition." *Id.* at *3.  The Honorable Stephanie Gallagher found the plaintiff failed to plead facts sufficient for a "regarded as" claim:

> Plaintiff's attempt to rely on that provision tries to fit a square peg into a round hole. There is simply no perceived disabling impairment alleged in this case. Not knowing a person's vaccination status is not the same as believing that person has a physical or mental impairment. That person, masked or unmasked, can perform all of his or her job duties as an engineer. And vaccination status is likewise not an impairment or an impediment to work-related tasks. Conduent's decision to protect its workplace by requiring its employees to attest to their vaccination status—and in some cases, to wear masks—does not plausibly reflect a determination or belief that any of its employees are disabled or impaired. *See Speaks*, 2022 WL 3448649, at *5 (explaining that "[r]efusing to get a vaccine required by an employer is not itself an 'impairment' of any sort[,]" but instead "reflects a personal choice [that] cannot be considered an impairment under the ADA").
>
> Moreover, as evidenced by the documentation attached to Plaintiff's Amended Complaint, Conduent's policies applied universally to all U.S.-based employees. ECF 6-4 at 16-17. Plaintiff was not singled out and asked to attest to his vaccination status. All employees had to comply. And all unvaccinated employees, or those who had not disclosed their vaccination status, had to be masked. *Id.* at 17. The policies did not hinge on any assessment of disability or perceived impairment. Thus, Plaintiff has not plausibly alleged that he is disabled within the meaning of the ADA.

2023 WL 1472022, at *4.  Further, courts outside of this circuit routinely conclude that inquiry regarding, or requiring disclosure of, vaccination status does not give rise to a "regarded as" claim. *See e.g., Speaks v. Health Sys. Mgmt., Inc.*, No. 522CV00077KDBDCK, 2022 WL 3448649 (W.D.N.C. Aug. 17, 2022) (finding that the plaintiff failed to allege a regarded as claim where "[t]he [defendant] only regarded [the plaintiff] as being required – like all of its employees – to obtain a COVID-19 vaccine or be approved for an exemption and then regarded her as having failed to do so by the deadline to become vaccinated and noting that [r]efusing to get a vaccine required by an employer is not itself an impairment of any sort") (internal citations omitted)); *Williams-Moore v. Quick Int'l Courier, LLC*, No. 22CV3592RPKRML, 2023 WL 6292540, at *4 (E.D.N.Y. Sept. 26, 2023) (concluding that "an employer's imposition of a COVID-19 vaccination requirement does not raise a plausible inference that the employer regarded all its employees (or its unvaccinated employees) as disabled within the meaning of the ADA").  The court agrees with the analysis and guidance provided by these sister courts.  The Motion will be granted as to Count IV.

### 3.    Constitutional Claims (Counts V, VII, IX through XI, and XIV)

As an initial  matter, Plaintiffs filed their constitutional claims pursuant to 42 U.S.C. § 1983.  Section 1983 "is not an independent source of substantive rights, but simply a vehicle for vindicating preexisting constitutional and statutory rights." *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).  "Section 1983 provides a cause of action for damages or equitable relief to remedy the deprivation of any rights, privileges or immunities secured by the Constitution and laws by a person acting under color of state law." *Rivero v. Montgomery Cnty*, 259 F. Supp. 3d 334, 345 (D. Md. 2017) (internal quotation marks omitted); *see West v. Atkins*, 487 U.S. 42, 48 (1988) ("To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the

Constitution and laws of the United States, and [] that the alleged deprivation was committed by a person acting under color of state law"); *Earle v. Shreves*, 990 F.3d 774, 777 (4th Cir. 2021) (explaining that "[a] person whose constitutional rights have been violated by a state official may bring an action seeking monetary damages against the official under 42 U.S.C. § 1983").

Section 1983, however, "does not provide a cause of action against federal officials, and there is no analogous statute imposing damages liability on federal officials." *Earle*, 990 F.3d at 777 (citation omitted). The court finds *Dowe v. Total Action Against Poverty in Roanoke Valley* instructive. 145 F.3d 635, 658 (4th Cir. 1998). In considering whether the actions of the defendant gave rise to liability under § 1983, the Fourth Circuit explained:

> Acting under color of state law is equivalent to that of state action under the Fourteenth Amendment. *See Rendell–Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (citing *United States v. Price*, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966)). The state action requirement "reflects judicial recognition of the fact that 'most rights secured by the Constitution are protected only against infringement by governments.'" *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936, 102 S. Ct. 2744, 73 L.Ed.2d 482 (1982) (quoting *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978)). "This fundamental limitation on the scope of constitutional guarantees 'preserves an area of individual freedom by limiting the reach of federal law' and 'avoids imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed.'" *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (quoting *Lugar*, 457 U.S. at 936–37, 102 S. Ct. 2744). The issue presented in this case is whether TAP engaged in state action when it discharged Dowe.
>
> By asserting that TAP is both regulated and funded by the federal government and, to a lesser extent, by the Commonwealth of Virginia, Dowe contends that she has demonstrated sufficient state involvement to invoke § 1983. We disagree. To the extent Dowe contends that TAP is funded and regulated by the federal government, she is really making the case that TAP was acting under the color of federal law. If so, the claim should have been brought under *Bivens v. Six Unknown Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), rather than § 1983. As the Supreme Court

> made clear in *Wheeldin v. Wheeler*, 373 U.S. 647, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963), § 1983 does not apply to federal actors. To the extent Dowe contends that TAP is funded and regulated by the Commonwealth, she, for the reasons that follow, has simply failed to demonstrate sufficient state involvement to invoke § 1983.

145 F.3d 635, 658 (4th Cir. 1998).

Plaintiffs bring the following constitutional claims by way of 42 U.S.C. § 1983:

- Count V: Violation of the First Amendment Free Exercise Clause

- Count VII: Violation of the Fifth and Fourteenth Amendments Equal Protection Clause

- Count IX: Violation of the Fifth Amendment Substantive Due Process Clause

- Count X: Violation of the Fifth and Fourteenth Amendments Procedural Due Process Clause

- Count XI: Violation of the Fifth Amendment Unconstitutional Conditions Doctrine

- Count XIV: Violation of First Amendment Freedom of Speech

Defendant argues that Plaintiffs' constitutional claims fail because Defendant is not a state actor. (ECF No. 27-1 at 16-22.) Further, Defendant argues that even if Plaintiff adequately alleged state action, Plaintiffs' claims fail because neither vaccination nor employment implicates a fundamental right, and Defendant's policy is rationally related to a legitimate interest. *Id.* at 23-26. In response, Plaintiffs maintain that the state action analysis is fact-intensive and should be rejected until the parties engage in discovery. (ECF No. 32 at 19.) Plaintiffs concede, however, that if the court finds that Defendant is not a state actor, the constitutional and religious freedom restoration act claims fail. *Id.* at 23.

The law is plain that "state action is a necessary component" of a First Amendment or Fourteenth Amendment claim pursuant to § 1983. *See Rivero*, 259 F. Supp. 3d at 351 (explaining that because the plaintiffs "seek declaratory relief to remedy an alleged deprivation of their First

and Fourteenth Amendment rights" they must allege state action); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 531 (1993) (explaining that the Free Exercise Clause of the First Amendment is applied to the States through the Fourteenth Amendment). Further, to the extent Plaintiffs seek to recover under the Fifth Amendment, they must allege federal government action. *See San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 542 n.21 (1987) (noting that the Fourteenth Amendment applies to actions by a State and the Fifth Amendment applies to actions by the Federal Government); *Dusenbery v. United States*, 534 U.S. 161, 167 (2002) (stating that "[t]he Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law'").

Plaintiffs allege:

> Under the tests articulated by the Supreme Court, MITRE, for purposes of the vaccine mandate, was a state actor. MITRE was deeply invested in the government's fight against COVID-19. There is a close nexus between the U.S. government and the challenged action. MITRE's actions may be fairly treated as that of the U.S. government itself. The U.S. government has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that jointly of the U.S. government and MITRE. MITRE was a willful participant in joint activity with the U.S. government and its agents. MITRE was delegated a public function by the U.S. government. MITRE's conduct was so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon governmental action.
>
> ***
>
> Instead of complying with the limitations imposed by the U.S. Constitution, the President and the executive branch of the U.S. government attempted a work-around – it created a "sword of Damocles" for a large sector of the citizenry: Either get vaccinated or suffer the extreme financial consequences of losing your job. MITRE was one of the authors of this work-around. As a result, it voluntarily and intentionally decided to lead the way and impose a

vaccine mandate in an attempt to garner the support and favor of the executive branch of the U.S. government, from whom it derives nearly all its funding.

MITRE receives so much of its funding from the federal government, it is completely beholden to the federal government. MITRE was a willful participant in joint activity with the federal government, in that it deliberately aided the federal government in its efforts to influence Americans to receive COVID-19 vaccination by threatening their employment. See Exec. Order No. 14043, 86 Fed. Reg. 50989 (executive order mandating vaccination for federal employees, issued simultaneously to Exec. Order No. 14042). MITRE performed a public function delegated by the federal government in implementing the vaccine mandate, because the federal government made it fulfill a role normally left to governmental public health agencies. Additionally, MITRE served a public function in that its primary business activities are supporting the federal government. MITRE was engaging in public action because its actions were entwined with governmental policies and impregnated with a governmental character, as it was essentially acting as the federal government's agent in implementing its vaccine mandate. Because of these facts, the First, Fifth and Fourteenth Amendments to the Constitution apply to actions undertaken by MITRE in relation to enforcing vaccine mandates.

\*\*\*

Here, MITRE's vaccine mandate and the medical examinations and inquiries associated therewith violated the Free Exercise Clause. Serving as an actor for the federal government, MITRE purposefully enacted its vaccine mandate to infringe upon or restrict the practices of its employees who objected to receiving the vaccine because of their religious beliefs . . .

(ECF No. 1 ¶¶ 105, 110-11, 113.)

Construed in the light most favorable to Plaintiffs and taken as true, the Complaint alleges that Defendant is a federal government actor. While Plaintiffs appear to use the terms "state actor" and "federal actor" interchangeably, Plaintiffs rest on MITRE's alleged federal government actor status, alleging that "MITRE's actions may be fairly treated as that of the U.S. government itself." (ECF No. 1 ¶ 105.)  To the extent Plaintiffs maintain that Defendant is a federal actor for purposes

of Counts V,VII, IX through XI, and XIV, recovery may not be had under § 1983 and the

Fourteenth Amendment.[17]   *See Dowe, Riveria, West, and Earle, supra. See also Irving*, 249 F.

Supp. 3d at 826 (noting that "[b]ecause plaintiff's § 1983 claim is against a federal contractor who

purportedly acted under color of federal law, this cause of action could be dismissed on this basis

without further comment.").

That notwithstanding, "merely private conduct, no matter how discriminatory or

wrongful," is excluded from the reach of § 1983 and constitutional claims.   *Am. Mfrs. Mut. Ins.

Co. v. Sullivan*, 526 U.S. 40, 50 (1999).   Determination of whether Defendant is a state actor

requires analysis of the same factors applicable to determination of whether Defendant is a federal

---

[17] The Ninth Circuit in *Morse v. North Coast Opportunities* encountered facts similar to the instant case.  118 F.3d 1338 (9th Cir. 1997).  There, the plaintiff brought an action under 42 U.S.C. § 1983 alleging that the defendant violated her First, Fifth and Fourteenth Amendment rights under color of state law.  *Id.* at 1340.  In response to the defendant's motion to dismiss, the plaintiff argued that the defendant was acting pursuant to federal law as a federal government actor.  *Id.*  In dismissing the complaint, the district court noted: "because only federal action was alleged, it appeared that Morse really intended the action to be brought under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), rather than under § 1983."  *Id.*  However, because, the question in the case turned on whether there was government action that would give rise to liability for constitutional deprivations, the court conducted the government action inquiry.  *Id.*

On appeal, the Ninth Circuit noted the issue:

> Finally, we note that Morse's complaint is invalid on its face in its reliance upon § 1983 as a cause of action against alleged federal government actors. Section 1983 provides a cause of action against any person "acting under color of State law" who causes a deprivation of the plaintiff's federal rights. 42 U.S.C. § 1983. In her briefs and at oral argument, Morse's attorney has asserted that § 1983 is an appropriate vehicle for bringing suit against those acting under color of either federal or State law. When questioned as to whether this suit should more properly be styled as a *Bivens* claim, she stated that it should not.

> As noted in Part II, we apply similar tests to determine whether federal action exists to support a *Bivens* claim or to determine whether State action will permit a § 1983 cause of action. *Mathis v. Pacific Gas and Elec. Co.*, 891 F.2d 1429, 1432 n. 3 (9th Cir. 1989). In both cases we conduct an inquiry into whether it is fair to attribute the challenged actions to either the federal or State government.

> However, the fact that similar standards are used in analyzing the prerequisites of § 1983 and *Bivens* causes of action does not mean that the claims are interchangeable. Lest there be any continuing confusion . . . § 1983 precludes liability in federal government actors.

118 F.3d 1338, 1343 (9th Cir. 1997).

actor. *San Francisco Arts & Athletics, Inc.*, 483 U.S. at 542-47 (analyzing same factors considered for state action in the context of whether the defendant is a federal government actor); *Informed Consent Action Network v. YouTube LLC*, 582 F. Supp. 3d 712, 718 n.3 (N.D. Cal. 2022) (noting that "[t]he standard for demonstrating whether a private entity's actions constituted federal or state action is identical, and a court may rely on precedent in either context to inform a state action analysis"); *Morse v. N. Coast Opportunities, Inc.*, 118 F.3d 1338 (9th Cir. 1997) (explaining that "the standard for determining the existence of federal government action can be no broader than the standard applicable to State action under § 1983").

### a.     Government Action

As stated above, Defendant argues that Plaintiffs' constitutional claims fail because Defendant is not a state actor.  (ECF No. 27-1 at 16-22.)  In response, Plaintiffs maintain that because the state action analysis is fact-intensive, the Motion should be denied at this time to allow the parties to engage in discovery.  (ECF No. 32 at 19.)

In *Manhattan Community Access Corp. v. Halleck*, the Supreme Court explained "a private entity can qualify as a state actor in a few limited circumstances—including, for example, (i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity." 139 S. Ct. 1921, 1928 (2019) (internal citations omitted).  In *San Francisco Arts & Athletics, Inc.*, the Supreme Court analyzed whether the defendant was "a government actor to whom the prohibitions of the Constitution apply" and applied the same factors set forth in *Manhattan Community Access Corp*. 483 U.S. at 542 (considering whether "the challenged entity performs functions that have been traditionally the exclusive prerogative of the Federal Government" and whether the government "exercised coercive power or has provided such

significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government]").

The Fourth Circuit has acknowledged that the state actor inquiry is fact-intensive:

> The common foundation underlying these various and sometimes overlapping circumstances is that (1) there is no bright-line rule separating state action from private action, and that (2) the inquiry is highly fact-specific in nature. In other words, the state action analysis "lack[s] rigid simplicity" and, thus, a "range of circumstances" can support a finding of state action. *Brentwood*, 531 U.S. at 295, 303 (noting that "no one criterion must necessarily be applied" to establish state action); *Goldstein*, 218 F.3d at 343 (holding that no single factor standing alone establishes state action). We therefore consider the totality of the circumstances of the relationship between the private actor and the state to determine whether the action in question fairly is attributable to the state. *Goldstein*, 218 F.3d at 343.

*Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 116 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 2657 (2023); *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 342 (4th Cir. 2000) (internal quotation marks omitted) (noting that the state actor inquiry "requires an examination of all the relevant circumstances, in an attempt to evaluate the degree of the Government's participation in the private party's activities." (internal quotation marks omitted)).   However, state action status often is resolved at the pleading stages.  *See, e.g., Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 154 (1978); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349 (1974); *Wilcher v. City of Akron*, 498 F.3d 516, 519 (6th Cir. 2007); *Rose v. Emergency Med. Training Processionals*, No. 15:19-CV-018-CHB, 2019 WL 4784607, at *2 (E.D. Ky. Sept. 30, 2019); *Pa. Informed Consent Advocs. Inc. v. Univ. of Penn. Health Sys.*, No. CV 21-4415, 2022 WL 2316648, at *2 (E.D. Pa. June 28, 2022); *Reed v. Tyson Foods, Inc.*, No. 21-CV-01155-STA-JAY, 2022 WL 2134410, at *4 n.3 (W.D. Tenn. June 14, 2022); *Informed Consent Action Network v. You Tube, LLC*, 582 F. Supp. 3d 712, 724 (N.D. Cal. 2022).

### i.      **Public Function**

Defendant argues that neither the decision to implement the vaccine policy nor the decision to deny Plaintiffs' exemption requests is a traditional and exclusive government function.  (ECF No. 27-1 at 19-20.)   In response, Plaintiffs argue that an FFRDC performs a traditionally governmental role.  (ECF No. 32 at 22.)

The Supreme Court "has found action to be governmental action when the challenged entity performs functions that have been 'traditionally the *exclusive* prerogative' of the Federal Government."  *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 544 (1987) (citation omitted) (emphasis in original).  "[V]ery few functions fall into that category." *Manhattan Cmty. Access Corp.*, 139 S. Ct. at 1929.  Accordingly, "the fact that the government licenses, contracts with, or grants a monopoly to a private entity does not convert the private entity into a state actor—unless the private entity is performing a traditional, exclusive public function." *Id.* at 1931-32.

As an initial matter, the parties appear to disagree as to what precisely is to be evaluated in determining whether an entity is performing a public function.  Defendant argues that "the key point that whether an entity is a state actor must be determined in relation to a specific action—it is not determined by broad statements that the entity receives federal monies or was acting in compliance with the law."  (ECF No. 39 at 11.)  Plaintiffs maintain that Defendant, as "[a]n FFRDC is performing the traditional role of the government.  It is making sure that tax money is spent effectively and it performs tasks that [a]re 'integral to the mission and operation of the government.'"  (ECF No. 32 at 22.)

On this issue, the court finds *Ciraci v. J.M. Smucker Company* instructive.  62 F.4th 278 (6th Cir. 2023).  There, the defendant company was in the industry of selling jelly, jam, peanut

butter, pet food, and coffee; because it provided its well-known sweet spreads to the federal government, it was also a federal contractor.[18]   *Id.* at 280.   In response to President Biden's Executive Order directing federal contractors to ensure their employees were vaccinated unless they were entitled to health or religious accommodation, the defendant implemented a formal vaccine mandate.   *Id.*   The plaintiffs were employees of the defendant company and sought religious exemptions from the vaccine mandate.   *Id.*   After the defendant denied the religious exemptions, the plaintiffs filed suit alleging violations of the Free Exercise Guarantee of the First Amendment.   *Id.*   The district court dismissed the action for failure to state a claim and the plaintiffs appealed.   *Id.*

On appeal, the Sixth Circuit concluded that when Smucker's denied the religious exemption request, it did not act as a government actor.   *Ciraci*, 62 F.4th at 280.   Specifically, the court explained:   "Smucker's does not perform a traditional, exclusive public function; it has not acted jointly with the government or entwined itself with it; and the government did not compel it to deny anyone an exemption."   *Id.*   The court noted that Smucker's status as a federal contractor and compliance with federal law did not, alone, render the company a government actor.   *Id.*   In analyzing whether the provision of jellies and jams involved a traditional government function, the *Ciraci* court explained:

> To qualify "as a traditional, exclusive public function," the government "must have traditionally and exclusively performed the function." For instance, private organizations become state actors when they administer public elections. But nothing of the sort happened here. We have never relied on the government to make jelly, peanut butter, and other products in the Smucker's lineup. Making jam simply is not a government function, whether by tradition or by the most up-to-date notions of what our governments should do.

---

[18] Its status as a federal contractor dates back to World War II, when the government added Smucker's apple butter to its GI ration kits.   62 F.4th at 280.

> That Smucker's carried out the government's vaccine mandate in the course of making jam does not change anything. In the first place, the inquiry focuses on the entity's underlying service, not the government's regulatory mandate. Otherwise, the inquiry would collapse into a public function each time a regulation covered the topic. In the second place, claimants cannot satisfy even this friendly re-framing of the issue. A vaccine mandate does not count as "a public function traditionally handled just by the State." It is hardly unheard of for private companies to make vaccination a condition of employment. No matter how you test them, Smucker's products and its actions do not amount to the kinds of functions that governments alone traditionally perform.

62 F.4th 278, 282 (6th Cir. 2023) (internal citations omitted).

While Defendant appears to rely on *Ciraci* for the proposition that the only relevant inquiry as to whether Defendant performs a public function is the specific challenged action taken by Defendant (*i.e.*, implementing a vaccine mandate), the Sixth Circuit in *Ciraci* also considered the type of business the defendant company engaged in (*i.e.*, selling jelly, jam, peanut butter, etc.). *See Ciraci*, *supra*; *see also Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921, 1927-29 (2019) (explaining that the relevant function at issue is the defendant's business in public access channels on a cable system).  Accordingly, for purposes of analyzing the public function test, Defendant's operation of FFRDCs is a key aspect of the inquiry.

Plaintiffs allege:

> MITRE is a large nonprofit organization, employing thousands of individuals across the country. MITRE operates federally funded research and development centers (FFRDCs) to assist the federal government with scientific research and analysis, development and acquisition, and systems engineering and integration. It was established for the express purpose of advancing national security and to serve the public interest.
>
> Along with other FFRDCs, MITRE operates the federal government's Health FFRDC on behalf of sponsors across the Department of Health and Human Services. Through multi-disciplinary teams, this federally funded research and development center serves all federal agencies with health and human services

missions: the Centers for Medicare & Medicaid Services, Centers for Disease Control and Prevention (CDC), Food and Drug Administration, National Institutes of Health (NIH), Health Resources and Services Administration, Administration for Children and Families. As the Health FFRDC operator, MITRE maintains a close working relationship with and guides decision-making at the CDC.

MITRE operates six FFRDCs. The federal government pays MITRE billions of dollars each year to support its operation. MITRE sees itself as a leader in public health and seeks federally funded research and development opportunities. As such, it stands in a direct conflict of interest when it recommends public health programs to the federal government and then benefits from those programs. In the context of this case, that conflict of interest colored its decision-making. MITRE was more interested in gaining recognition and currying favor with the current Executive Branch of the Federal Government than it was in protecting the interests of its employees.

***

. . . MITRE was delegated a public function by the U.S. government . . .

MITRE performed a public function delegated by the federal government in implementing the vaccine mandate, because the federal government made it fulfill a role normally left to governmental public health agencies. Additionally, MITRE served a public function in that its primary business activities are supporting the federal government. MITRE was engaging in public action because its actions were entwined with governmental policies and impregnated with a governmental character, as it was essentially acting as the federal government's agent in implementing its vaccine mandate . . .

(ECF No. 1 ¶¶ 9-11, 105, 111.)

In support of their argument that Defendant's FFRDC operations render it a government actor, Plaintiffs cite the Federal Acquisition Regulations ("FAR") at § 35.017(a)(2) and two cases (*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.* and *Miller v. Institute for Defense Analyses*). (ECF No. 32 at 21-22.) Plaintiffs' application of § 35.017(a)(2) is overbroad and the cases are not persuasive in Plaintiffs' favor. FAR § 35.017(a)(2) provides:

56

An FFRDC meets some special long-term research or development need which cannot be met as effectively by existing in-house or contractor resources. FFRDC's enable agencies to use private sector resources to accomplish tasks that are integral to the mission and operation of the sponsoring agency. An FFRDC, in order to discharge its responsibilities to the sponsoring agency, has access, beyond that which is common to the normal contractual relationship, to Government and supplier data, including sensitive and proprietary data, and to employees and installations equipment and real property. The FFRDC is required to conduct its business in a manner befitting its special relationship with the Government, to operate in the public interest with objectivity and independence, to be free from organizational conflicts of interest, and to have full disclosure of its affairs to the sponsoring agency. It is not the Government's intent that an FFRDC use its privileged information or access to installations equipment and real property to compete with the private sector. However, an FFRDC may perform work for other than the sponsoring agency under the Economy Act, or other applicable legislation, when the work is not otherwise available from the private sector.

FFRDC's are operated, managed, and/or administered by either a university or consortium of universities, other not-for-profit or nonprofit organization, or an industrial firm, as an autonomous organization or as an identifiable separate operating unit of a parent organization.

FAR § 35.017(a)(2). Plaintiffs omit the remainder of the regulation, which provides that an FFRDC is operated by a nonprofit organization "as an autonomous organization or as an identifiable separate operating unit of a parent organization." FAR § 35.017(a)(3).

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.* and *Miller v. Institute for Defense Analyses* do not favor Plaintiffs. (ECF No. 32 at 21-22.) *Presidio* was before the court on a motion to disqualify a designated expert. No. 08CV335 IEG (NLS), 2008 WL 4950989, at *1, *6-7 (S.D. Cal. Nov. 18, 2008). That notwithstanding, the court provided *dicta* analysis on FFRDCs. *Id.* There, the defendant objected to plaintiff's designated expert on several grounds, including on the basis that the expert's affiliation with the Aerospace Corporation rendered the expert a "government agent," because of Aerospace Corporation's status a federal government contractor,

which (the defendant argued) resulted in an impermissible conflict of interest.  *Id.* at *1, *6.  The court explained that Aerospace Corporation operated as an FFRDC and, as such, provided "scientific and engineering support for launch, space, and related ground systems and support[ed] long-term planning and the immediate needs of our nation's military and reconnaissance space programs."  *Id.* at *6.  Based on this information specific to Aerospace and the applicable FAR, the *Presidio* court concluded that Aerospace Corporation did not "appear to be an express branch of the U.S. Government."  *Presidio*, 2008 WL 4950989, at *7.  Therefore, the court declined to exclude the designated expert as a government agent/employee.  *Id.  Presidio* does not move the needle for Plaintiffs.

In *Miller*, the FFRDC defendant sought a protective order. The plaintiff objected on the basis that, as an FFRDC, the defendant was a "quasi-governmental" actor and therefore not entitled to the protective order at issue.  No. 17-CV-02411-NYW, 2018 WL 3216547, at *2 (D. Colo. July 2, 2018).  The *Miller* court concluded that the defendant's status as an FFRDC, standing alone, did not render it a government (or quasi-government) actor.  (And, in any event, even were it a government actor by virtue of its FFRDC status, such status did not automatically render it unentitled to a protective order to shield information as confidential.)

The *Miller* court explained:

> In some instances, courts have undertaken a factual analysis to determine whether a FFRDC is standing in the shoes of a governmental agency. The fact that [defendant] IDA is a FFRDC, however, does not necessarily transform it into a federal government agency or its employees into federal employees. In unrelated contexts, courts have described IDA as "a private, nonprofit organization engaged in analyzing high level management problems, primarily for the Department of Defense," and a "non-governmental agency," This court found no case law addressing whether, for the purposes of discovery in civil litigation, FFRDCs in general, or IDA specifically, is considered a federal agency. But even if IDA was considered a federal agency or an arm of the

> Department of Defense (which are not conclusions that this court is
> willing or permitted to make on the record before it), not all
> information provided to or held by a federal agency is publicly
> available. Indeed, courts have entered blanket protective orders to
> facilitate production of documents involving federal agencies.

2018 WL 3216547, at *2 (internal citations omitted).

In sum, FAR § 35.017(a)(3) provides that an FFRDC and the government are engaged in a special relationship whereby the FFRDC helps the relevant government agency meet its mission more effectively than if the government did not have the benefit of the FFRDC, but expressly notes that the FFRDC is autonomous and remains free to engage in its FFRDC services/activities within the private sector.  By definition, therefore, an FFRDC does not perform what is traditionally an "exclusive public function" merely by virtue of its status as an FFRDC; there must be something more.  *SNL Workforce Freedom All. v. Nat'l Tech. & Eng'g Sols. of Sandia, LLC*, No. 122CV00001KWRSCY, 2022 WL 3715858, at *9 (D.N.M. Aug. 29, 2022), citing *Murphy v. Hylton*, 281 F. App'x 818, 821 (10th Cir. 2008) (declining to find federal action based solely on the existence of a contractual relationship with the federal government); *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1931-32 (2019) (holding "the fact that the government licenses, contracts with, or grants a monopoly to a private entity does not convert the private entity into a state actor – unless the private entity is performing a traditional, exclusive public function. The same principle applies if the government funds or subsidizes a private entity.").

Plaintiffs urge that Defendant has a "special relationship" with the federal government but do not set forth plausible allegations that Defendants are in fact federal actors; instead, Plaintiffs rest on allegations that Defendant assists the federal government with scientific research and analysis, development and acquisition, and systems engineering and integration.  (ECF No. 1 ¶

9.)[19]   Giving full faith to these allegations does not render Defendant a government actor through even the most permissive lens; such activities do not fall within the traditional and exclusive prerogative of the government.  *Cohen v. President and Fellows of Harvard Coll.*, 568 F. Supp. 638, 661 (D. Mass. 1983), *aff'd*, 729 F.2d 59 (1st Cir. 1984) (noting that scientific research "is by no means within the exclusive domain of the government").

To the extent Plaintiffs allege that Defendant performed a traditional function within the exclusive prerogative of the government by implementing a vaccination policy, this, too, is insufficient to satisfy the public function test.  *Johnson v. Tyson Foods, Inc.*, 607 F. Supp. 3d 790, 800 (W.D. Tenn. 2022) (explaining that "[a] private business's implementation of an employee vaccination policy is not akin to any of 'those limited activities – for example running a city — that have traditionally and exclusively been performed by the government'" (quoting *United States v. Miller*, 982 F.3d 412, 423 (6th Cir. 2020)); *see Pa. Informed Consent Advocs. Inc. v. Univ. of Pa. Health Sys.*, No. CV 21-4415, 2022 WL 2316648, at *3 (E.D. Pa. June 28, 2022) (declining to find that the defendant is a state actor where the "[c]omplaint merely states that [the defendant] became a state actor after providing, administering, and requiring federally-funded SARS-CoV-2 vaccinations") (internal quotation marks omitted)).  Lastly, Defendant's affiliation with the federal government and receipt of government funding are, together, insufficient to satisfy the public function test.  *See Cox ex rel. Dermitt v. Liberty Healthcare Corp.*, 622 F. Supp. 2d 487, 494 (E.D. Ky. 2008) (explaining that "[p]ublic funding of nearly all of the private actor's activities, as well

---

[19] Plaintiffs do not allege in the Complaint that by virtue of Defendant's special relationship with the federal government, Defendant is, or should be deemed, a state and/or federal actor.  "It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."  *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991).  Further, "allegations raised for the first time in response to a motion to dismiss are not properly considered by the court."  *Glenn v. Wells Fargo Bank, N.A.*, No. DKC-3058, 2016 WL 3570274 at *9 (D. Md. July 1, 2016).  The court is not bound to accept as true Plaintiffs' legal conclusions set forth in the Complaint.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting that "[a]lthough for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation'") (quoting *Twombly*, 550 U.S. 554, 555)).

as the private actor's use of public property, are similarly insufficient to establish the required nexus"); *Wolotsky v. Huhn*, 960 F.2d 1331, 1336 (6th Cir. 1992) (noting that "[t]he actions of a private entity do not become state action merely because the government provides substantial funding to the private party").

Even liberally construed in a light most advantageous to Plaintiffs, the Complaint fails to allege facts on which one could reasonably conclude that Defendant is a government actor under the public function test.

### ii.   Compel Private Entity

In *Mentavlos v. Anderson*, the Fourth Circuit explained:

> Of particular relevance here, the Supreme Court has held that challenged activity may be found to be state action where "the State 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" *American Mfrs.*, 526 U.S. at 52, 119 S. Ct. 977 (quoting *Blum*, 457 U.S. at 1004, 102 S. Ct. 2777); *see also Brentwood*, 531 U.S. 288, 121 S. Ct. at 930. And, "the required nexus may be present if the private entity has exercised powers that are 'traditionally the exclusive prerogative of the State.'" *Blum*, 457 U.S. at 1005, 102 S. Ct. 2777 (quoting *Jackson*, 419 U.S. at 353, 95 S. Ct. 449); *see also American Mfrs.*, 526 U.S. at 55, 119 S. Ct. 977; *Brentwood*, 531 U.S. 288, 121 S. Ct. at 930 ("We have treated a nominally private entity as a state actor . . . when it has been delegated a public function by the State." (citing *West v. Atkins*, 487 U.S. 42, 56, 108 S. Ct. 2250, 101 L.Ed.2d 40 (1988)); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 627–28, 111 S. Ct. 2077, 114 L.Ed.2d 660 (1991)); *Goldstein*, 218 F.3d at 348 (holding "that when it has been established that the State has empowered, or is permitting, a private actor to homestead on territory that has heretofore been the exclusive, traditional province of the State, there need be no specific demonstration of a nexus to the alleged constitutional violation").

249 F.3d 301, 311 (4th Cir. 2001).

In its Motion, Defendant argues that Plaintiffs fail to allege that the Executive Order compelled denial of their exemption requests or termination of their employment.  (ECF No. 27-1

at 19-21.)   In response, Plaintiffs refer the court to their Complaint: "As alleged in the complaint, [and] as the evidence will show, MITRE clearly relied on Exec. Order 14042 as the basis for its actions.  MITRE was actively attempting to further the goals of the executive branch of the U.S. government even though, at the time of Plaintiffs' terminations, it had no obligation to do so.  The effective date had not come and, by the time it had, the Supreme Court had ruled that it was an illegal executive order."  (ECF No. 32 at 23.)  Plaintiffs reason that even though MITRE issued its vaccine mandate before the Executive Order was effective (and before the Supreme Court issued its decision in *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, OSHA, 595 U.S. 109 (2022)), MITRE "did so in reliance on the Executive Order, and in an attempt to curry favor with the only source of its income."  *Id.*  In their Complaint, Plaintiffs allege: "The U.S. government has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that jointly of the U.S. government and MITRE . . . ."  (ECF No. 1 ¶¶ 105.)

Construed in the light most favorable to Plaintiffs, Plaintiffs' relevant allegations in the Complaint are conclusory – merely reciting the words of the Supreme Court (and, in turn, the Fourth Circuit) – and lack support by well-pleaded facts tending to demonstrate or suggest that Defendant's "challenged activity" was the result of government coercion or such encouragement (overt or covert) that MITRE's actions (imposition of the policy, denial of exemptions, and constructive or actual terminations of employment) were effectively government actions.  Indeed, Plaintiffs' response to the Motion lays bare that the requisite government coercive effect does not exist, is not known (by Plaintiffs) to exist, and that good faith allegations cannot pass muster: "Yes, [MITRE] issued its own mandate but it did so in reliance on the Executive Order, and in an attempt to curry favor with the only source of its income."

In summary, Plaintiffs' Complaint allegations are conclusory and, therefore, inadequate;[20] when coupled with Plaintiffs' averments in opposition to the Motion that MITRE acted of its own volition in a strategic effort to gain favor with its funding source, it is plain to the court that Plaintiffs fail to allege, and cannot allege, that Defendant is a government actor under the compulsion test. *See Mentavlos*, 249 F.3d at 319 (noting that "[w]hile substantial state assistance is generally a factor to be considered in determining whether the state has coerced or significantly encouraged private action, a private party's dependence upon the state for assistance, even if substantial, does not transform its actions into actions of the state") (internal citation omitted)); *see also Lane v. Piedmont Healthcare, Inc.*, No. 1:21-CV-2430-TWT, 2021 WL 5074494 (N.D. Ga. Oct. 13, 2021), *appeal dismissed*, No. 21-13747-BB, 2021 WL 6750794 (11th Cir. Nov. 10, 2021) (concluding that the plaintiffs failed to satisfy the state compulsion test where they did not allege that "that the state forced these specific policies upon the [d]efendant or that the state collaborated in the creation or enforcement of these policies").

### iii.   Close Nexus Between Challenged Activity and Action by Government Officials

"[S]tate action has also been found in circumstances where the private actor operates as a willful participant in joint activity with the State or its agents, or when a nominally private entity . . . is controlled by an agency of the State . . . [or] where a private entity is entwined with

---

[20] "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "A complaint that provides no more than 'labels and conclusions,' or 'formulaic recitation of the elements of a cause of action,' is insufficient." *Bourgeois v. Live Nation Ent., Inc.*, 3 F. Supp. 3d 423, 434 (D. Md. 2014) (quoting *Twombly*, 550 U.S. at 555). "The [c]ourt must be able to deduce 'more than the mere possibility of misconduct'; the facts of the complaint, accepted as true, must demonstrate that the plaintiff is entitled to relief." *Evans v. 7520 Surratts Rd. Operations, LLC*, No. PX-21-1637, 2021 U.S. Dist. LEXIS 221041, at *4 (D. Md. Nov. 16, 2021) (quoting *Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 526 (D. Md. 2015)).

governmental policies or the government is entwined in the management or control of a private

entity." *Mentavlos v. Anderson*, 249 F.3d 301, 311-12 (4th Cir. 2001) (internal citations and

quotation marks omitted)).

*Cox ex rel. Dermitt v. Liberty Healthcare Corp.* provides helpful guidance. 622 F. Supp.

2d 487, 494 (E.D. Ky. 2008). Relying on Supreme Court and Sixth Circuit precedent, *Cox* advises:

> Determinations of state action under the nexus test necessarily depend on the unique facts and circumstances presented by each individual case. "The cases establish no clear standard for identifying a 'sufficiently close nexus.'" *Lansing v. City of Memphis*, 202 F.3d 821, 830 (6th Cir. 2000); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982) (state-action determination is a "necessarily fact-bound inquiry"). However, the Supreme Court and the Sixth Circuit have provided some guidance to the inquiry. Certain factors have been deemed insufficient, in and of themselves, to establish the required nexus between the private actor's complained-of conduct and the State. Extensive state regulation of a private entity's operations does not establish state action via the nexus test. *See, e.g., Rendell–Baker v. Kohn*, 457 U.S. 830 (1982); *Adams v. Vandemark*, 855 F.2d 312 (6th Cir. 1988); *Crowder v. Conlan*, 740 F.2d 447 (6th Cir. 1984). Public funding of nearly all of the private actor's activities, as well as the private actor's use of public property, are similarly insufficient to establish the required nexus. *See, e.g., Blum v. Yaretsky*, 457 U.S. 991 (1982); *Wolotsky*, 960 F.2d at 1336; *Crowder*, 740 F.2d at 450, 453. The minority presence of public officials on the private actor's decision-making board also does not satisfy the nexus test for state action. *See, e.g., Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S. Ct. 449 (1974); *Lansing*, 202 F.3d at 831; *Crowder*, 740 F.2d at 447. Also, the utilization of public services by private actors does not by itself establish the requisite nexus for state action. *See, e.g., Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999); *Ellison v. Garbarino*, 48 F.3d 192 (6th Cir. 1995).
>
> Courts are to consider any combination of the above factors, or other unique facts, that happen to be presented by the circumstances of the case before determining whether there is a sufficient nexus between the state and the private entity to constitute state action. Importantly, it should also be remembered that for this state-action test to be satisfied, the required nexus must be found between the specific complained-of actions of the private actor and the involvement or influence of the State. *See Wolotsky*, 960 F.2d at 1335 ("[I]t must be demonstrated that the state is intimately involved in the challenged

> private conduct in order for that conduct to be attributed to the state for purposes of section 1983."); *see also Straub v. Kilgore*, 100 Fed. Appx. 379, 385 (6th Cir. 2004) ("In order to show state action, the state must be 'intimately involved' with the challenged conduct."); *Crowder*, 740 F.2d at 453 (explaining that plaintiff must demonstrate nexus between the specific challenged action and the governmental involvement alleged to provide the basis for a finding of state action).

622 F. Supp. 2d 487, 494 (E.D. Ky. 2008).

Plaintiffs base their theory of government action on alleged concerted activity between Defendant and the government. Plaintiffs allege: "MITRE was a willful participant in joint activity with the federal government, in that it deliberately aided the federal government in its efforts to influence Americans to receive COVID-19 vaccination by threatening their employment." (ECF No. 1 ¶ 110.) Defendant argues this is insufficient and that Plaintiffs fail to allege that MITRE and the government partnered to deny Plaintiffs' exemptions and terminate their employment. (ECF No. 27-1 at 21.) The court agrees.

Even taken as true, the mere fact that Defendant relied on the Executive Order and instituted the policy in order to support the executive branch is insufficient to allege government action or the requisite nexus between MITRE's challenged activity and action by government officials. *See Hardy v. Cmty. Mental Health*, No. 17-2181, 2018 WL 4846570, at *1 (6th Cir. Jul. 10, 2018) (finding that the plaintiff "did not allege that state officials had any involvement in [his employer's] decision to terminate his employment" where the plaintiff "alleged that his former employer—a non-profit corporation which received state and federal funding"); *Wilcher v. City of Akron*, 498 F.3d 516, 520 (6th Cir. 2007) (affirming district court's denial of the plaintiff's complaint under 12(b)(6) where the "[p]laintiff argued that a cable television operator should be considered a state actor because the operator and city worked "hand-in-glove" to enact new regulations" because "although some television channels were subject to both federal and state

regulation, . . . this alone did not convert [the cable operator's] private action into state action") (internal quotation marks and citation omitted); *Johnson v. Tyson Foods, Inc.*, 607 F. Supp. 3d 790, 802 (W.D. Tenn. 2022) (explaining that "[t]he mere fact that Tyson relied on OSHA and CDC guidance in formulating its vaccine policy does not make either [d]efendant an agent of the government. Nor does the fact that Tyson is subject to the federal government's COVID-19 guidance for meat and poultry plants convert Defendants into government actors") (internal quotation marks omitted)).

To the extent Plaintiffs maintain that the nexus is satisfied because of Defendant's receipt of government funding, this, too, is insufficient. *See, e.g., Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974) (finding that "a heavily regulated, privately owned utility, enjoying at least a partial monopoly in the providing of electrical service within its territory," was not a state actor); *Blum v. Yaretsky*, 457 U.S. 991, 1011 (1982) (concluding that a private nursing home was not a state actor despite extensive regulation and 90% of fees sourced from state); *and see Manhattan Community Access Corporation v. Halleck*, 139 S. Ct. 1921, 1932 (2019) (explaining that "[n]umerous private entities in America obtain government licenses, government contracts, or government-granted monopolies. If those facts sufficed to transform a private entity into a state actor, a large swath of private entities in America would suddenly be turned into state actors and be subject to a variety of constitutional constraints on their activities.")

Because Plaintiffs fail to adequately allege government action in accordance with the requisite factors, Plaintiffs fail to state a claim in Counts V, VII, IX through XI, and XIV.

For purposes of completeness, the court will address Defendant's remaining arguments as to the constitutional claims; for these purposes, where appropriate, the court undertakes its analysis as though Defendant were a government actor (which this court finds it is not).

### b.      *Due Process and Equal Protection (Counts VII, IX, X, and IV)*

Defendant argues that Plaintiffs' Due Process and Equal Protection claims fail because: 1) a vaccine requirement as a workplace condition does not implicate a fundamental right, and MITRE's policy was uniformly and generally applied to all employees; 2) a government vaccine mandate does not violate rights guaranteed by the First Amendment; 3) no other fundamental right is at issue or implicated by MITRE's vaccine policy; and 4) in the absence of a fundamental right, Plaintiffs' claims are subject to rational basis review, which they cannot survive, because "inhibiting the spread of COVID-19 is a legitimate interest" and "requiring vaccination is rationally related to that interest."  (ECF No. 27-1 at 25.)[21]

---

[21] "Under this deferential standard, the plaintiff bears the burden 'to negate every conceivable basis which might support' the legislation." *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).  In *Giarratano*, the Fourth Circuit explained:

> In *Wroblewski v. City of Washburn*, 965 F.2d 452 (7th Cir. 1992), the Seventh Circuit, realizing the dilemma created when "the rational basis standard meets the standard applied to a dismissal under FED. R. CIV. P. 12(b)(6)," *id.* at 459, noted:
>
>> The rational basis standard requires the government to win if any set of facts reasonably may be conceived to justify its classification; the Rule 12(b)(6) standard requires the plaintiff to prevail if "relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). The rational basis standard, of course, cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard. The latter standard is procedural, and simply allows the plaintiff to progress beyond the pleadings and obtain discovery, while the rational basis standard is the substantive burden that the plaintiff will ultimately have to meet to prevail on an equal protection claim.
>
> *Id.* at 459–60. The Seventh Circuit resolved the dilemma as follows:
>
>> While we therefore must take as true all of the complaint's allegations and reasonable inferences that follow, we apply the resulting 'facts' in the light of the deferential rational basis standard. To survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications.
>
> *Id.* at 460 (emphasis added). In *Wroblewski*, because the complaint's conclusory assertion that the challenged policy was "without rational basis" was "insufficient to overcome the presumption of rationality coupled with the readily apparent justification for the policy," the Seventh Circuit upheld the 12(b)(6) dismissal. *Id.*; *see also Shanks v. Forsyth County Park Authority, Inc.*, 869 F. Supp.   1231

###### i.      **Substantive Due Process (Count IX)**[22]

Plaintiffs assert that Defendant's vaccine mandate violates their substantive due process rights under the Fifth Amendment.   (ECF No. 1 ¶ 145.)   Plaintiffs allege that they have a constitutionally protected "fundamental liberty interest in refusing medical treatment and maintaining bodily integrity," that MITRE's vaccinate mandate "did not serve a compelling interest," was not "narrowly tailored," because its purposes could have been "easily achieved . . . through remote work, masking, social distancing, and regular [COVID-19] testing."   *Id.* ¶¶ 145, 148-49.

The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law . . . ."  U.S. CONST. AMEND. V, § 1.  In *Bauer v. Summey*, the District of South Carolina explained the relevant inquiry in a substantive due process claim:

> Substantive due process rights are much more limited in scope than procedural due process rights. For substantive due process to apply, governmental action must be so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protection or of adequate rectification by any post-deprivation state remedies. Depending upon whether the claimed violation is by executive act or legislative enactment, different methods of judicial analysis are appropriate. This is so because there are different criteria for determining whether executive acts and legislative enactments are fatally arbitrary, an essential element of any substantive due process claim.
>
> In executive act cases, the issue of fatal arbitrariness should be addressed as a threshold question, asking whether the challenged

---

(M.D.N.C.1994) (applying *Wroblewski* framework to dismiss equal protection challenge).

521 F.3d at 303-304.

[22] Some of the cases cited involve the substantive due process clause of the Fourteenth Amendment, which applies to the states.  *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without due process of law.").  "The same analysis that applies to a substantive due process claim under the Fourteenth Amendment applies to a substantive due process claim under the Fifth Amendment."  *Molina-Aviles v. D.C.*, 824 F. Supp. 2d 4, 9 n.8 (D.D.C. 2011) (citing *Piechowicz v. U.S.*, 885 F.2d 1207, 1214 n.9 (4th Cir. 1989)).

conduct was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. If it does not meet that conscience-shocking test, the claim fails on that account, with no need to inquire into the nature of the asserted liberty interest. If it does meet the threshold test of culpability, the inquiry must turn to the nature of the asserted interest to determine the level of protection to which it is entitled.

If the claimed violation is by legislative enactment, the court's analysis proceeds by a different two-step process that does not involve any threshold conscience-shocking inquiry. The first step in this process is to determine whether the claimed violation involves one of those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. The next step depends upon the result of the first. If the asserted interest has been determined to be "fundamental," it is entitled in the second step to the protection of strict scrutiny judicial review of the challenged legislation. (observing that fundamental liberty interest is violated by legislation that infringes it unless the legislation is narrowly tailored to serve a compelling state interest). If the interest is determined not to be fundamental, it is entitled only to the protection of rational-basis judicial review.

Critically, the fundamental interest inquiry must be conducted on the basis of a careful description of the asserted fundamental liberty interest. Such a careful description is necessary because the Nation's history, legal traditions, and practices . . . provide the crucial guideposts for responsible decisionmaking, and these guideposts would be threatened by analyzing the claimed right at too general a level.

568 F. Supp. 3d 573, 590-91 (D.S.C. 2021) (internal citations and quotation marks omitted).

With respect to their substantive due process claim, Plaintiffs are silent as to whether Defendant's vaccine mandate should be assessed as an executive action or legislative enactment. "To the extent plaintiffs complain that an executive action has violated their substantive due process rights, they must plead facts sufficient to allege that the government has deprived them of life, liberty, or property in an arbitrary manner that 'shock[s] the contemporary conscience.'" *McArthur v. Braband*, 610 F. Supp. 3d 822, 845 (E.D. Va. 2022) (quoting *Hawkins v. Freeman*,

195 F.3d 732, 738-39 (4th Cir. 1999)).  Plaintiffs make no allegation that the policy suffers from

arbitrariness, either in purpose or application, and do not allege that the policy is "so egregious, so

outrageous, that it may fairly be said to shock the contemporary conscience" – nor do they allege

facts to support such a conclusion.  *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).

Plaintiffs do, however, as set forth above, allege that MITRE's vaccine policy implicates their

"fundamental interest in refusing medical treatment and maintaining bodily integrity," does not

serve a compelling interest, and is overbroad to achieve its ends.  This rubric suggests Plaintiffs'

Count IX targets the policy as a legislative enactment.  Therefore, the court must engage in a two-

step analysis: "first determine[e] whether the enacted rule violates a fundamental right, then

engag[e] in the appropriate level of review."  *McArthur*, 610 F. Supp. 3d at 845.  If a fundamental

right is at issue, then strict scrutiny applies, which provides that "a law 'may be justified only by

compelling state interests, and must be narrowly drawn to express only those interests.'"  *Bostic v.

Schaefer*, 760 F.3d 352, 377 (4th Cir. 2013) (quoting *Carey v. Population Servs. Int'l*, 431 U.S.

678, 686 (1977)).  If there is no fundamental right at issue, then the court applies the rational basis

standard of review.  *Wilkins v. Gaddy*, 734 F.3d 344, 347 (4th Cir. 2013).

     In *Wilkins v. Gaddy*, the Fourth Circuit explained the rational basis review:

> This standard is quite deferential. It simply requires courts to
> determine whether the classification in question is, at a minimum,
> rationally related to legitimate governmental goals. *City of Cleburne
> v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985). In other
> words, the fit between the enactment and the public purposes behind
> it need not be mathematically precise. As long as Congress has a
> reasonable basis for adopting the classification, which can include
> "rational speculation unsupported by evidence or empirical data,"
> the statute will pass constitutional muster. *FCC v. Beach Commc'ns,
> Inc.*, 508 U.S. 307, 315 (1993). The rational basis standard thus
> embodies an idea critical to the continuing vitality of our
> democracy: that courts are not empowered to "sit as a
> superlegislature to judge the wisdom or desirability of legislative

> policy determinations." *City of New Orleans v. Dukes*, 427 U.S. 297,
> 303 (1976).

734 F.3d at 347-48; *see also* n.21, *supra.*

Relying on several cases, Plaintiffs argue that they have a fundamental right in refusing medical treatment and maintaining bodily integrity, and, therefore, strict scrutiny applies. *See* ECF No. 32 at 27. *See Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 278 (1990) (stating that a "competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment"); *Washington v. Harper*, 494 U.S. 210, 221–22, (1990) (recognizing that prisoners possess "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment" and noting that the "forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty" (citations omitted)); *Washington v. Glucksberg*, 521 U.S. 702, 735 (1997) (holding that a state ban on assisted suicide did "not violate the Fourteenth Amendment, either on its face or as applied to competent, terminally ill adults who wish to hasten their deaths by obtaining medication prescribed by their doctors" (citation and internal quotation marks omitted)).

In the context of vaccine mandates, courts have repeatedly rejected that the fundamental right at issue is refusing medical treatment and maintaining bodily integrity, and have found that such arguments are "misplaced." *Antunes v. Rector & Visitors of Univ. of Va.*, 627 F. Supp. 3d 553, 564 (W.D. Va. 2022); *see Mass. Corr. Officers Federated Union v. Baker*, 567 F. Supp. 3d 315, 326 n.5 (D. Mass. 2021) (explaining that the plaintiff's reliance on *Cruzan* is misplaced, since the *Cruzan* "holding . . . was limited to an individual's choice related to the refusal of lifesaving medical care and nutrition, with no impact on the health of others or the public."); *Bauer v. Summey*, 568 F. Supp. 3d 573, 592 n.5 (D.S.C. 2021) (noting that the plaintiffs' reliance on such

cases is misplaced and "the caselaw involving the refusal of medical treatment that plaintiffs rely on is inapposite to the instant action" and "courts overwhelmingly apply rational basis review to assess mandatory vaccination measures"); *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 293 (2d Cir. 2021) ( "In *Cruzan*, a case relied upon by [the] [p]laintiffs for the proposition that they have a fundamental constitutional right to refuse medical treatment, the Court expressly recognized its holding in *Jacobson* that 'an individual's liberty interest in declining an unwanted smallpox vaccine' was outweighed by 'the State's interest in preventing disease'") (citation omitted)).

In *Smith v. Biden*, the court explained:

> In *Jacobson*,[23] the seminal case regarding vaccine mandates, the Supreme Court upheld a Massachusetts statute which authorized the board of health of any town to require citizens to be vaccinated against smallpox as necessary for the public health and safety. *Jacobson*, 197 U.S. at 12. Jacobson refused to be vaccinated and was criminally charged and convicted. *Id.* at 13. On appeal, Jacobson argued that the vaccine mandate violated his constitutional rights. *Id.* at 26. The Supreme Court rejected Jacobson's arguments and held that the State had the right to impose vaccine mandates. *Id.* at 27. The Court noted "in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual with respect of his liberty may, at times, under pressure of great dangers, be subjected to such restraint to be enforced by reasonable regulations as the safety of the general public may demand." *Id.* at 29. Based upon *Jacobson*, courts across the country have held that there is no fundamental right to refuse a COVID-19 vaccination. Indeed, every court that has considered the constitutionality of a COVID-19 vaccine mandate by an employer or university has deemed *Jacobson* controlling, rejected claims of a fundamental right to refuse a vaccine, and applied a rational basis standard of review. *See, e.g., Norris v. Stanley*, 2021 WL 4738827, at *2-3 (W.D. Mich. Oct. 8, 2021); *Messina*, 2021 WL 4786114, at *8-9; *Does 1-6 v. Mills*, 2021 WL 4783626, at *12-13 (D. Me. Oct. 13, 2021); *Mass. Corr. Officers Fed. Union v. Baker*, 2021 WL 4822154, at *6-7 (D. Mass. Oct. 15, 2021); *Williams v. Brown*, 2021 WL 4894264, at *8-9 (D. Or. Oct. 19, 2021).

---

[23] *Jacobson v. Massachusetts*, 197 U.S. 11 (1905).

*Smith v. Biden*, No. 1:21-CV-19457, 2021 WL 5195688, at *6 (D.N.J. Nov. 8, 2021), *appeal dismissed as moot sub nom. Smith v. President United States*, No. 21-3091, 2023 WL 5120321 (3d Cir. Aug. 10, 2023).

> In applying the rational basis standard of review, the *Smith* court explained:

> > This Court, like every other Court that has considered the issue to date, easily concludes that such a rational relationship exists -- vaccines are a safe and effective way to prevent the spread of COVID-19. Courts have repeatedly refused to enjoin an employer's COVID-19 vaccine mandate, provided they contain legally required exemptions, finding they pass muster under the rational basis test. *See, e.g., Mass. Corr. Officers Fed. Union*, 2021 WL 4822154, at *8; Does 1-6, 2021 WL 4783626, at *18; *Harsman v. Cincinnati Child.'s Hosp. Med. Ctr.*, 2021 WL 4504245, at *6 (S.D. Ohio Sept. 30, 2021); *Norris*, 2021 WL 4738827, at *4; *Williams*, 2021 WL 4894262, at *11; *Maniscalo v. The N.Y.C. Dept. of Ed.*, 2021 WL 4344267, at *6 (E.D.N.Y. Sept. 23, 2021); *Andrew-Rodney v. Hochul*, 2021 WL 5050067, at *9 (N.D.N.Y. Nov. 1, 2021); *Johnson v. Brown*, 2021 WL 4846060, at *27 (D. Or. Oct. 18, 2021); *Kehearty v. Regents of Cal.*, 2021 WL 4714664, at *9 (C.D. Cal. Sept. 29, 2021); *see also We the Patriots*, 2021 WL 5121983 at *21.

2021 WL 5195688, at *7.

Because there is no fundamental right to refuse a vaccine, Defendant's vaccine policy is subject to rational basis review. *See Smith, supra.* As set forth earlier, "[u]nder this deferential standard, the plaintiff bears the burden 'to negate every conceivable basis which might support' the legislation." *Giarratano v. Johnson*, 521 F.3d 298, 303-304 (4th Cir. 2008) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973), and *Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992) (applying rational basis review in the context of a 12(b)(6) motion and explaining, "[w]hile we therefore must take as true all of the complaint's allegations and reasonable inferences that follow, we apply the resulting 'facts' in the light of the deferential rational basis standard. To survive a motion to dismiss for failure to state a claim, a

plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications.")).

Plaintiffs fail to undertake their burden under the rational basis review on a 12(b)(6) motion.  Further, as Defendant argues, and numerous courts have found, preventing the spread of COVID-19 is a legitimate government interest and requiring individuals to be vaccinated is rationally related to such interest.  *See Smith, supra.*  Accordingly, the Motion will be granted as to Count IX.

### ii.     <u>Procedural Due Process (Count X)</u>

Plaintiffs allege that Defendant's vaccine mandate violates the procedural due process clause of the Fifth and Fourteenth Amendments.  (ECF No. 1 ¶ 152.)

The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law . . . ."  U.S. CONST. AMEND. V, § 1.  The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. AMEND. XIV, § 1.  "A plaintiff alleging a procedural due process violation must allege facts sufficient to show that he or she was deprived of a constitutionally cognizable interest in life, liberty, or property by 'some form of state action,' and that the procedures employed by the state were constitutionally inadequate."  *McArthur v. Braband*, 610 F. Supp. 3d 822, 843 (E.D. Va. 2022) (quoting *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013)); *see Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015) ("To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law.").  "Protected liberty interests may arise from two sources — the Due Process Clause itself and the laws of the States."  *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

Plaintiffs allege that they have been deprived of two constitutionally cognizable interests: (1) a property interest in employment; and (2) a liberty interest to refuse vaccination. (ECF No. 1 ¶¶ 154, 160.) As discussed above, Plaintiffs do not have a constitutional right to refuse to comply with a vaccine mandate; therefore, Plaintiffs fail to allege a protected liberty interest to refuse vaccination. *See* Section III.B.3.b.i, *supra.* As to their asserted property interest in employment, "[t]he courts look to state law in determining whether such a property interest exists." *Demesme v. Montgomery Cnty. Gov.*, 63 F. Supp. 2d 678, 682 (D. Md. 1999) (citing *Bd. of Regents v. Roth*, 408 U.S. at 577 ("Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . .")).

Plaintiffs fail – in their Complaint or motions papers – to offer any legal authority to suggest that Maryland's common law rule of at-will employment does not apply to their employment at MITRE. *See Adler v. Am. Standard Corp.*, 291 Md. 31, 35 (1981) (explaining that "[t]he common law rule, applicable in Maryland, is that an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time"). Therefore, the Complaint fails to state any property interest in employment. *See Pittman v. Wilson Cnty.*, 839 F.2d 225, 229 (4th Cir. 1988) (holding that an at-will employee does not have a property interest in his position of employment).[24]

---

[24] Even if the Plaintiffs could state a protected property interest in employment, Plaintiffs fail to allege that or how Defendant's implementation of the vaccine policy was defective. *See Bauer v. Summey*, 568 F. Supp. 3d 573, 588 (D.S.C. 2021) (explaining that the plaintiffs failed to show that they had a property interest in their continued employment with the government entities; however, even if they did the plaintiffs failed "to explain how defendants' processes for implementing the Policies were defective"); *Ibekweh v. Ascend Learning, Inc.*, No. 22-CV-1587(EK)(SJB), 2023 WL 6292526, at *5 n.6 (E.D.N.Y. Sept. 27, 2023) (concluding that the plaintiff failed to confront the second element where the plaintiff "does not allege anywhere what process was due, or what process he did or did not receive with regard to his suspension and termination"). Lastly, Plaintiffs do not allege that "they are entitled to any greater process beyond the notice and enactment of the" vaccine policy. *See Bauer*, 568 F. Supp. 3d at 588 (noting that "[a]t least one district court reviewing a property interest claim in the context of an employer-imposed COVID-19 vaccine mandate has held that the employees received all the process to which they were entitled when

The Motion will be granted as to Count X.

### iii.     **Equal Protection (Count VII)**

Plaintiffs allege that Defendant's vaccine mandate violates the Equal Protection Clause of the Fifth and Fourteenth Amendment.  (ECF No. 1 ¶¶ 133-136.)

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. AMEND. XIV, § 1.  The Supreme Court has also "held that the Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws."  *Davis v. Passman*, 442 U.S. 228, 236 (1979).   The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

To state an Equal Protection claim, a plaintiff must first allege that "he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination."  *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001); see also  *Nassau & Suffolk Cnty. Taxi Owners Ass'n, Inc. v. New York*, 336 F. Supp. 3d 50, 77 (E.D.N.Y. 2018) (""In applying this standard, a defendant's motion to dismiss will be granted when neither the complaint nor the non-moving party's opposition negate any reasonably conceivable state of facts that could provide a rational basis for the challenged classification.").  Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny."  *Morrison*, 239 F.3d at 654.  "Whether a state law or policy satisfies this general principle, and what sort of review a court must apply, depends on the nature of the class of individuals the state or local government treats differently or the rights

---

the prospective rule—which applied to all employees, albeit with certain exemptions—was implemented and published to the plaintiffs").

at issue." *Winston v. City of Syracuse*, 887 F.3d 553, 560 (2d Cir. 2018).  "[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Id.* (quoting *Romer v. Evans*, 517 U.S. 620, 631 (1996)).

Here, Plaintiffs allege that the vaccine mandate violates their fundamental rights of personal autonomy and bodily integrity.  (ECF No. 1 ¶ 133.)  As discussed, the alleged vaccine mandate does not implicate a fundamental right; therefore, rational basis review applies, a burden Plaintiffs fail to carry even assessed at the 12(b)(6) stage.  *See* Section III.B.3.b.i., *supra.* Accordingly, the Motion will be granted as to Count VII.

### iv.   Unconstitutional Conditions Doctrine (Count XI)

Under the unconstitutional conditions doctrine, "the government may not deny a benefit to a person because he exercises a constitutional right." *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 545 (1983).  In *Antunes v. Rector & Visitors of Univ. of Va.*, the Western District of Virginia explained:

> "Where an employee has a property interest in her job, the only protection we have found the Constitution gives her is a right to adequate procedure. And an at-will employee . . . generally has no claim based on the Constitution at all." *Waters v. Churchill*, 511 U.S. 661, 679 (1994) (plurality opinion) (reasoning incorporated by *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 606 (2008)). When considering a case with facts similar to those in the case currently before the Court, the Western District of Michigan recently arrived at such a conclusion.  In *Norris v. Stanley*, plaintiffs, current and former employees of Michigan State University, alleged an unconstitutional condition claim based on the university's COVID-19 vaccination requirement. *Norris*, 2022 WL 247507. The court reasoned that "the 'benefit' at issue here is Plaintiffs' employment at MSU, to which they are not constitutionally entitled," and "[b]ecause of the lack of governmental benefit at issue in this matter, the Court finds that Plaintiffs have failed to plead sufficient facts to allege a violation of the unconstitutional conditions doctrine to survive Defendants' motion to dismiss." *Id.* at *4. The same

> reasoning applies to Plaintiff Antunes' allegation that UVA violated
> the unconstitutional conditions doctrine, and this claim thus must be
> dismissed.

627 F. Supp. 3d 553, 566 (W.D. Va. 2022); *see Ibekweh*, 2023 WL 6292526, at *4 n.5 (noting that

because the plaintiff "has not identified any right protected by substantive due process, he cannot

allege that his employment is conditioned on the 'giving up' of that right"). The same reasoning

applies in the instant case – the benefit at issue is the right to employment to which Plaintiffs are

not constitutionally entitled. *See* Section III.B.3.b.ii., *supra.* Thus, Plaintiffs cannot allege that

their employment is unconstitutionally conditioned on giving up a purported right to refuse

vaccination or compliance with MITRE's vaccine policy. *See Antunes and Ibekweh, supra.* The

Motion will be granted as to Count XI.

Accordingly, even if the court found that Plaintiffs adequately allege that Defendant carries

state actor status, Counts VII, IX, X, and IV would be granted on this alternative basis.

### v.      First Amendment Freedom of Speech (Count XIV)

In Count XIV, titled "Violation of First Amendment Freedom of Speech," Plaintiffs allege

they "expressed their opposition to MITRE's vaccine mandate and articulated the contention that

it violated their religious freedoms and/or that they were entitled to a medical exemption." (ECF

No. 1 ¶ 185.)  Plaintiffs allege further that "MITRE violated Plaintiffs' right to freedom of

expression protected by the First Amendment by terminating Plaintiffs because of their voiced

opposition to the vaccine mandate." *Id.* ¶ 186. Defendant argues that this claim fails because

Plaintiffs fail to identify any statement made opposing the policy on First Amendment grounds.

(ECF No. 27-1 at 26.)

The First Amendment "includes not only the affirmative right to speak, but also the right

to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus.*

*v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). "Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *Am. Civil Liberties Union of Md., Inc. v. Wicomico Cnty., Md.*, 999 F.2d 780, 785 (4th Cir. 1993). Further, "[a]lthough 'speech' does not have to be spoken to be protected under the first amendment . . . the Supreme Court has repeatedly rejected 'the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.'" *Dennison v. Cnty. of Frederick*, 921 F.2d 50, 53-54 (4th Cir. 1990) (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)) (holding that the plaintiff's first amendment right to freedom of speech could not have been violated when the dispute centered around a general course of conduct, and the plaintiff could not identify any particular speech, expression, or opinion).

"Public employees do not 'relinquish First Amendment rights to comment on matters of public interest by virtue of government employment.'" *Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 341 (4th Cir. 2017) (quoting *Connick*, 461 U.S. at 140, 103 S.Ct. 1684)). In analyzing whether Plaintiffs' First Amendment rights are violated:

> [C]ourts must also consider 'the government's countervailing interest in controlling the operation of its workplaces. *Hunter*, 789 F.3d at 397 (quoting *Lane*, 134 S. Ct. at 2377). Just as there is a public interest in having free and unhindered debate on matters of public importance, *Pickering*, 391 U.S. at 573, 88 S. Ct. 1731, [t]he efficient functioning of government offices is a paramount public interest, *Robinson v. Balog*, 160 F.3d 183, 189 (4th Cir. 1998). Therefore, a public employee by necessity must accept certain limitations on his or her freedom. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). In particular, under the balancing test developed by the Supreme Court in *Pickering* and *Connick*, the First Amendment does not protect public employees when their speech interests are outweighed by the government's interest in providing efficient and effective services to the public.

*Grutzmacher v. Howard County*, 851 F.3d 332, 342 (4th Cir. 2017) (internal quotation marks and citations omitted).

*Wolfe v. Logan* provides helpful guidance.  Case No. 2:22-cv-06463-JLS-PD, 2023 WL 2239062 (C.D. Ca. Jan. 25, 2023).  There, the plaintiff maintained that "getting a vaccine and disclosing vaccination status" violated her right to free speech.  *Id.* at *3.  The *Wolfe* court explained:

> The vaccination requirement regulates conduct; if an individual wants to become a poll worker, she must get vaccinated and provide proof of vaccination. Though Wolfe makes the conclusory assertion that [w]hether someone is vaccinated against COVID-19 is a form of speech, [t]he Supreme Court has consistently rejected the view that an apparently limitless variety of conduct can be labeled speech whenever the person engaging in the conduct intends thereby to express an idea. Getting, or not getting, a vaccine is not the kind of conduct where the likelihood [is] great that the message would be understood by those who view[ ] it. People get, and do not get, vaccinated for a variety of reasons, and the fact that someone is or is not vaccinated does not communicate a particular message. Where, as here, the actions [are] expressive only because Wolfe accompanied [her] conduct with speech explaining it, it is not inherently expressive conduct that warrants heightened First Amendment protection. Because getting, or refusing, a vaccine is conduct that is not sufficiently imbued with elements of communication, all that is necessary is that the vaccination requirement is rationally related to a legitimate governmental interest.
>
> . . . Having found that rational basis review applies rather than strict scrutiny, the Court finds that the vaccine requirement against COVID-19 as alleged in Wolfe's Complaint easily satisfies rational basis review. The LA County Defendants argue that preventing the spread of COVID-19 is a legitimate government interest, and that requiring public employees to be vaccinated is rationally related to that end. Stemming the spread of COVID-19 is unquestionably a compelling interest. As many courts have already found, requiring state employees to be vaccinated is rationally related to stemming the spread of COVID-19. Wolfe argues that Defendants have failed to show any relationship between the Mandate or the government interest at stake, but the burden is hers to show the policy's irrationality. Her only affirmative argument that the requirement is

> not rational is that [v]oters cannot be subject to a vaccination requirement, such that the vast majority of those who come into the polling place will be under no mandate and may or may not be vaccinated. All of these people are just as much at risk for contracting and being hospitalized or dying from COVID-19 as if there were no Mandate for poll workers in place. It is not the Court's role to second-guess the wisdom of the County's policy; implicit in Wolfe's argument is a recognition that the County has concluded that being vaccinated reduces the risk of spreading or contracting COVID-19. This connection is sufficient to support the policy on rational basis review.

*Wolfe*, 2023 WL 2239062, at *3-4 (internal citations and quotation marks omitted).

Like *Wolfe*, Plaintiffs' "actions [are] expressive only because Plaintiffs accompanied [their] conduct with speech explaining it" but "it is not inherently expressive conduct that warrants heightened First Amendment protection." *See Wolfe, supra.*[25]  Further, the vaccine mandate alleged by Plaintiffs "does not target inherently expressive conduct." *See, Wolfe supra; see also Clementine Co., LLC v. Adams*, 74 F.4th 77, 86 (2d Cir. 2023) (noting that the First Amendment was not implicated because the "program requiring checks of vaccination status . . . regulated non-expressive conduct").  Indeed, Defendant's vaccine mandate "'neither limit[ed] what' Plaintiffs 'may say nor require[d] them to say anything.'" *Clementine Co.*, 74 F.4th at 86 (quoting *Rumsfeld v. F. for Acad. & Institutional Rts., Inc. ("FAIR")*, 547 U.S. 47, 60 (2006)).  Like the court explained in *Clementine*, "[t]he First Amendment protects the right to express one's viewpoint, but 'it does not guarantee ideal conditions for doing so, since the individual's right to speech must always be balanced against the state's interest' in regulating harmful conduct." *Id.* at 87 (quoting *Church of the Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 209 (2d Cir. 2004)).

---

[25] Moreover, here, some Plaintiffs (the Complaint omits to mention who or how many) failed to articulate any reason for refusing to comply with Defendant's vaccine policy, failed to submit a request for exemption, and simply maintained a general objection to the policy for "personal reasons."  Clearly, these Plaintiffs fail to state a claim under the First Amendment's freedom of speech protection having failed to speak at all – whether through conduct or words. *See* pp. 2-3, *supra*.

Moreover, "[b]ecause every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities, a conduct-regulating statute of general application that imposes an incidental burden on the exercise of free speech rights does not implicate the First Amendment." *Id.* (citation and internal quotation marks omitted).   Accordingly, the Motion will be granted as to Count XIV.

### 4. Religious Freedom Restoration Act (Count VI)

Count VI is brought pursuant to the RFRA, 42 U.S.C. §§ 2000bb, *et seq.*  Plaintiffs allege that Defendant, acting for the federal government, "substantially burdened Plaintiffs' exercise of religion by failing to grant religious accommodations."  (ECF No. 1 ¶ 121.)  Defendant argues that the RFRA claim fails for the same reason Plaintiffs' constitutional claims fail—Plaintiffs fail to allege government action.  (ECF No. 27-1 at 7.)

42 U.S.C. § 2000bb provides in part:

> **(a) In general**
> Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).
>
> **(b) Exception**
> Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—
>> (1) is in furtherance of a compelling governmental interest; and
>> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. §§ 2000bb–1(a)-(b).  Government "includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity."  *Id.*  §§ 2000bb–2(1).

In analyzing whether the RFRA applies to suits involving only private parties, this court explained:

> While the Supreme Court and the Fourth Circuit have never addressed the issue of whether RFRA applies to suits involving only private parties, and there is a circuit split on the issue, the weight of circuit court authority tips in favor of a conclusion that it does not.
>
> The three circuit courts that have allowed a private defendant's RFRA defense in a suit by a private plaintiff are feeble support for Defendants' position. The United States Court of Appeals for the Second Circuit held that a RFRA defense could apply to a suit brought by a private plaintiff in *Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006). However, the Second Circuit has since expressed doubt about the strength of the reasoning in that case, based on the text and operation of RFRA. *See Rweyemamu v. Cote*, 520 F.3d 198, 203-04, 203 n.2 (2d Cir. 2008). In In re Young, 82 F.3d 1407, 1416-17 (8th Cir. 1996), *vacated, sub nom. Christians v. Crystal Evangelical Free Church*, 521 U.S. 1114, 117 S. Ct. 2502, 138 L.Ed.2d 1007 (1997), *reinstated, sub nom. In re Young*, 141 F.3d 854 (8th Cir. 1998), the United States Court of Appeals for the Eighth Circuit allowed a RFRA defense in a bankruptcy case. However, its reasoning in doing so was based on the fact that the bankruptcy court that heard the case was a "branch" of the government that would be implementing federal bankruptcy law— the unique bankruptcy context in that case makes it less persuasive in the present case. Finally, in *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996), the United States Court of Appeals for the District of Columbia Circuit allowed a RFRA defense in a case involving both the Equal Employment Opportunity Commission and a private plaintiff; however, it did not analyze the question, let alone state whether RFRA would apply if the private plaintiff had sued alone.
>
> On the other hand, multiple circuit courts have explicitly rejected the notion that RFRA can apply in a suit involving only private parties. The United States Court of Appeals for the Sixth Circuit held in *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010), that "the [RFRA] defense does not apply in suits between private parties." It reasoned that "[t]he text of the statute makes quite clear that Congress intended RFRA to apply only to suits in which the government is a party." *Id.* The United States Court of Appeals for the Seventh Circuit in *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 736 (7th Cir. 2015), held that, "[b]ased on RFRA's plain language, its legislative history,

and the compelling reasons offered by our sister circuits, . . . RFRA is not applicable in cases where the government is not a party." See also *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006), abrogated on other grounds by *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 132 S. Ct. 694, 181 L.Ed.2d 650 (2012) (stating that "RFRA is applicable only to suits to which the government is party" and referring to the Second Circuit's decision in Hankins as "unsound"). The United States Court of Appeals for the Ninth Circuit applied an "under color of law" requirement in *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834-43 (9th Cir. 1999), and concluded that, in the absence of a nexus between a private party and the government, RFRA did not apply to that party.

Additionally, several district courts in this circuit have held that RFRA cannot apply in suits where the government is not a party. *See Billard v. Charlotte Catholic High School*, No. 3:17-cv-00011, 2021 WL 4037431, at *15-22 (M.D.N.C. Sept. 3, 2021) (analyzing the question extensively and concluding "that RFRA does not apply to suits between purely private parties"); *Doe v. Catholic Relief Servs.*, No. 20-cv-1815-CCB, 2022 WL 3083439, at *5-6 (D. Md. Aug. 3, 2022) ("This court finds as a matter of law that RFRA restricts the government rather than private parties, and so [the defendant] may not assert RFRA as an affirmative defense against [the plaintiff's] claims."); *Goddard v. Apogee Retail LLC*, No. 19-cv-3269-DKC, 2021 WL 2589727, at *8 (D. Md. June 24, 2021) (dismissing a claim predicated on RFRA because it "places restrictions on the government, not private parties").

*Hammons v. Univ. of Maryland Med. Sys. Corp.*, 649 F. Supp. 3d 104, 125-27 (D. Md. 2023). While the Fourth Circuit has not squarely addressed this issue, the *Hammons* court concluded that if the defendant is not a state actor, then the RFRA is not applicable. *Id.* at 127. The court finds the *Hammons* analysis sound and persuasive.

As discussed, Plaintiffs fail to allege that Defendant is a state or federal actor for purposes of their constitutional claims; under the guidance of *Hammons*, therefore, the RFRA is not applicable. *See* Section III.B.3.a., *supra.* That notwithstanding, even if the Fourth Circuit or Supreme Court determines that the RFRA is applicable in this action, Plaintiffs' RFRA claim fails because Plaintiffs fail to allege a sincerely held religious belief. *See Cunningham v. City of*

*Shreveport*, 407 F. Supp. 3d 595, 608 (W.D. La. 2019) (holding that "[a] sincerely held religious belief is also a necessary element" for Religious Freedom Restoration Act claims and Free Exercise Clause Claims); *see* Section III.B.2.a., *supra.*  Accordingly, the Motion will be granted as to Count VI.

**5.**    <u>**Common Law Wrongful Discharge (Counts VIII and XII)**</u>

As an initial matter, Plaintiffs fail to identify in their Complaint (or in their opposition papers) what state law they rely on in support of these counts, and instead cite to an Eleventh Circuit case ruling on neither Virginia nor Maryland law.  (ECF No. 32 at 29.)  Defendant argues that Virginia law applies to Plaintiffs' wrongful discharge claims, but that even if the court applies Maryland law, the result is the same – the claims fail.  (ECF No. 27-1 at 27.)

*a.*    ***Choice of Law***

A federal district court considering state common law claims applies the substantive law of the forum state.  *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).  The substantive law of the forum state includes its choice-of-law rules.  *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941).  Maryland courts ordinarily apply the tort law of the place where the tort occurred under the doctrine of *lex loci delicti.  Sherrod v. Achir,* 149 Md. App. 640, 647 (2003).  "For tort claims, Maryland applies the *lex loci delicti* rule . . . [which] dictates 'that in a conflict of law situation . . . where the events giving rise to a tort action occur in more than one State, we apply the law of the State where the injury[,] the last event required to constitute the tort[,] occurred.'" *Bank of La*, 438 F. Supp. 3d at 442 (quoting *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 620 (Md. 2007)).  The place of the injury is the place where the injury was suffered, not where the wrongful act took place.  *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 511 (4th Cir. 1986).

Maryland courts have not explicitly addressed "the proper application of *lex loci delicti* in cases where the wrongful conduct in one jurisdiction causes pecuniary loss or injury to the plaintiff in another jurisdiction." *Dell v. Detar*, No. 16-00887, 2017 U.S. Dist. LEXIS 141366, at *11 (D. Md. Aug. 31, 2017); *see Hardwire LLC v. Goodyear Tire & Rubber Co.*, 360 F. Supp. 2d 728, 733 (D. Md. 2005) (noting that "Maryland courts have not addressed the issue of where the 'wrong' occurs in cases of fraud, or negligent misrepresentation, when the alleged wrongful act and the alleged loss occur in separate jurisdictions.")

This court's analysis in *Cremi v. Brown* is helpful.  955 F. Supp. 499 (D. Md. 1997).  In *Cremi*, the plaintiffs were a credit institution incorporated under the laws of Mexico, with its principal place of business in Mexico, and its wholly owned subsidiary (incorporated under the laws of the Cayman Islands and located in Mexico).  *Id.* at 501.  One of the defendants was a securities brokerage firm, incorporated under the laws of Maryland, with its principal place of business in Baltimore, Maryland.  *Id.*  The other defendant was a citizen of Texas.  *Id.*  The plaintiffs brought various claims, including common law claims of breach of fiduciary duty, negligence, negligent misrepresentation, and fraud.  *Id.* at 522.  The parties disagreed as to what state's substantive law applied to the common law claims.  *Id.*  The court examined "the use of *lex loci delecti* in other multi-state tort contexts" and relied on the Fourth Circuit's decision in *Farwell v. Un*, 902 F.2d 282 (4th Cir. 1990).  *Id.* at 523.  The *Cremi* court explained that the Fourth Circuit "has determined that it is the law of the place of injury, not that of the place of death (loss) which governs."  *Id.*  (citing *Farwell*, 902 F.2d at 286-87).  Relying on *Farwell* (and common sense), the *Cremi* court concluded that Texas law applied as the place where the alleged misrepresentations and omission by the defendants occurred.  *Id.* at 524.

Here, Plaintiffs do not challenge that the alleged wrongful conduct occurred in Virginia or that the alleged injuries/harms occurred in Plaintiffs' home states. Guided by *Cremi,* the court finds that the place of wrong is where the alleged wrongful discharge took place, which is Virginia. Regardless, the result is the same whether the court applies Maryland or Virginia law.

### b.      *Wrongful Discharge (Counts VIII and XII)*

In Count VIII, Plaintiffs bring a common law wrongful discharge claim based on violation of the public policy articulated in the Procurement Act.[26] (ECF No. 1 at 64.) Specifically, Plaintiffs allege that termination of employees pursuant to an illegal executive order, and in violation of the Procurement Act, constitutes wrongful discharge under the common law. (ECF No. 1¶ 142.)

In Count XII, Plaintiffs bring a common law wrongful discharge claim for violation of the public policy articulated in the Emergency Use Authorization ("EUA") provisions of the United States Code, 21 U.S.C. §§ 360bbb-3, *et seq*. (ECF No. 1 at 72.) Specifically, Plaintiffs allege that "[b]y imposing its Mandatory COVID-19 Vaccination Policy on Plaintiffs, MITRE is denying Plaintiffs their right to accept or refuse administration of the three currently available COVID-19 vaccines, which were subject only to emergency use approval under the EUA Statute. By denying Plaintiffs the right to accept or refuse administration of the three currently available COVID-19 vaccines, MITRE is violating the public policy articulated in the EUA Statute." (ECF No. 1 ¶ 180.)

---

[26] "The purpose of the Procurement Act is 'to provide the Federal Government with an economical and efficient system' for 'procuring and supplying property and nonpersonal services.'" *Donovan v. Vance*, 576 F. Supp. 3d 816 (E.D. Wash. 2021), *aff'd in part, appeal dismissed in part and remanded*, 70 F.4th 1167 (9th Cir. 2023) (quoting 40 U.S.C. § 101)). "Under the Act, the President 'may prescribe policies and directives . . . necessary to carry out' the provisions of the Act, so long as the policies are consistent with the Act." *Id.* (quoting 40 U.S.C. § 121(a)).

Defendant argues that Plaintiffs' wrongful discharge claims fail under Virginia law because the claims are premised on federal, not state, law; and these claims fail under both Virginia and Maryland law for failure to identify any mandate of public policy violated by their employment termination.  Further, Defendant argues, the EUA neither governs private actors nor creates a private right of action.  (ECF No. 27-1 at 26-30.)  The court agrees on all fronts.

As Plaintiffs do not contend otherwise, the court presumes that Plaintiffs were at-will employees, "meaning that [Defendant] could terminate [them] for any reason upon reasonable notice." *McFarland v. Virginia Ret. Servs. of Chesterfield, L.L.C.*, 477 F. Supp. 2d 727, 732 (E.D. Va. 2007) (citing *County of Giles v. Wines*, 262 Va. 68, 72 (2001)).  "However, Virginia recognizes an exception to the doctrine of employment at-will 'based on an employer's violation of public policy in the discharge of an employee.'" *Id.* (quoting *Rowan v. Tractor Supply Co.*, 263 Va. 209, 213 (2002).  "A lawsuit brought under this exception is known as a '*Bowman* claim.'" *Id.*

"The narrow exception recognized in *Bowman* is limited 'to discharges which violate public policy, that is, the policy underlying existing laws designed to protect the property rights, personal freedoms, health, safety, or welfare of the people in general.'" *McFarland*, 477 F. Supp. 2d at 733 (quoting *Miller v. SEVAMP, Inc.*, 234 Va. 462, 468 (1987)).  "The Supreme Court of Virginia has recognized at least three circumstances where a *Bowman* claim can be maintained: (1) where an employer violated a policy enabling the exercise of an employee's statutorily created right; (2) where the public policy violated by the employer was explicitly expressed in the statute (*e.g.*, 'It is the public policy of the Commonwealth of Virginia that . . . .'), and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy; or (3) where the discharge was based on the employee's refusal to engage in a criminal act." *Id.* at 732-33.

Importantly, "an employee plaintiff attempting to assert a wrongful discharge claim in violation of public policy must 'identify [a] Virginia statute establishing a public policy' that was violated by the employer."   *McFarland*, 477 F. Supp. 2d at 733 (quoting *Lawrence Chrysler Plymouth Corp. v. Brooks*, 251 Va. 94, 99 (1996)).   Because Plaintiffs fail to identify a Virginia statute on which it bases its wrongful discharge claims, Counts VIII and XII fail under Virginia law.   Further, as Defendant notes, "any proceedings under the Federal Food, Drug, and Cosmetic Act, of which the EUA is a part, must be brought 'by and in the name of the United States,' and not as private actions." *McArthur v. Brabrand*, 610 F. Supp. 3d 822, 847 (E.D. Va. 2022) (quoting 21 U.S.C. § 337(a)).

Under Maryland law, the outcome is the same:

> Under Maryland law, an employer may ordinarily discharge an at-will employee for any reason whatsoever. *See Adler v. Am. Standard. Corp.*, 291 Md. 31, 35, 432 A.2d 464, 467 (1981). However, Maryland recognizes the tort of abusive or wrongful discharge as a "narrow exception" to the general rule in circumstances where an at-will employee's termination contravenes a "clear mandate of public policy." *Id.* at 47, 432 A.2d at 473. An employee who asserts that he was wrongfully discharged must "specifically identify the clear mandate of Maryland public policy that was violated by his termination." *Szaller v. Am. Nat'l Red Cross, et al.*, 293 F.3d 148, 151 (4th Cir. 2002) (citing *Adler*, 291 Md. at 42–44). In order for a mandate of public policy to be well-established enough to form the basis of a wrongful discharge action, there "'must be a preexisting, unambiguous, and particularized pronouncement by constitution, enactment, or prior judicial decision, directing, prohibiting, or protecting the conduct in question so as to make the public policy on the relevant topic not a matter of conjecture or interpretation.'" *Id.* (quoting *Porterfield v. Mascari II, Inc.*, 142 Md. App. 134 (2002)). The rationale for placing these limits on what constitutes a "clear mandate of public policy" is to "'limit[ ] judicial forays into the wilderness of discerning public policy without clear direction from a legislature or regulatory source.'" *Id.* (quoting *Milton v. IIT Research*, 138 F.3d 519, 523 (4th Cir. 1998)).

241 F. Supp. 2d 566, 569 (D. Md. 2003).  Plaintiffs fail to identify any Maryland public policy they contend was offended by their termination of employment.  Accordingly, the Motion will be granted as to Counts VIII and XII.

### **CONCLUSION**

For the reasons set forth herein Defendant's Motion to Transfer (ECF No. 27) is **DENIED** and Defendant's Motion to Dismiss (ECF No. 28) is **GRANTED**.

A separate order follows.

_____/s/_____

Julie R. Rubin
United States District Judge

January 29, 2024